**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 22-5252**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

SHAWN MUSGRAVE,

Plaintiff-Appellant,

v.

MARK WARNER, Chairman, and SENATE SELECT COMMITTEE ON
INTELLIGENCE

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE IN SUPPORT OF APPELLEES**

_____

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
  *Attorneys, Appellate Staff
  Civil Division, Room 7323
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-4332*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.      Parties and Amici

The plaintiff-appellant is Shawn Musgrave.  The defendants-appellees are Senator Mark Warner and the Senate Select Committee on Intelligence. There were no *amici* in district court.

### B.      Rulings Under Review

The ruling under review is an order issued by the district court (Howell, C.J.) on September 15, 2022.  The opinion accompanying that order is available on Westlaw at 2022 WL 4245489.

### C.      Related Cases

This case was not previously before this Court or any other court. Counsel for the United States is not aware of any related cases within the meaning of this Court's Rule 28(a)(1)(C), but some similar issues are presented in *Leopold v. Manger*, No. 22-5304 (D.C. Cir.), and *Schilling v. U.S. House of Representatives*, No. 22-5290.

/s/ *Thomas Pulham*
Thomas Pulham

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND STATEMENT OF INTEREST ............................. 1

STATEMENT OF THE CASE ........................................................ 3

    A.    Factual Background ........................................................3

    B.    Prior Proceedings ..........................................................6

ARGUMENT ............................................................................. 8

THE DISTRICT COURT CORRECTLY DISMISSED MUSGRAVE'S SUIT .................. 8

    A.    Sovereign Immunity Bars Claims Based on Common Law Absent a Statutory Waiver ...............................................8

    B.    Common Law Provides No Right of Access to the Report..........13

        1.    Classified Documents Are Not "Public Records"...............15

        2.    The Balance of Interests Weighs Against Disclosure of the Full Report ..................................................23

    C.    Common Law Could Not Provide Musgrave a Right to Compel the Creation of a Declassified Version of the Report....................................................................27

CONCLUSION.............................................................................30

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*American Civil Liberties Union v. CIA*,
   823 F.3d 655 (D.C. Cir. 2016) ..................................... 3, 4, 5, 6, 26, 28

*Application of Newsday, Inc., In re*,
   895 F.2d 74 (2d Cir. 1990) ........................................... 29

*Bismullah v. Gates*,
   501 F.3d 178 (D.C. Cir. 2007) ........................................ 21

*Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*,
   461 U.S. 273 (1983) .................................................. 8

*Center for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) ........................................ 21

*CIA v. Sims*,
   471 U.S. 159 (1985) ............................................... 18, 20

*Clark v. Library of Cong.*,
   750 F.2d 89 (D.C. Cir. 1984) ......................................... 9, 13

*Department of the Navy v. Egan*,
   484 U.S. 518 (1988) ........................................ 17, 18, 19, 28, 29

*Dhiab v. Trump*,
   852 F.3d 1087 (D.C. Cir. 2017) ....................................... 24

*Douglas Oil Co. v. Petrol Stops Nw.*,
   441 U.S. 211 (1979) ................................................. 15

*Dugan v. Rank*,
   372 U.S. 609 (1963) ............................................... 1, 7, 9

*El-Masri v. United States*,
   479 F.3d 296 (4th Cir. 2007) ......................................... 19

*Energy & Env't Legal Inst. v. Epel*,
   793 F.3d 1169 (10th Cir. 2015) ....................................... 25

*Federal Deposit Ins. Corp. v. Meyer*,
   510 U.S. 471 (1994) .................................................. 8

ii

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990) ......................................................... 21

*Florida Dep't of State v. Treasure Salvors, Inc.,*
    458 U.S. 670 (1982) ....................................................................... 10

*General Dynamics Corp. v. United States,*
    563 U.S. 478 (2011) ....................................................................... 16

*Goland v. CIA,*
    607 F.2d 339 (D.C. Cir. 1978) .................................................. 11, 25

*Judicial Watch v. U.S. Dep't of Defense,*
    715 F.3d 937 (D.C. Cir. 2013) ........................................................ 22

*Judicial Watch, Inc. v. U.S. Secret Serv.,*
    726 F.3d 208 (D.C. Cir. 2013) ........................................................ 25

*Krikorian v. Department of State,*
    984 F.2d 461 (D.C. Cir. 1993) ........................................................ 19

*Larson v. Department of State,*
    565 F.3d 857 (D.C. Cir. 2009) ........................................................ 30

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949) ................................................ 1, 9, 10, 11, 12, 14

*Lewis v. Clarke,*
    581 U.S. 155 (2017) ......................................................................... 8

*Machado Amadis v. U.S. Dep't of State,*
    971 F.3d 364 (D.C. Cir. 2020) ........................................................ 27

*Martin v. Mott,*
    25 U.S. 19 (1827) ........................................................................ 16,

*McBurney v. Young,*
    569 U.S. 221 (2013) ....................................................................... 14

*McGehee v. Casey,*
    718 F.2d 1137 (D.C. Cir. 1983) ...................................................... 21

*McLean v. United States,*
  566 F.3d 391 (4th Cir. 2009), *abrogated on other grounds by*
  *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020) ........................................... 8

*Motions of Dow Jones & Co., In re,*
  142 F.3d 496 (D.C. Cir. 1998) ........................................................................ 15

*Pollack v. Hogan,*
  703 F.3d 117 (D.C. Cir. 2012) .................................................................... 9, 13

*Rockefeller v. Bingaman,*
  234 F. App'x 852 (10th Cir. 2007) ................................................................. 9

*Rodriguez v. Federal Deposit Ins. Corp.,*
  140 S. Ct. 713 (2020) ............................................................................... 22, 25

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ...................................................................... 13

*Times Mirror Co. v. United States,*
  873 F.2d 1210 (9th Cir. 1989) .......................................................................15

*United States v. Curtiss-Wright Exp. Corp.,*
  299 U.S. 304 (1936) ........................................................................................ 16

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
  17 F.3d 1446 (D.C. Cir. 1994) ............................................................. 2, 15, 20

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
  89 F.3d 897 (D.C. Cir. 1996) ......................................................... 7, 12, 14, 15

*Wolf v. CIA,*
  473 F.3d 370 (D.C. Cir. 2007) .................................................................. 21, 28

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ........................................................................................ 26

## U.S. Constitution:

Art. I, § 5, cl. 3 ............................................................................................. 11

Art. I, § 6, cl. 1 ................................................................ 6

**Statutes:**

Freedom of information Act:
   5 U.S.C. § 552(a)(3)(A) ................................................ 28
   5 U.S.C. § 552(b) ........................................................ 28
   5 U.S.C. § 552(b)(1) ........................................... 17, 21, 28

18 U.S.C. § 793 ............................................................ 17

18 U.S.C. § 798 ............................................................ 17

50 U.S.C. § 783(a) ........................................................ 17

50 U.S.C. § 3024(i)(1) .................................................... 16

50 U.S.C. § 3121 .......................................................... 17

50 U.S.C. § 3507 .......................................................... 17

50 U.S.C. § 3605 .......................................................... 17

**Executive Orders:**

Exec. Order No. 12968, 60 Fed. Reg. 40,245 (Aug. 2, 1995)
   § 3.1(b) .................................................................. 19

Exec. Order No. 13526, 75 Fed. Reg. 707 (Jan. 5, 2010):
   § 1.1(a)(4) ........................................................... 17, 23
   § 1.2(a)(1) ............................................................... 24
   § 1.2(a)(2) ............................................................... 24
   § 3.5 ...................................................................... 22
   § 4.1(a) ................................................................ 1, 18
   § 6.1(dd) ................................................................. 18

**Legislative Material:**

S. Rep. No. 113-288 (2014) ................................................................. 1, 3, 5

**Other Authority:**

Nat'l Archives, *Mandatory Declassification Review (MDR)*,
    https://perma.cc/YBH6-SC22 ......................................................... 23

# GLOSSARY

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| CIA | Central Intelligence Agency |
| FOIA | Freedom of Information Act |
| JA | Joint Appendix |
| Report | Senate Report No. 113-288, *Report of the Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program* |

**INTRODUCTION AND STATEMENT OF INTEREST**

As part of its oversight of the U.S. Intelligence Community, the Senate Select Committee on Intelligence (Committee) undertook a review of the Central Intelligence Agency's (CIA) former detention and interrogation program.  This review culminated in the creation of a voluminous classified report.  S. Rep. No. 113-288 (2014) (Report).  Plaintiff Shawn Musgrave, who does not allege that he has either an appropriate security clearance or a legitimate "need to know" the classified information in the Report, *see* Exec. Order No. 13526, § 4.1(a), 75 Fed. Reg. 707, 720 (Jan. 5, 2010), nevertheless claims that the common law provides him with a right to access it.  Musgrave has sued the Chairman of the Committee (and the Committee itself) to compel disclosure of the Report.

Musgrave's claim fails for three independent reasons.  First, sovereign immunity bars suits against federal officers based on alleged violations of a common-law duty.  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 692 (1949).  As the Supreme Court has repeatedly explained, officer suits are permitted only when the plaintiff claims that the officer has acted beyond statutory authority or has violated the Constitution.  *See id.* at 689-90; *Dugan*

*v. Rank*, 372 U.S. 609, 621-22 (1963)).  Musgrave makes no such claims in this case.

Second, the common-law right of access that Musgrave invokes applies only to "public records."  *Washington Legal Found. v. U.S. Sentencing Comm'n* (*Washington Legal Found. I*), 17 F.3d 1446, 1451 (D.C. Cir. 1994).  The Report, which is a classified review of a highly sensitive former U.S. intelligence program, is in no sense a "public" record.  There is a well-established tradition, recognized by all three branches of government, of keeping classified information secret to protect national security.  The protection of such information, and the authority to decide who may have access to it, is constitutionally vested in the Executive Branch.  Federal courts are poorly positioned to second-guess the Executive's predictive judgments about the harms to national security that could follow from the Report's compelled disclosure.

Third, and finally, even if the common-law right of access did apply here, the balance of interests could not weigh in favor of compelled disclosure.  Whatever public interest might exist in the contents of a classified and highly sensitive document could not outweigh the damage to the national security that could reasonably be expected to result from its

2

unauthorized disclosure.  Nor, moreover, could a court exercising common lawmaking authority properly override the Committee's "clearly expressed intent to control" the circumstances of the Report's disposition and public release.  *American Civil Liberties Union v. CIA* (*ACLU*), 823 F.3d 655, 666 (D.C. Cir. 2016).

The United States submits this brief as *amicus curiae* to advance its interests in preserving the proper scope of sovereign immunity and controlling access to classified information.  The United States takes no position in this case on the application of the Speech or Debate Clause to Musgrave's claim.

## STATEMENT OF THE CASE

### A.    Factual Background

The Committee initiated its review of the CIA's former detention and interrogation program in March 2009.  *See* S. Rep. No 113-288, at 457.  To facilitate that review, the "Committee and officials at the CIA negotiated arrangements to deal with access to classified materials by Senators and their staff, and agreed on rules regarding the Committee's control over its work product."  *ACLU*, 823 F.3d 655, 658 (D.C. Cir. 2016).  These negotiations reflected an inter-branch accommodation that respected both

3

the President's constitutional authority to protect classified information and
Congress's constitutional authority to conduct oversight of the Executive
Branch.  The resulting "arrangements and rules were memorialized in a
June 2, 2009, letter" sent by the Chairman and Vice Chairman of the
Committee to the Director of the CIA that set forth the "procedures and
understandings" that would govern the Committee's review.  *Id.*; *see* Add. 1.

     One key feature of this inter-branch accommodation, included "at the
insistence of the Senate Committee," was the articulation of "clear terms
regarding control of the Senate Committee's work product."  *ACLU*, 823
F.3d at 659.  The letter provided that "any . . . notes, documents, draft and
final recommendations, reports, or other materials generated by Committee
staff or Members, are the property of the Committee."  Add. 2.  It then
stated that "disposition and control over these records, even after the
completion of the Committee's review, lies exclusively with the Committee."
*Id.*  At the same time, however, the Committee acknowledged that "[a]ny . . .
reports" arising out of the review "will carry the highest classification of any
of the underlying source materials," and that if the Committee wants to
produce an unclassified report—i.e., one suitable for public release—it "will

4

submit that document to CIA . . . for classification review and, if necessary, redaction."  Add. 4.

In December 2014, the Committee filed the final version of its Report with the Senate and distributed it to various Executive Branch agencies for their internal use.  The Committee publicly released a "minimally redacted," declassified version of the Report's Executive Summary (including the Report's findings and conclusions), along with minority views and the additional views of various Committee members.  *ACLU*, 823 F.3d at 660; S. Rep. No. 113-288, at i.  But the Committee never acted to seek declassification or public release of the full Report.  *See* S. Rep. No. 113-288, at vi, viii (explaining that such decisions "will be made later").

When a private party sued various agencies to compel the Report's disclosure under the Freedom of Information Act (FOIA), this Court held that the Report was a "congressional document" and not an agency record subject to compelled disclosure under that statute.  *ACLU*, 823 F.3d at 667.  Pointing to the June 2009 letter, the Court explained that the "Committee could hardly have been more clear or precise in claiming control over all of the work produced during its investigation."  *Id.* at 666.  "The Letter's command is unequivocal, and it contains no temporal limitations."  *Id.* at 665.

5

The Court further explained that the Committee did not subsequently relinquish control of the Report when it distributed copies to Executive Branch agencies for their internal use.  On the contrary, the Committee made it clear that it "alone" would decide "if and when to publicly disseminate the Full Report." *Id.* at 667.

### B.     Prior Proceedings

Musgrave submitted a request to the Committee for a copy of the "full" classified Report on June 4, 2021.  JA18.  The Committee denied his request. JA18.  Musgrave then sued the Committee's Chairman, Senator Mark Warner, and the Committee itself, claiming that he "has a legal right under the common law right of access to public records to obtain" the Report. JA18.

The district court dismissed Musgrave's suit for lack of jurisdiction. The court's judgment rested on two independent grounds.  First, the court held that Musgrave's suit was barred by the Speech or Debate Clause, U.S. Const., art. I, § 6, cl. 1, because the Report was an "integral part" of a legitimate investigation within the Senate's jurisdiction.  JA174-76.

Second, the district court held that Musgrave's suit was barred by sovereign immunity.  The court explained that the defendants would be

immune from suit unless Musgrave's claims fell within the "*Larson-Dugan* exception," which provides "an exception to sovereign immunity in actions seeking specific relief for '(1) action by [government] officers beyond their statutory powers [or] (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void.'" JA178 (alterations in original) (quoting *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963)). Although Musgrave had not alleged that either circumstance applied, the district court read this Court's opinion in *Washington Legal Foundation v. U.S. Sentencing Commission* (*Washington Legal Found. II*), 89 F.3d 897 (D.C. Cir. 1996), as "expand[ing]" the *Larson-Dugan* exception to any case in which "the Government has a duty to the plaintiff . . . to allow it access to certain government records," even if "the relevant 'duty' . . . stemmed from the common[ ]law." JA180-81 & n.8. Thus, in the district court's view, "the application of sovereign immunity merge[d] with" the merits of Musgrave's request. JA181.

On the merits, the district court held that the common law did not provide Musgrave with a right of access to the Report because the Report was not a "public record," and the balance of interests weighed against

disclosure.  JA186.  The court noted that the government has a compelling

interest in protecting national security and that the Report contains

"classified information about the CIA's detention and interrogation policies

and procedures that would compromise national security if released, far

outweighing the public's interest in disclosure."  JA186.

**ARGUMENT**

### THE DISTRICT COURT CORRECTLY DISMISSED MUSGRAVE'S SUIT

### A.    Sovereign Immunity Bars Claims Based on Common Law Absent a Statutory Waiver

"The basic rule of federal sovereign immunity is that the United States

cannot be sued at all without the consent of Congress."  *Block v. North*

*Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983); *see also*

*Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 475 (1994) ("Sovereign

immunity is jurisdictional in nature.").  That immunity covers not only suits

against government entities themselves but also "lawsuits brought against

employees in their official capacity," which are simply "another way of

pleading an action against an entity of which an officer is an agent."  *Lewis v.*

*Clarke*, 581 U.S. 155, 162 (2017) (quotation marks omitted).  Thus, both

Senator Warner and the Committee and are generally immune from suit

absent a waiver.  *See McLean v. United States,* 566 F.3d 391, 401 (4th Cir.

8

2009), *abrogated on other grounds by Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020) (sovereign immunity bars suit against Congress); *Clark v. Library of Cong.*, 750 F.2d 89, 102-03 (D.C. Cir. 1984) (same for suit against Librarian of Congress); *see also Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) (same for suit against houses of Congress and individual legislators).

There are, however, two categories of "suits for specific relief against officers of the sovereign which are not suits against the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). The first is "where the officer's powers are limited by statute" and the officer takes "actions beyond those limitations." *Id.* The second is where "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Id.* at 690. In both circumstances, the unauthorized actions are considered "beyond the officer's powers" and therefore "not the conduct of the sovereign," such that they "may be made the object of specific relief" without implicating sovereign immunity. *Id.* at 689-90. Together, these categories of permitted suits are sometimes referred to as the "*Larson-Dugan* exception" to sovereign immunity, *see, e.g.*, *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (per curiam), after the Supreme

Court opinions that linked them together.  *Larson*, 337 U.S. at 689-90;

*Dugan v. Rank*, 372 U.S. 609, 621-22 (1963) (explaining that "the recognized

exceptions" to the "general rule" of sovereign immunity "are (1) action by

officers beyond their statutory powers and (2) even though within the scope

of their authority, the powers themselves or the manner in which they are

exercised are constitutionally void").

The Supreme Court has made clear that these "two types" of suits are

"the only ones in which a restraint may be obtained against the conduct of

Government officials." *Larson*, 337 U.S. at 690.  In *Larson* itself, the Court

expressly rejected the argument that "there exists a third category of cases

in which the action of a Government official may be restrained or directed,"

based on claims that the official's conduct is "'illegal' as a matter of general

law," such as the common law of torts.  *Id.* at 692.  Thus, the rule articulated

in that case is that "the action of an officer of the sovereign . . . can be

regarded as so 'illegal' as to permit a suit for specific relief against the officer

as an individual only if it is not within the officer's statutory powers or, if

within those powers, only if the powers, or their exercise in the particular

case, are constitutionally void."  *Id.* at 701-02; *see also Florida Dep't of State

v. Treasure Salvors, Inc.*, 458 U.S. 670, 688-89 (1982) ("Since in *Larson* it was

10

not alleged that the Government official had exceeded his statutory

authority . . . or that the exercise of such authority was unconstitutional, the

Court held that the action was barred by sovereign immunity." (footnote

omitted))

Musgrave's claim does not fall within this exception to sovereign

immunity. He does not identify any statute that limits the authority of

Senator Warner (or the Committee, for that matter) to shield sensitive

Senate records from public view, nor does he contend that Senator Warner's

(or the Committee's) conduct has in any way violated the Constitution. He

urges only that this conduct violated the general common law. But *Larson*

held that an officer's actions are imputed to the sovereign as long as they "do

not conflict with the terms of his valid statutory authority," regardless of

"whether or not they are tortious under general law." 337 U.S. at 695.

"Congress has undoubted authority to keep its records secret, authority

rooted in the Constitution, longstanding practice, and current congressional

rules." *Goland v. CIA*, 607 F.2d 339, 346 (D.C. Cir. 1978) (footnotes omitted)

(citing the Journal Clause, U.S. Const. art. I, § 5, cl. 3); *see also* Appellees'

Br. 38-40 (discussing Senate and Committee rules). In exercising those

powers to deny Musgrave's request, Senator Warner's "action is the

11

sovereign's and a suit to enjoin it may not be brought unless the sovereign has consented." *Larson*, 337 U.S. at 693.

Contrary to the district court's belief, JA180-81 & n.8, this Court's decision in *Washington Legal Foundation II* does not hold otherwise. The Court in that case stated that "[w]hether the *Larson-Dugan* exception applie[d]" to a claim of access to records of the U.S. Sentencing Commission turned on "whether the Government has a duty to the plaintiff, *viz.* to allow it access" those records. *Washington Legal Found. II*, 89 F.3d 897, 901 (D.C. Cir. 1996). But it also acknowledged that "the only basis upon which [the Government] resist[ed] application" of the exception was that the common law did not impose such a duty. *Id.* at 901-02.[1] The Court was therefore not directly confronted with the antecedent question whether a duty based on judicially fashioned common law could be equivalent to a duty imposed by statute, and the Court did not address the part of *Larson* that answers that question.

The opinion in *Washington Legal Foundation II* should not be interpreted to resolve a question it did not consider, much less in a way that

---

[1] The Court agreed on the ground that the documents sought were not public records. *Washington Legal Found. II*, 89 F.3d at 907.

would make it inconsistent with well-established Supreme Court precedent. *See* JA181 n.8 (district court's observation that its reading "significantly broadens this exception to sovereign immunity beyond the parameters articulated by the Supreme Court"). Indeed, in cases both before and after *Washington Legal Foundation II*, this Court has described the *Larson-Dugan* exception as applying only to suits against federal officers "allegedly acting beyond statutory authority or unconstitutionally," with no reference to the common law. *Pollack*, 703 F.3d at 120 (quotation marks omitted); *see also, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) ("The 'Larson-Dugan* exception' . . . holds that sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority . . . ."); *Clark*, 750 F.2d at 102 ("The Supreme Court, in *Larson* . . . , stated that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.").

## B. Common Law Provides No Right of Access to the Report

If, however, the *Larson-Dugan* exception could be triggered by allegations that an official acted in violation of a common-law duty, then "the question of jurisdiction merges with the question on the merits."

13

*Washington Legal Found. II*, 89 F.3d at 902; *cf. Larson*, 337 U.S. at 690 (explaining that, in cases involving an "officer's lack of delegated power," the court's jurisdiction may turn on its decision on the merits). Even assuming that the common-law right of access extended to congressional documents, *but see McBurney v. Young*, 569 U.S. 221, 232-34 (2013) (explaining that, with respect to "non-judicial records," there was "no general common law right in all persons" to access or inspect government documents (quotation marks omitted)); Appellees Br. 35-41 (noting that this Court has never applied the common-law right of access to a house of Congress and arguing that it should not do so), Musgrave would lose on the merits.

"[T]he decision whether a document must be disclosed pursuant to the common law right of access involves a two-step inquiry." *Washington Legal Found. II*, 89 F.3d at 902. At the first step, the court "must decide whether the document sought is a public record." *Id.* (quotation marks omitted). At the second, the court must "balance the government's interest in keeping the document secret against the public's interest in disclosure." *Id.* Musgrave fails at both steps.

14

### 1.     Classified Documents Are Not "Public Records"

"[T]he common law right extends only to 'public records,' not to every document contained in government files." *Washington Legal Found. I*, 17 F.3d at 1451.  Because classified documents are, by their very nature, not public, the common-law right does not apply and the inquiry is over.

### a.     There Is No Tradition of Access to Classified Information

As with the scope of the common-law right generally, where it is recognized, the public records inquiry is guided by tradition.  *See, e.g.*, *Washington Legal Found. II*, 89 F.3d at 903-06.  Thus, there is "no right of access to 'documents which have traditionally been kept secret for important policy reasons.'"  *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 504 (D.C. Cir. 1998) (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)).  For example, "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979).  That is why the "common law tradition of public access to criminal trials" has "never extended to preindictment, pretrial proceedings involving a grand jury." *Dow Jones*, 142 F.3d at 504; *see also Douglas Oil*, 441 U.S. at 218 n.9 (explaining that the

15

records of grand jury proceedings have traditionally "been kept from the public eye").

There is a similar tradition of secrecy for information that could harm the national security if publicly disclosed.  The Supreme Court has long recognized that the need to "protec[t] our national security" amply justifies the Executive Branch's efforts to "kee[p] information about our military, intelligence, and diplomatic efforts secret."  *General Dynamics Corp. v. United States*, 563 U.S. 478, 484 (2011); *see, e.g.*, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) ("[The President] has his confidential sources of information. . . . Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results.").  Indeed, nearly 200 years ago, the Court explained that "the public interest, and even safety" demand that "important secrets of state" be "kept in concealment."  *Martin v. Mott*, 25 U.S. 19, 31 (1827).

Congress, too, has recognized the importance of keeping national security information secret.  For example, the Director of National Intelligence is required to protect "intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  "In the interests of the

16

security of the foreign intelligence activities of the United States," the CIA is expressly exempt from the provisions of any laws that might require disclosure of the "organization or functions of the Agency," or information about "personnel employed by the Agency." *Id.* § 3507; *see also id.* § 3605 (similar exemptions for the National Security Agency).  A number of criminal statutes prohibit various activities relating to the unauthorized use or disclosure of national security information.  *See, e.g.*, 18 U.S.C. §§ 793, 798; 50 U.S.C. §§ 783(a), 3121.  And when it created FOIA, Congress expressly authorized agencies to withhold classified information.  5 U.S.C. § 552(b)(1).

The Executive Branch has undertaken systematic efforts to "protect national security information by means of a classification system," *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988), requiring documents to be labelled and carefully restricted according to their sensitivity.  Under the governing Executive Order, a minimum requirement for classification (at any level) is a determination that "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."  Exec. Order No. 13526, § 1.1(a)(4), 75 Fed. Reg. at 707.  Because this potential consequence is so severe, access to classified information is limited to individuals who have (1) received a

17

favorable determination of eligibility for access; (2) signed an approved

nondisclosure agreement; and (3) a need to know the information in order to

perform or assist in a lawful and authorized governmental function.  *Id.*

§§ 4.1(a), 6.1(dd), 75 Fed. Reg. at 720, 729.  Information restricted in this

manner cannot be considered "public" in any meaningful sense of the word.

> **b.    Decisions Regarding Access to Classified Information Are Committed to the Executive Branch**

The Supreme Court has made clear that the "authority to classify and

control access to information bearing on national security and to determine

whether an individual is sufficiently trustworthy" to have "access to such

information" is constitutionally vested in the President and delegated to

Executive Branch officials under his supervision and control.  *Egan*, 484 U.S.

at 527.  "For 'reasons . . . too obvious to call for enlarged discussion,' the

protection of classified information must be committed to the broad

discretion of the agency responsible, and this must include broad discretion

to determine who may have access to it."  *Id.* at 529 (omission in original)

(quoting *CIA v. Sims*, 471 U.S. 159, 170 (1985)).  Thus, the decision to provide

a particular person with access to classified information is "a sensitive and

inherently discretionary judgment call" that is "committed by law to the appropriate agency of the Executive Branch." *Id.* at 527.

It follows from this that "no one has a 'right'" to access classified information. *Egan*, 484 U.S. at 528. Rather, eligibility to access classified information requires "an affirmative act of discretion on the part of the granting official" based on a "[p]redictive judgment" whether the grantee might "compromise sensitive information." *Id.* at 528-29. Doubts are necessarily resolved against the individual seeking access to our nation's secrets. Exec. Order No. 12968, § 3.1(b), 60 Fed. Reg. 40,245, 40,250 (Aug. 2, 1995). And the general standard therefore is that access to classified information is permitted only when "clearly consistent with the interests of the national security." *Id.*

Courts are not well-positioned to make these determinations. They lack the "unique insights" possessed by "the Executive departments responsible for national defense" into "what adverse [e]ffects . . . might occur as a result of public disclosures of a particular classified record." *Krikorian v. Department of State*, 984 F.2d 461, 464 (D.C. Cir. 1993); *see also El-Masri v. United States*, 479 F.3d 296, 305 (4th Cir. 2007) ("[T]he Executive and the intelligence agencies under his control occupy a position superior to that of

19

the courts in evaluating the consequences of a release of sensitive information.").  "What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *Sims*, 471 U.S. at 178. Thus, "it is the responsibility of the [Executive] not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk" of harm to national security.  *Id.* at 180.

Recognition of a common-law right of access to classified documents would require courts to override Executive Branch determinations in this area.  At a basic level, any ruling in the plaintiff's favor would result in disclosure to an individual who meets none of the requirements the Executive Branch has established for access to classified information. Further, analysis of the plaintiff's claim would require a court to "balance the government's interest in keeping the document secret against the public's interest in disclosure." *Washington Legal Found. I*, 17 F.3d at 1451-52.  But the Executive Branch already determined that disclosure could result in harm to the national security when it classified the information in the first instance.  "It is not within the role of the courts to second-guess executive

20

judgments made in furtherance of that branch's proper role." *Bismullah v. Gates*, 501 F.3d 178, 187-88 (D.C. Cir. 2007); *see also Center for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) ("The court should not second-guess the executive's judgment in this area."); *McGehee v. Casey*, 718 F.2d 1137, 1149 (D.C. Cir. 1983) (explaining that courts, "by reasonable necessity, cannot second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise").

Indeed, in FOIA litigation, courts "consistently defe[r] to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Center for Nat'l Sec. Studies*, 331 F.3d at 927. They do not conduct their own balancing of interests to determine whether classified information should be publicly disclosed, but rather limit their inquiry to whether the information is "in fact properly classified," 5 U.S.C. § 552(b)(1); *see Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (faulting a district court for "perform[ing] its own calculus as to whether or not harm to the national security . . . would result from disclosure"). And on this inquiry, the court asks only if the agency's rationale for classification "appears logical or plausible." *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007) (quotation marks omitted).

21

Moreover, because FOIA pre-empts any common-law right of access with respect to documents held by Executive Branch agencies, courts would be engaging in a balancing of interests only when documents are sought from another Branch.  In such cases, as here, the agency constitutionally charged with protecting the classified information at issue might not even be a party to the litigation.  The court could thus be called upon to second-guess the agency's classification decisions without knowing anything about the reasons supporting them.

Finally, there is no basis for federal courts to engage in common lawmaking in this area.  "Judicial lawmaking in the form of federal common law plays a necessarily modest role" in our constitutional system.  *Rodriguez v. Federal Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020).  The political branches have created pathways for members of the public to get access to classified information where disclosure no longer presents a risk to national security.  Through FOIA, Congress has authorized courts to compel disclosure of classified information if the agency withholding the information cannot demonstrate that it meets "both substantive and procedural criteria for classification."  *Judicial Watch v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam).  And the President has ordered agencies to

22

conduct a declassification review upon request by a member of the public.
Exec. Order No. 13526, § 3.5, 75 Fed. Reg. at 717-18.  Information that no
longer meets the standards for classification will be disclosed unless
withholding is justified on other grounds.  *See* Nat'l Archives, *Mandatory
Declassification Review (MDR)*, https://perma.cc/YBH6-SC22.

For all of these reasons, this Court should hold that there is no
common-law right of access to classified documents because such documents
are, categorically, not public records.

### 2.    The Balance of Interests Weighs Against Disclosure of the Full Report

Even if the Report were somehow considered to be a "public record,"
the balance of interests cannot favor a right of access, especially for any
member of the general public.  This is so for two reasons.

First, the risk of harm to the national security associated with the
disclosure of classified information compels a *per se* rule that the balance of
interests can never favor public access while the materials sought remain
classified.  As noted previously, classified information is, by definition,
information for which "unauthorized disclosure . . . reasonably could be
expected to result in damage to the national security."  Exec. Order No.
13526, § 1.1(a)(4), 75 Fed. Reg. at 707.  The consequences for disclosure of

information classified at the "Secret" and "Top Secret" levels are especially severe: "serious damage" and "exceptionally grave damage" to the national security, respectively. *Id.* § 1.2(a)(1)-(2), 75 Fed. Reg. at 707-08. The interest of a member of the public in learning the contents of a classified document could never justify those risks.

Indeed, this Court applied such a *per se* approach in *Dhiab v. Trump*, 852 F.3d 1087 (D.C. Cir. 2017). In that case, press organizations sought access to classified video recordings that were part of the judicial record in habeas proceedings brought by a detainee at Guantanamo Bay. The Court did not analyze the competing interests in the particular recordings at issue. Rather, the Court relied on the sensitive nature of the information to dispose of the common-law claim categorically in two sentences: "The law of this circuit is that the need to 'guard against risks to national security interests' overcomes a common-law claim for access. Because keeping the recordings sealed is narrowly tailored to protect the government's compelling interest in guarding national security, intervenors cannot prevail on their common-law claim." *Id.* at 1098 (citation omitted). The Court need say no more here.

In other contexts, moreover, where a "common-law-like . . . balancing test provid[es] the background rule of decision," courts adopt "more

24

demanding '*per se*' rules applied to discrete subsets of cases" where they have sufficient "confidence" about the outcome that "a more laborious inquiry isn't worth" the effort. *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015) (Gorsuch, J.) (discussing antitrust and Commerce Clause applications). A *per se* rule is warranted here on this ground as well.

Second, even putting aside the classified nature of the Report, public interest in its disclosure cannot outweigh Congress's clearly expressed intent to control decisions over its disposition and release. As noted above, "Congress has undoubted authority to keep its records secret." *Goland*, 607 F.2d at 346. This authority "counsel[s] in favor of according due deference to Congress' affirmatively expressed intent to control its own documents." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 221 (D.C. Cir. 2013). Indeed, this Court has warned that "requiring the disclosure of documents or information generated by Congress" over that body's clearly expressed intent would give rise to "separation-of-powers concerns," even where Congress has provided a statutory right of access. *See id.* at 225-26. Such concerns would be necessarily heightened were a court to rely on its own fashioning of common law to compel disclosure. *See Rodriguez*, 140 S. Ct. at 717 (noting the "modest role" for "[j]udicial lawmaking" in our constitutional

25

system); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 637 (1952) (Jackson, J., concurring) (explaining that the President has greater authority when acting "pursuant to an express or implied authorization of Congress" than in the "zone of twilight in which he and Congress may have concurrent authority").

This Court has already held that Congress clearly expressed its intent to control the disposition and release of the Report.  In *ACLU*, the Court considered whether the Report (when in the possession of Executive Branch agencies) was an agency record subject to FOIA.  The Court held that the Report was not an agency record because "Committee's intent to retain control of the Full Report is clear."  823 F.3d 655, 667 (D.C. Cir. 2016).  The Court explained that the "Committee could hardly have been more clear or precise" in the 2009 letter "in claiming control over all of the work produced during its investigation," and no subsequent event had "vitiated" that "clearly expressed intent."  *Id.* at 666.

The analysis of *ACLU* applies equally to the common-law claim asserted here.  The Committee has "made it clear" that "the Committee alone" would decide "if and when to publicly disseminate the Full Report," and that "affirmatively expressed intent" is entitled to "deference."  *ACLU*,

823 F.3d at 662, 667.  In such circumstances, a court could not properly

invoke common lawmaking to compel disclosure.

### C. Common Law Could Not Provide Musgrave a Right to Compel the Creation of a Declassified Version of the Report.

Musgrave argues (Br. 22-23) that the balance of interests should tip in

his favor because he does not seek the Report in its entirety but only a

"redacted version" disclosing "reasonably segregable unclassified

information" and any classified information that was "previously officially

disclosed."  This argument does not correspond with the claim asserted or

the relief requested in his complaint.  *See* JA18 (stating that he sought

"disclosure of the full Report").  And this modified request would still call for

a court to override the Committee's clearly expressed intent to control the

Report.

More fundamentally, the concepts that Musgrave invokes—

segregability and official acknowledgment—are limitations imposed by

FOIA on an agency's ability to withhold information requested under that

statute.  *See, e.g.*, *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371

(D.C. Cir. 2020) ("FOIA provides that '[a]ny reasonably segregable portion

of a record shall be provided to any person requesting such record after

27

deletion of the portions which are exempt.'" (alteration in original) (quoting 5 U.S.C. § 552(b))); *Wolf*, 473 F.3d at 378 ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."). They function as tools to distinguish information that is properly classified, and therefore exempt from disclosure, *see* 5 U.S.C. § 552(b)(1), from that which is not properly classified, and therefore subject to FOIA's general rule that agencies must make their records available upon request, *id.* § 552(a)(3)(A). These concepts could not properly be imported into a framework for analyzing claims under any asserted common-law right.

In any event, the entity with the "necessary expertise" and the constitutional authority to identify and protect classified information in the Report—the Executive Branch agency responsible for the information—is not a party to this litigation. *See Egan*, 484 U.S. at 529. Neither Senator Warner nor the Committee has authority to undertake a declassification review of the Report to create a redacted copy suitable for public release. *See ACLU*, 823 F.3d at 661 (noting that the Committee had "voted to send the Executive Summary to the President for declassification review"); *see also* Appellees Br. 46 (noting that Musgrave's argument would require the

28

court to "order the Senate or one of its committees to "request . . . a declassification review from the Executive Branch").

Nor, for reasons discussed above, could the district court properly decide for itself what information in the Report is appropriate for disclosure to the public. In some circumstances, a district court may balance competing interests by releasing a redacted version of a document sought under the common law affording access to judicial records. *See, e.g.*, *In re Application of Newsday, Inc.*, 895 F.2d 74 (2d Cir. 1990) (affirming the release of a redacted copy of a warrant application). But in cases involving access to judicial records, courts generally have the benefit of input from those whose interests are implicated by the requested disclosure. *See id.* at 75 (noting the participation of the subject of the warrant in the litigation). And any error in the scope of redaction is not likely to harm national security. Musgrave offers no authority for the proposition that a federal court could fashion common law to enable it to decide which portions of a classified document in the custody and under the control of another Branch could be safely released to the public, much less in an action to which the Executive Branch is not even a party. *See Egan*, 484 U.S. at 529 (explaining that the Executive Branch has constitutional authority and "broad discretion" to decide access

29

to classified information); *see also Larson v. Department of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (noting that this Court has "consistently deferred to executive affidavits predicting harm to the national security" because national security is a "uniquely executive purview").  Whether Musgrave hopes to obtain the Report in full or some kind of redacted version, there is no common law that could provide him the relief he seeks.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MICHAEL S. RAAB

  */s/ Thomas Pulham*
THOMAS PULHAM
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7323*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4332*
  *thomas.pulham@usdoj.gov*

April 2023

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,123 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Thomas Pulham*
Thomas Pulham

**ADDENDUM**

# TABLE OF CONTENTS

Letter from Dianne Feinstein, Chairman, Senate Select Comm. on
    Intelligence, and Christopher S. Bond, Vice Chairman, Senate
    Select Comm. on Intelligence, to Leon Panetta, Director, CIA
    (June 2, 2009) ...................................................................................... Add. 1

C06274838 Case 1:13-cv-01870-JEB   Document 39-1   Filed 01/21/15   Page 39 of 48

USCA Case #22-5252   Document #1986239   Filed: 04/24/2023   Page 55 of 171
USCA Case #15-5153   Document #1583859   Filed: 11/16/2015   Page 43 of 171

APPROVED FOR RELEASE DATE: 14-Jan-2015

SECRET

## United States Senate

SELECT COMMITTEE ON INTELLIGENCE
WASHINGTON, DC 20510-6475

June 2, 2009

The Honorable Leon Panetta
Director
Central Intelligence Agency
Washington, D.C. 20505

Dear Director Panetta:

In a letter dated March 26, 2009, the Senate Select Committee on Intelligence (the Committee) informed the Central Intelligence Agency (CIA) of its intention to conduct a thorough review of the CIA's detention and interrogation program. The letter included terms of reference approved by the Committee, as well as a document request.

To conduct our work in a comprehensive and timely matter, the Committee requires access to unredacted materials that will include the names of non-supervisory CIA officers, liaison partners, black-site locations, or contain cryptonyms or pseudonyms. We appreciate the CIA's concern over the sensitivity of this information. Our staff has had numerous discussions with Agency officials to identify appropriate procedures by which we can obtain the information needed for the study in a way that meets your security requirements. We agree that the Committee, including its staff, will conduct the study of CIA's detention and interrogation program under the following procedures and understandings:

1. Pursuant to discussions between the Committee and CIA about anticipated staffing requirements, the CIA will provide all Members of the Committee and up to 15 Committee staff (in addition to our staff directors, deputy staff directors, and counsel) with access to unredacted responsive information. In addition, additional cleared staff may be given access to small portions of the unredacted information for the purpose of reviewing specific documents or conducting reviews of individual detainees. These Committee staff have or will have signed standard Sensitive Compartmented Information non-disclosure agreements for classified information in the [       ] compartment.

SECRET

Add. 1

C06274838 Case 1:13-cv-01870-JEB Document 39-1 Filed 01/21/15 Page 40 of 48

USCA Case #22-5253 Document #1936239 Filed: 04/24/2022 Page 40 of 171
USCA Case #23-5253 Document #1583859 Filed: 11/26/2013 Page 44 of 171

RELEASED DATE
14-Jan-2015

SECRET

The Honorable Leon Panetta
June 2, 2009
Page Two

2. CIA will make unredacted responsive operational files, as that term is defined in Section 701(b) of the National Security Act of 1947 (50 U.S.C. 431(b)), available at a secure Agency electronic Reading Room facility (Reading Room) which will permit Committee staff electronic search, sort, filing, and print capability.

3. If responsive documents other than those contained in operational files identify the names of non-supervisory CIA officers, liaison partners, or black-site locations, or contain cryptonyms or pseudonyms, CIA will provide unredacted copies of those documents at the Reading Room.

4. Responsive documents other than those contained in operational files that do not identify the names of non-supervisory CIA officers, liaison partners, or black-site locations, or contain cryptonyms or pseudonyms will be made available to the Committee in the Committee's Sensitive Compartmented Information Facility (SCIF), unless other arrangements are made.

5. CIA will provide a stand-alone computer system in the Reading Room with a network drive for Committee staff and Members. This network drive will be segregated from CIA networks to allow access only to Committee staff and Members. The only CIA employees or contractors with access to this computer system will be CIA information technology personnel who will not be permitted to copy or otherwise share information from the system with other personnel, except as otherwise authorized by the Committee.

6. Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference. These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee. As such, these records are not CIA records under the Freedom of Information Act or any other law. The CIA may not

SECRET

C06274838 Case 1:13-cv-01870-JEB   Document 39-1   Filed 01/21/15   Page 41 of 48

USCA Case #22-5252       Document #1986239        Filed: 04/24/2023    Page 46 of 471
USCA Case #13-5183       Document #1583655        Filed: 11/18/2014    Page 46 of 471

14-Jan-2015

SECRET

The Honorable Leon Panetta
June 2, 2009
Page Three

integrate these records into its records filing systems, and may not
disseminate or copy them, or use them for any purpose without the prior
written authorization of the Committee. The CIA will return the records to
the Committee immediately upon request in a manner consistent with
paragraph 9. If the CIA receives any request or demand for access to these
records from outside the CIA under the Freedom of Information Act or any
other authority, the CIA will immediately notify the Committee and will
respond to the request or demand based upon the understanding that these
are congressional, not CIA, records.

7. CIA will provide the Committee with lockable cabinets and safes, as
   required, in the Reading Room.

8. If Committee staff identifies CIA-generated documents or materials made
   available in the Reading Room that staff would like to have available in the
   Committee SCIF, the Committee will request redacted versions of those
   documents or materials in writing. Committee staff will not remove such
   CIA-generated documents or materials from the electronic Reading Room
   facility without the agreement of CIA.

9. To the extent Committee staff seeks to remove from the Reading Room any
   notes, documents, draft and final recommendations, reports or other
   materials generated by Committee Members or staff, Committee staff will
   ensure that those notes, documents, draft and final recommendations, reports
   or other materials do not identify the names of non-supervisory CIA officers,
   liaison partners, or black-site locations, or contain cryptonyms or
   pseudonyms. If those documents contain such information, Committee staff
   will request that CIA conduct a classification review to redact the above-
   referenced categories of information from the materials or replace such
   information with alternative code names as determined jointly by the
   Committee and the CIA.

SECRET

SECRET

The Honorable Leon Panetta
June 2, 2009
Page Four

Any document or other material removed from the reading room pursuant to
paragraphs 8, 9, or 10 will be stored in the Committee SCIF or transferred
and stored on Committee TS//SCI systems, under Committee security
procedures.

10. Any notes, documents, draft and final recommendations, reports or other
materials prepared by Committee Members or Staff based on information
accessed in the Reading Room will be prepared and stored on TS//SCI
systems. Such materials will carry the highest classification of any of the
underlying source materials. If the Committee seeks to produce a document
that carries a different classification than the underlying source material, the
Committee will submit that document to CIA, or if appropriate to the DNI,
for classification review and, if necessary, redaction.

11. The Reading Room will be available from 0700 to 1900 hours, official
government business days, Monday through Friday. If Committee staff
requires additional time or weekend work is required, Committee staff will
make arrangements with CIA personnel with as much advance notice as
possible.

12. The Committee will memorialize any requests for documents or information
in writing and CIA will respond to those requests in writing.

13. All Committee staff granted access to the Reading Room shall receive and
acknowledge receipt of a CIA security briefing prior to reviewing CIA
documents at the Reading Room.

SECRET

C06274838 Case 1:13-cv-01870-JEB Document 39-1 Filed 01/21/15 Page 43 of 48
USCA Case #22-5252 Document #1986239 Filed: 04/24/2023 Page 46 of 471
USCA Case #13-5183 Document #1583658 Filed: 11/10/2014 Page 46 of 471
APPROVED FOR
RELEASE DATE:
14-Jan-2015

SECRET

The Honorable Leon Panetta
June 2, 2009
Page Five

We anticipate that agreement to these conditions will address your concerns about Committee access to unredacted materials responsive to the Committee's document request. We look forward to immediate staff access to those materials.

In addition, we expect that the discussions and agreements over access to the study information are a matter restricted to the Congress and the Executive branch. As such, neither this letter nor derivative documents may be provided or presented to CIA's liaison partners.

Sincerely,

Dianne Feinstein
Chairman

Christopher S. Bond
Vice Chairman

SECRET

Add. 5