No. 22-5252

[ORAL ARGUMENT NOT YET SCHEDULED]

**UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

_____

SHAWN MUSGRAVE,

*Plaintiff-Appellant*,

v.

MARK WARNER, *et al.*,

*Defendant-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:21-cv-02198 (Beryl A. Howell, C.J.)

_____

**JOINT APPENDIX**

_____

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff-Appellant*

## <u>NOTE ON APPENDIX ORGANIZATION</u>

The Table of Contents includes references to briefs and similar arguments, but those briefs are not actually included in this Appendix. The references to other briefs in the Table of Contents are solely to provide organizational context for the exhibits and related documents which are included in this Appendix.

# **TABLE OF CONTENTS**

**Document**                                                                                          **Page**

Civil Docket..................................................................................................1

Complaint (Dkt. #1, filed Aug. 18, 2021)........................................................7

Defendants' Motion to Dismiss (Dkt. #5, filed Oct. 19, 2021)

      Ex. A: S. Res. 400..................................................................20

      Ex. B: *Schwartz v. DOJ*, No. 78-1334 (D.C. Cir.) summary ................36

      Ex. C: *Schwartz v. DOJ*, No. 78-1334 (D.C. Cir.) summary ...............46

Plaintiff's Cross-Motion for Partial Summary Judgment, Dkt. #15 (filed
      Mar. 20, 2022)

      Ex. A: *Schwartz v. DOJ*, No. 76-2039 briefs.........................................67

      Ex. B: *Pentagen Technologies International Ltd. v.Comm. on Approps.
      of the U.S. House of Reps.*, No. 98-47 briefs ...............................77

      Ex. C: *ACLU v. CIA*, No. 15-5183 Brief of *Amicus Curiae* Senator
      John D. Rockefeller IV in Support of Appellants.......................114

      Plaintiff's Statement of Material Facts as to Which There Is No
      Genuine Issue ...........................................................................134

Plaintiff's Reply in Support of Plaintiff's Cross-Motion for Partial Summary
      Judgment and Sur-Reply to Defendants' Motion to Dismiss (Dkt. #20,
      filed May 27, 2022)

      Ex. D: Cox v. DOJ, No. 17-3329 Memorandum and Order..................136

Order (Dkt. #23, filed Sept. 15, 2022).............................................................166

Memorandum Opinion (Dkt. #24, filed Sept. 15, 2022) ..................................167

Civil Notice of Appeal (Dkt. #25, filed Sept. 20, 2022) ..................................188

RECAP Actions

APPEAL,CLOSED,JURY,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:21-cv-02198-BAH

MUSGRAVE v. WARNER et al
Assigned to: Chief Judge Beryl A. Howell
 Case: 1:21-cv-02199-BAH
Case in other court: 22-05252
Cause: 28:1331 Fed. Question

Date Filed: 08/18/2021
Date Terminated: 09/15/2022
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**SHAWN MUSGRAVE**                    represented by  **Kelly Brian McClanahan**
NATIONAL SECURITY COUNSELORS
4702 Levada Terrace
Rockville, MD 20853
(301) 728-5908
Fax: (240) 681-2189
Email: kel@nationalsecuritylaw.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MARK WARNER**                    represented by  **Morgan John Frankel**
*Chairman*                                           OFFICE OF SENATE LEGAL COUNSEL
United States Senate
642 Hart Senate Office Building
United States Senate
Washington, DC 20510
(202) 224-4435
Fax: (202) 224-3391
Email: morgan_frankel@legal.senate.gov
*ATTORNEY TO BE NOTICED*

**Patricia M. Bryan**
OFFICE OF SENATE LEGAL COUNSEL
United States Senate
642 Hart Senate Office Building
United States Senate
Washington, DC 20510
(202) 224-4435
Fax: (202) 224-3391
Email: pat_bryan@legal.senate.gov

JA 1

*ATTORNEY TO BE NOTICED*

Thomas Edward Caballero
OFFICE OF SENATE LEGAL COUNSEL
United States Senate
642 Hart Senate Office Building
United States Senate
Washington, DC 20510
(202) 224-4435
Fax: (202) 224-3391
Email: thomas_caballero@legal.senate.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. SENATE SELECT COMMITTEE**          represented by   **Morgan John Frankel**
**ON INTELLIGENCE**                                        (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Patricia M. Bryan**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Thomas Edward Caballero**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/18/2021 | 1 R | COMPLAINT against SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER ( Filing fee $ 402 receipt number ADCDC-8675228) filed by SHAWN MUSGRAVE. (Attachments: # 1 R Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(McClanahan, Kelly) (Entered: 08/18/2021) |
| 08/18/2021 |  | Case Assigned to Chief Judge Beryl A. Howell. (zsb) (Entered: 08/18/2021) |
| 08/18/2021 | 2 | SUMMONS (4) Issued Electronically as to U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(adh, ) (Entered: 08/18/2021) |
| 08/18/2021 | 3 R | STANDING ORDER. Signed by Chief Judge Beryl A. Howell on August 18, 2021. (lcbah1) (Entered: 08/18/2021) |
| 08/24/2021 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE served on 8/23/2021; MARK WARNER served on 8/23/2021, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 8/23/21., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 8/23/2021. ( Answer due for ALL FEDERAL DEFENDANTS by 10/22/2021.) (McClanahan, Kelly) (Entered: 08/24/2021) |

| | | |
|---|---|---|
| 10/19/2021 | 5 | MOTION to Dismiss by U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER. (Attachments: # 1 R Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Text of Proposed Order)(Bryan, Patricia) (Entered: 10/19/2021) |
| 10/19/2021 | 6 | NOTICE of Appearance by Morgan John Frankel on behalf of U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER (Frankel, Morgan) (Entered: 10/19/2021) |
| 10/19/2021 | 7 | NOTICE of Appearance by Thomas Edward Caballero on behalf of U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER (Caballero, Thomas) (Entered: 10/19/2021) |
| 10/29/2021 | 8 | Unopposed MOTION for Scheduling Order by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 10/29/2021) |
| 11/01/2021 | | MINUTE ORDER (paperless) GRANTING plaintiff's 8 Unopposed Motion to Set Briefing Schedule and ISSUING the following SCHEDULING ORDER to govern the timing of further proceedings in this matter: (1) by November 16, 2021, plaintiff shall file its cross-motion for summary judgment and its combined opposition to defendants' motion for summary judgment and memorandum in support of its cross-motion; (2) by December 7, 2021, defendants shall file their combined opposition to plaintiff's cross-motion for summary judgment and reply in support of their own motion for summary judgment; and (3) by December 21, 2021, plaintiff shall file its reply in support of its cross-motion for summary judgment. Signed by Chief Judge Beryl A. Howell on November 1, 2021. (lcbah1) (Entered: 11/01/2021) |
| 11/02/2021 | | Set/Reset Deadlines: Cross-motion/opposition to motion for summary judgment due by 11/16/2021; opposition to cross-motion/reply to opposition to motion for summary judgment 12/7/2021; reply to opposition to cross-motion due by 12/21/2021. (ztg) (Entered: 11/02/2021) |
| 11/16/2021 | 9 | Consent MOTION for Scheduling Order *(Modified)* by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 11/16/2021) |
| 11/17/2021 | | MINUTE ORDER (paperless) GRANTING plaintiff's 9 Consent Motion to Modify Scheduling Order and MODIFYING the SCHEDULING ORDER as follows: (1) by November 22, 2021, plaintiff shall file its cross-motion for summary judgment and its combined opposition to defendants' motion for summary judgment and memorandum in support of its cross-motion; (2) by December 13, 2021, defendants shall file their combined opposition to plaintiff's cross-motion for summary judgment and reply in support of their own motion for summary judgment; and (3) by December 28, 2021, plaintiff shall file its reply in support of its cross-motion for summary judgment. Signed by Chief Judge Beryl A. Howell on November 17, 2021. (lcbah1) (Entered: 11/17/2021) |
| 11/18/2021 | | Set/Reset Deadlines: Cross-Motion and opposition to motion for summary judgment due by 11/22/2021; opposition to cross-motion and reply to opposition to motion for summary judgment due by 12/13/2021; reply to opposition to cross-motion for summary judgment due by 12/28/2021. (ztg) (Entered: 11/18/2021) |

| | | |
|---|---|---|
| 11/22/2021 | 10 | Unopposed MOTION for Scheduling Order *(Modified)* by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 11/22/2021) |
| 11/23/2021 | | MINUTE ORDER (paperless) GRANTING plaintiff's 10 Unopposed Motion to Modify Scheduling Order and MODIFYING the SCHEDULING ORDER as follows: (1) by January 12, 2022, plaintiff shall file his cross-motion for summary judgment and his combined opposition to defendants' motion for summary judgment and memorandum in support of his cross-motion; (2) by February 16, 2022, defendants shall file their combined opposition to plaintiff's cross-motion for summary judgment and reply in support of their own motion for summary judgment; and (3) by March 16, 2022, plaintiff shall file his reply in support of his cross-motion for summary judgment. Signed by Chief Judge Beryl A. Howell on November 23, 2021. (lcbah1) (Entered: 11/23/2021) |
| 11/23/2021 | | Set/Reset Deadlines: Cross-motion for summary judgment and opposition to motion for summary judgment due by 1/12/2022; opposition to cross-motion and reply to opposition to motion for summary judgment due by 2/16/2022; reply to opposition to cross-motion for summary judgment due by 3/16/2022. (ztg) (Entered: 11/23/2021) |
| 01/12/2022 | 11 | Unopposed MOTION for Scheduling Order *(Modified)* by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 01/12/2022) |
| 01/13/2022 | | MINUTE ORDER (paperless) GRANTING plaintiff's 11 Unopposed Motion to Modify Scheduling Order and MODIFYING the SCHEDULING ORDER as follows: (1) by February 23, 2022, plaintiff shall file his cross-motion for summary judgment and his consolidated combined opposition to defendants' motions to dismiss and motion for summary judgment and memorandum in support of his cross-motion; (2) by March 30, 2022, defendants shall file their combined opposition to plaintiff's cross-motion for summary judgment and reply in support of their own motions to dismiss and motion for summary judgment; and (3) by April 27, 2022, plaintiff shall file his consolidated reply in support of his cross-motion for summary judgment. Signed by Chief Judge Beryl A. Howell on January 13, 2022. (lcbah1) (Entered: 01/13/2022) |
| 01/14/2022 | | Set/Reset Deadlines: Cross-motion and opposition to motion for summary judgment due by 2/23/2022; opposition to cross-motion and reply to opposition to motion for summary judgment due by 3/30/2022; reply to opposition to cross-motion due by 4/27/2022. (ztg) (Entered: 01/14/2022) |
| 02/23/2022 | 12 R | Unopposed MOTION for Scheduling Order *(Modified)* by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 02/23/2022) |
| 02/23/2022 | | MINUTE ORDER (paperless) GRANTING plaintiff's 12 R Unopposed Motion to Modify Scheduling Order and MODIFYING the SCHEDULING ORDER as follows: (1) by March 16, 2022, plaintiff shall file his cross-motion for summary judgment and his consolidated combined opposition to defendants' motions to dismiss and motion for summary judgment and memorandum in support of his cross-motion; (2) by April 27, 2022, defendants shall file their combined opposition to plaintiff's cross-motion for summary judgment and reply in support of their own motions to dismiss and motion for summary judgment; and (3) by May 25, 2022, plaintiff shall file his consolidated reply in support of his cross-motion for summary |

| | | |
|---|---|---|
| | | judgment. Signed by Chief Judge Beryl A. Howell on February 23, 2022. (lcbah1) (Entered: 02/23/2022) |
| 02/24/2022 | | Set/Reset Deadlines: Cross-motion due by 3/16/2022; opposition to cross-motion and reply to opposition to motion for summary judgment due by 4/27/2022; reply to opposition to cross-motion due by 5/25/2022. (ztg) (Entered: 02/24/2022) |
| 03/16/2022 | 13 | Unopposed MOTION for Extension of Time to File Response/Reply as to 5 MOTION to Dismiss by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/16/2022) |
| 03/17/2022 | | MINUTE ORDER (paperless) GRANTING plaintiff's 13 Unopposed Motion for Extension of Time to File Response/Reply and DIRECTING plaintiff to file, by March 18, 2022, his cross-motion for summary judgment and his consolidated combined opposition to defendants' motion to dismiss and memorandum in support of his cross-motion. Signed by Chief Judge Beryl A. Howell on March 17, 2022. (lcbah1) (Entered: 03/17/2022) |
| 03/18/2022 | | Set/Reset Deadlines: Plaintiff's cross-motion/opposition to defendants' motion to dismiss and memorandum in support of his cross-motion due by 3/18/2022. (ztg) (Entered: 03/18/2022) |
| 03/20/2022 | 14 | Memorandum in opposition to re 5 MOTION to Dismiss filed by SHAWN MUSGRAVE. (Attachments: # 1 Exhibit A - Schwartz briefs, # 2 Exhibit B - Pentagen briefs, # 3 Exhibit C - Rockefeller amicus, # 4 Text of Proposed Order) (McClanahan, Kelly) (Entered: 03/20/2022) |
| 03/20/2022 | 15 | Cross MOTION for Partial Summary Judgment by SHAWN MUSGRAVE. (Attachments: # 1 Exhibit A - Schwartz briefs, # 2 Exhibit B - Pentagen briefs, # 3 Exhibit C - Rockefeller amicus, # 4 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/20/2022) |
| 03/21/2022 | 16 | Unopposed MOTION for Extension of Time to File Response/Reply as to 5 MOTION to Dismiss *(Nunc Pro Tunc)* by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 03/21/2022) |
| 03/21/2022 | | MINUTE ORDER (paperless) GRANTING plaintiff's 16 Unopposed Motion for Extension of Time to File Response/Reply. Upon consideration of the motion, which shall be construed as a motion for leave to file, plaintiff's 14 memorandum in opposition to defendants' motion to dismiss and 15 cross-motion for summary judgment shall be accepted for filing and not stricken from the docket as untimely filed. Signed by Chief Judge Beryl A. Howell on March 21, 2022. (lcbah1) (Entered: 03/21/2022) |
| 04/27/2022 | 17 | REPLY to opposition to motion re 5 MOTION to Dismiss filed by U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER. (Bryan, Patricia) (Entered: 04/27/2022) |
| 04/27/2022 | 18 | Memorandum in opposition to re 15 Cross MOTION for Partial Summary Judgment filed by U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE, MARK WARNER. (Attachments: # 1 Defendants' Response to Plaintiff's Statement of Material Facts, # 2 Text of Proposed Order)(Bryan, Patricia) (Entered: 04/27/2022) |

JA 5

| | | |
|---|---|---|
| 05/25/2022 | 19 | Unopposed MOTION for Extension of Time to File Response/Reply as to 15 Cross MOTION for Partial Summary Judgment by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 05/25/2022) |
| 05/26/2022 | | MINUTE ORDER (paperless) GRANTING plaintiff's 19 Unopposed Motion for Enlargement of Time, and DIRECTING plaintiff to file, by May 27, 2022, any reply in further support of his Cross-Motion for Partial Summary Judgment. Signed by Chief Judge Beryl A. Howell on May 26, 2022. (lcbah2) (Entered: 05/26/2022) |
| 05/27/2022 | | Set/Reset Deadlines: Plaintiff's reply in support of his Cross-Motion due by 5/27/2022. (ztg) (Entered: 05/27/2022) |
| 05/27/2022 | 20 | REPLY to opposition to motion re 15 Cross MOTION for Partial Summary Judgment filed by SHAWN MUSGRAVE. (Attachments: # 1 Exhibit D - Cox opinion)(McClanahan, Kelly) (Entered: 05/27/2022) |
| 05/27/2022 | 21 | SURREPLY to re 5 MOTION to Dismiss filed by SHAWN MUSGRAVE. (Attachments: # 1 Exhibit D - Cox opinion)(McClanahan, Kelly) (Entered: 05/27/2022) |
| 05/27/2022 | 22 | Unopposed MOTION for Leave to File *Sur-Reply* by SHAWN MUSGRAVE. (Attachments: # 1 Text of Proposed Order)(McClanahan, Kelly) (Entered: 05/28/2022) |
| 05/31/2022 | | MINUTE ORDER (paperless) GRANTING plaintiff's 22 Unopposed Motion for Leave to File Sur-Reply and DIRECTING plaintiff to file the brief referenced in his motion as a sur-reply to defendant's motion to dismiss. Signed by Chief Judge Beryl A. Howell on May 31, 2022. (lcbah2) (Entered: 05/31/2022) |
| 09/15/2022 | 23 Ⓡ | ORDER GRANTING defendants' 5 Motion to Dismiss and DENYING plaintiff's 15 Cross Motion for Partial Summary Judgment. The Clerk of the Court is directed to close this case. Signed by Chief Judge Beryl A. Howell on September 15, 2022. (lcbah2) (Entered: 09/15/2022) |
| 09/15/2022 | 24 Ⓡ | MEMORANDUM OPINION regarding defendants' 5 Motion to Dismiss and plaintiff's 15 Cross Motion for Partial Summary Judgment. Signed by Chief Judge Beryl A. Howell on September 15, 2022. (lcbah2) (Entered: 09/15/2022) |
| 09/20/2022 | 25 Ⓡ | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 23 Ⓡ Order on Motion to Dismiss,, Order on Motion for Partial Summary Judgment, by SHAWN MUSGRAVE. Filing fee $ 505, receipt number ADCDC-9537257. Fee Status: Fee Paid. Parties have been notified. (McClanahan, Kelly) (Entered: 09/20/2022) |
| 09/21/2022 | 26 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 25 Ⓡ Notice of Appeal to DC Circuit Court,. (zed) (Entered: 09/21/2022) |
| 09/28/2022 | | USCA Case Number 22-5252 for 25 Ⓡ Notice of Appeal to DC Circuit Court, filed by SHAWN MUSGRAVE. (zed) (Entered: 09/30/2022) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHAWN MUSGRAVE | * | |
| 185 Forest Avenue | * | |
| Unit 4A | * | |
| Palo Alto, CA 94301, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| MARK WARNER, | * | |
| Chairman | * | |
| U.S. Senate Select Committee on | * | Civil Action No. 1:21-cv-02198 |
| Intelligence | * | |
| 211 Hart Senate Office Building | * | |
| Washington, DC 20510, | * | |
| | * | |
| and | * | |
| | * | |
| U.S. SENATE SELECT COMMITTEE | * | |
| ON INTELLIGENCE | * | |
| 211 Hart Senate Office Building | * | |
| Washington, DC 20510, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## COMPLAINT

Plaintiff Shawn Musgrave brings this action against Defendants Mark Warner and the

U.S. Senate Select Committee on Intelligence pursuant to the common law right of access to

public records, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act,

28 U.S.C. § 1651.

## JURISDICTION

1.      This Court has both subject matter jurisdiction over this action and personal

jurisdiction over Defendants pursuant to 28 U.S.C. §§ 1331 and 1361.

## VENUE

2.      Venue is appropriate under 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Shawn Musgrave ("Musgrave") is a citizen of the United States and a resident of the State of California. As a freelance reporter whose work has been featured in *Politico*, the *Boston Globe*, the *Intercept*, and elsewhere, Musgrave is a representative of the news media.

4.      Defendant Mark Warner ("Warner") is a United States Senator for the Commonwealth of Virginia. He currently serves as the Chairman of the U.S. Senate Select Committee on Intelligence ("SSCI") and is being sued in that capacity.

5.      Defendant SSCI is a committee of the U.S. Senate.

6.      Defendants Warner and SSCI are in possession and/or control of the record requested by Musgrave which are the subject of this action.

## BACKGROUND

### *PART I: THE COMMON LAW RIGHT OF ACCESS TO PUBLIC RECORDS*

7.      "In 'the courts of this country'—including the federal courts—the common law bestows upon the public a right of access to public records and documents." The Supreme Court "was unequivocal in stating that there is a federal common law right of access 'to inspect and copy public records and documents.'"

8.      All three branches of government are subject to this common law right, which "predates the Constitution itself" and is "fundamental to a democratic state."

9.      As Judge Karen LeCraft Henderson noted in her concurrence in *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989 (D.C. Cir. 2021), this common law right of access to public records

2

JA 8

exists in some theoretical tension with constitutional provisions including the Speech or Debate

Clause. Although Judge Henderson agreed that the right did not apply in that case because the

Speech or Debate Clause outweighed Judicial Watch's right to access the records it sought, she

noted that it is hardly clear that it would not apply to "the right case." According to Judge

Henderson, the application of the common law right to access public records has long required

"careful balancing," and *Judicial Watch* did not purport to preclude the right entirely.

10.     Indeed, Judge Henderson noted that the D.C. Circuit has "never considered the

Speech or Debate Clause's application to a common law right of access claim and the parties [in

*Judicial Watch*] simply cite a single district court case where the two doctrines were raised."

Moreover, as Judge Henderson explained, in that case—*Pentagen Technologies International v.*

*Committee on Appropriations of the United States House of Representatives*, 20 F. Supp. 2d 41

(D.D.C. 1998)—Judge Kessler decided that the investigative reports at issue were protected from

disclosure by the Speech or Debate Clause "only *after* determining that the [reports] were 'not

'public records'" as that term was construed by this Circuit's controlling precedent. The Speech

or Debate Clause clearly did not provide "absolute protection from disclosure—including

protection from a common law right of access claim"—because if it had, Judge Henderson

argued, "the district court's 'public records' analysis would have been unnecessary."

11.     Judge Henderson explained the proper framework for determining when this

common law right of access applies. "First, a court must decide whether the document sought is

a 'public record.'" If so, only then should the court "proceed to balance the government's interest

in keeping the document secret against the public's interest in disclosure."

12.     Judge Henderson then explained what constitutes a "public record" subject to this

common law right of access: "a government document created and kept for the purpose of

memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." The subpoenas at issue in *Judicial Watch* were public records, Judge Henderson explained, but the Committee's interest in keeping the documents secret outweighed Judicial Watch's interest in public disclosure.

13. "Nevertheless, the fundamental importance of the common law right of access to a democratic state . . . cautions against the categorical extension of Speech or Debate Clause immunity to the right." Judge Henderson explained that she only joined the judgment in that case because "Judicial Watch did not adequately present the argument resolving the Speech or Debate Clause and common law right of access doctrines *inter se*."

14. If a document is a "public record" under this framework, then, the Government's interest in keeping the document secret must be weighed against the public's interest in disclosure, and the Speech or Debate Clause may not be categorically invoked to preclude any request for such a public record.

15. After *Judicial Watch* was decided on 4 June 2021, Musgrave sent a request to SSCI for a copy of the full SSCI Torture Report ("Torture Report" or "Report"). As the Torture Report is undoubtedly "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived," and because the public interest in disclosure is high, Musgrave brings this action under the common law right of access to public records to compel the Report's disclosure. The following sections provide further background on the Torture Report itself and the efforts to keep an unredacted copy hidden from the public—and even from the rest of the Government.

## *PART II: THE TORTURE REPORT*

16.     The Torture Report is officially titled Senate Report 113-288, *Report of the Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, and it was ordered to be printed on 9 December 2014 by Senator Dianne Feinstein, then-Chairman of SSCI. The Report is 6,700 pages long with 38,000 footnotes, although a redacted and heavily abridged version—containing a foreword, an Executive Summary, Findings and Conclusions, and Additional and Minority Views, and totaling about seven hundred pages—is available at

https://www.govinfo.gov/content/pkg/CRPT-113srpt288/pdf/CRPT-113srpt288.pdf.

17.     The Torture Report's foreword—written by Sen. Feinstein—discusses the post-9/11 national security context within which the Central Intelligence Agency ("CIA") ran its detention and interrogation program, with Sen. Feinstein writing that "it is against that backdrop [of 9/11]—the largest attack against the American homeland in our history—that the events described in this report were undertaken. Nearly 13 years later, the Executive Summary and Findings and Conclusions of this report are being released. They are highly critical of the CIA's actions, and rightfully so. Reading them, it is easy to forget the context in which the program began—not that the context should serve as an excuse, but rather as a warning for the future."

18.     The foreword continues: "[SSCI] . . . often pushes intelligence agencies to act quickly in response to threats and world events. Nevertheless, such pressure, fear, and expectation of further terrorist plots do not justify, temper, or excuse improper actions taken by individuals or organizations in the name of national security. The major lesson of this report is that regardless of the pressures and the need to act, the Intelligence Community's actions must always reflect who we are as a nation, and adhere to our laws and standards. It is precisely at

these times of national crisis that our government must be guided by the lessons of our history and subject decisions to internal and external review."

19.     The foreword then summarizes the full Report's contents: "Instead, CIA personnel, aided by two outside contractors, decided to initiate a program of indefinite secret detention and the use of brutal interrogation techniques in violation of U.S. law, treaty obligations, and our values. This Committee Study documents the abuses and countless mistakes made between late 2001 and early 2009." Sen. Feinstein notes that, although "[t]he Executive Summary of the Study provides a significant amount of new information . . . to what has already been made public by the Bush and Obama Administrations, as well as non-governmental organizations and the press," the full Report is "more than ten times the length of the Executive Summary and includes comprehensive and excruciating detail." The Report "describes the history of the CIA's Detention and Interrogation program from its inception to its termination, including a review of each of the 119 known individuals who were held in CIA custody."

20.     The full Torture Report "also provides substantially more detail than what is included in the Executive Summary on the CIA's justification and defense of its interrogation program on the basis that it was necessary and critical to the disruption of specific terrorist plots and the capture of specific terrorists." Although the Executive Summary "provides sufficient detail to demonstrate the inaccuracies of each of [the CIA's] claims, the information in the full Committee Study [i.e., the full Report] is far more extensive."

21.     Sen. Feinstein chose not to seek declassification of the full Torture Report when it was released in part because doing so for the "more than six thousand page report would have significantly delayed the release of the Executive Summary. Decisions will be made later on the declassification and release of the full 6,700 page Study."

22.     Sen. Feinstein concluded that "under any common meaning of the term, CIA detainees were tortured. I also believe that the conditions of confinement and the use of authorized and unauthorized interrogation and conditioning techniques were cruel, inhuman, and degrading. I believe the evidence of this is overwhelming and incontrovertible."

23.     Sen. Feinstein wrote that the Torture Report should be used by "[t]his and future Administrations" to "guide future programs, correct past mistakes, increase oversight of CIA representations to policymakers, and ensure coercive interrogation practices are not used by our government again." Further, she called the full document "the most significant and comprehensive oversight report in [SSCI's] history, and perhaps in that of the U.S. Senate."

24.     The beginning of the Findings and Conclusions section lists twenty topline conclusions which help provide further background about the final product. The following examples are representative of the nature of the rest of the topline conclusions:

- "#1: The CIA's use of its enhanced interrogation techniques was not an effective means of acquiring intelligence or gaining cooperation from detainees."

- "#2: The CIA's justifications for the use of its enhanced interrogation techniques rested on inaccurate claims of their effectiveness."

- "#3: The interrogations of CIA detainees were brutal and far worse than the CIA represented to policymakers and others."

- "#5: The CIA repeatedly provided inaccurate information to the Department of Justice, impeding a proper legal analysis of the CIA's Detention and Interrogation Program."

- "#6: The CIA has actively avoided or impeded congressional oversight of the program."

- "#7: The CIA impeded effective White House oversight and decision-making."

- "#17: The CIA rarely reprimanded or held personnel accountable for serious and significant violations, inappropriate activities, and systemic and individual management failures."

- "#20: The CIA's Detention and Interrogation Program damaged the United States' standing in the world, and resulted in other significant monetary and non-monetary costs."

### PART III: LATER DEVELOPMENTS AND CONTINUED SECRECY

25.     When Sen. Feinstein and SSCI published the Torture Report in December 2014, it was distributed to the White House, the Director of National Intelligence, the Director of the CIA, the Attorney General, the Secretary of Defense, the Secretary of State, the Director of the Federal Bureau of Intelligence, and the CIA Inspector General ("IG").

26.     In addition to copying those officials on the letter and transmission, Sen. Feinstein wrote to President Obama that to "ensure that such a program will not be contemplated by the United States ever again," and to "strengthen our resolve against torture . . . the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." "To achieve that result," she added, "I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees."

27.     In January 2015, about a month after Sen. Feinstein and SSCI transmitted the Torture Report to the Senate and to the executive branch officials noted above, Senator Richard Burr became Chairman of SSCI. In one of his first moves as SSCI chair, on 14 January 2015, he

called for the White House and all agencies in the executive branch with copies of the full

Torture Report to return them to SSCI. *See*, *e.g.*, Jason Leopold, *GOP Senator Wants to Make*

*Sure the Full CIA Torture Report Never Sees the Light of Day*, VICE News (Jan. 21, 2015), *at*

https://www.vice.com/en/article/a38mba/gop-senator-wants-to-make-sure-the-full-cia-torture-

report-never-sees-the-light-of-day.

28.     Sen. Burr's original request was not entirely successful for several reasons. First,

the Obama Administration did not comply with Sen. Burr's request—President Obama instead

ordered that the Report be preserved under the Presidential Records Act as part of his official

presidential records. *See*, *e.g.*, Josh Gerstein, *Obama Won't Declassify Senate 'Torture Report'*

*Now, But Will Preserve It*, POLITICO (Dec. 12, 2016), *at* https://www.politico.com/blogs/under-

the-radar/2016/12/barack-obama-torture-report-declassify-preserve-232519. Second, and also in

December 2016, Judge Royce Lamberth ordered that a full copy of the Report be both kept by

the Department of Defense ("DOD") and deposited with this Court for secure storage as part of

several habeas corpus cases related to Guantanamo Bay detainees.

29.     Sen. Burr's request was largely successful, however. Several agency declarations

were submitted to this Court on 21 January 2015 as part of a Freedom of Information Act lawsuit

over the Report—*ACLU v. CIA*, No. 13-1870 (D.D.C.). In that case, the Government asserted

that "[n]either [the Department of Justice] nor [the Department of State] . . . has even opened the

package with the disc containing the full Report," and "CIA and DOD have carefully limited

access to and made only very limited use of the Report." "Each agency has ensured that the

envelope containing the disc is marked with the appropriate classification marking, stored in a

secure location . . . and labeled as a 'congressional record.'" This was despite Sen. Feinstein's

urging that the Report be read widely by cleared executive branch officials so the history of the

CIA's torture program is not forgotten and so "appropriate lessons can be learned from it," as she reiterated to President Obama in a second letter on 16 January 2015 when she was no longer Chairman.

30.     In the summer of 2017, the Trump Administration returned the White House's copies of the Torture Report to Sen. Burr and SSCI. *See, e.g.*, Mark Mazzetti, Matthew Rosenberg, & Charlie Savage, *Trump Administration Returns Copies of Report on C.I.A. Torture to Congress*, N.Y. Times (June 2, 2017). The return of the Report "raise[d] the possibility that most of the copies could be locked in Senate vaults indefinitely or even destroyed—and increases the risk that future government officials, unable to read the report, will never learn its lessons."

31.     Government officials have already apparently failed to learn the lessons of the Report. When Christopher Sharpley, then-Acting CIA IG, faced SSCI in a confirmation hearing on 17 October 2017 to be the CIA Inspector General, the following exchange occurred after Sharpley stated that it was his decision alone to return the Report to SSCI at Sen. Burr's demand:

> Sen. Ron Wyden (D-Ore.) was not impressed: "If your office and the committee are going to be erasing historical records because somebody down the road is unhappy with them," he said, "our country is going to need a lot of erasers." Wyden worried aloud about the precedent Sharpley's decision set, and was so exasperated by the nominee's refusal to acknowledge as much that he spontaneously announced his intention to vote "no" from the dais. Sen. Martin Heinrich (D-N.M.) followed up by pointing out that the report includes chapters dealing specifically with the IG's office, then asked Sharpley if he at least "consider[ed] reading the report before returning [it]…so you could do your job more effectively?" "No, I did not," Sharpley replied. He conceded that he could have done so, but "chose not to." Ranking Member Dianne Feinstein (D-Calif.) took a moment to remind Sharpley of the obvious: "The point of distributing [the report] to the departments was in the hope they would read it, not look at it as some poison document, and learn from it."

Scott Roehm, *Congress is Facing Decisions on Torture, and Needs to Treat Them As Such*, Just Security (Nov. 10, 2017) (alterations in original), *at* https://www.justsecurity.org/46924/congress-facing-decisions-torture-treat/.

32.     As a result of Sen. Burr's push to recall the Torture Report to SSCI, coupled with the Trump Administration's cooperation with his demands, there are few entities with remaining copies of the Report. A federal district court and the Department of Defense only have their copies pursuant to Judge Lamberth's order mentioned above, and the National Archives and Records Administration only has a copy as part of President Obama's official presidential archive. Thus, unless it comes from SSCI, the earliest date at which the Report is likely to become subject to public declassification requests would be when President Obama's records collection becomes subject to such requests in 2029, since President Obama has already stated that he would seek to keep the Report confidential for the maximum legal duration.

33.     The damage of the Report's continued secrecy is already being done as more and more high-level officials are not only not required to read the Report but could not read it even if they wanted to. Indeed, CIA officials clearly did not read the Report when it was released—or at least, they testified to that end to a federal court—and CIA officials cannot read it now because they no longer have a copy of the report about how their own agency illegally tortured detainees and then misled Congress, the White House, the Department of Justice, and the public about it.

34.     Meanwhile, the American public has only ever had access to the redacted and heavily abridged Executive Summary version, despite Sen. Feinstein's wishes when she and SSCI transmitted the Report that it would eventually be declassified. The "overwhelming and incontrovertible" evidence in the document Sen. Feinstein deemed "the most significant and comprehensive oversight report in [SSCI's] history, and perhaps in that of the U.S. Senate" is

virtually memory-holed for at least another eight years if not longer. It is time that this critical piece of American history is made public.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (WARNER/SSCI – PUBLIC RECORDS DENIAL)

35.     Musgrave repeats and realleges the allegations contained in all paragraphs set forth above.

36.     On 4 June 2021, Musgrave submitted to SSCI a request for a copy of the full Torture Report.

37.     SSCI has not provided the Torture Report as of the filing of this lawsuit.

38.     Musgrave has a legal right under the common law right of access to public records to obtain the Torture Report because it is a "public record" within the relevant framework, it does not implicate the Speech or Debate Clause rights of any individual Member of Congress or Committee to a meaningful extent, and SSCI's interest in keeping it secret is outweighed by the uniquely significant public interest in disclosure of the full Report.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shawn Musgrave prays that this Court:

(1)     Order Defendants Warner and SSCI to provide the Torture Report to him;

(2)     Declare that the common law right of access applies to committees of the U.S. Senate, and direct the Secretary of the Senate to develop a standardized process for the handling of such requests;

(3)     Order preliminary and permanent injunctive and/or declaratory relief as may be appropriate;

(4)     Award reasonable costs and attorneys' fees as provided in 28 U.S.C. § 2412(d) or

any other applicable law;

(5)     Expedite this action in every way pursuant to 28 U.S.C. § 1657(a); and

(6)     Grant such other relief as the Court may deem just and proper.

Date:   August 18, 2021

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

# Exhibit A

Memorandum of Points and Authorities in Support of
Defendants' Motion to Dismiss

*Musgrave v. Warner, et al.*, Civil Action No. 1:21-cv-02198-BAH

Case 1:21-cv-02198-BAH   Document 5-2   Filed 10/19/21   Page 2 of 16

USCA Case #22-5252     Document #1988603      Filed: 03/04/2023     Page 25 of 192

*Resolved,* That it is the purpose of this resolution to establish a new select committee of the Senate, to be known as the Select Committee on Intelligence, to oversee and make continuing studies of the intelligence activities and programs of the United States Government, and to submit to the Senate appropriate proposals for legislation and report to the Senate concerning such intelligence activities and programs. In carrying out this purpose, the Select Committee on Intelligence shall make every effort to assure that the appropriate departments and agencies of the United States provide informed and timely intelligence necessary for the executive and legislative branches to make sound decisions affecting the security and vital interests of the Nation. It is further the purpose of this resolution to provide vigilant legislative oversight over the intelligence activities of the United States to assure that such activities are in conformity with the Constitution and laws of the United States.

SEC. 2. (a)(1) There is hereby established a select committee to be known as the Select Committee on Intelligence (hereinafter in this resolution referred to as the "select committee"). The select committee shall be composed of not to exceed fifteen Members appointed as follows:

(A) two members from the Committee on Appropriations;

(B) two members from the Committee on Armed Services;

(C) two members from the Committee on Foreign Relations;

(D) two members from the Committee on the Judiciary; and

(E) not to exceed seven members to be appointed from the Senate at large.

(2) Members appointed from each committee named in clauses (A) through (D) of paragraph (1) shall be evenly divided between the two major political parties and shall be appointed by the President pro tempore of the Senate upon the recommendations of the majority and minority leaders of the Senate. Of any members appointed under paragraph (1)(E), the majority leader shall appoint the majority members and the minority leader shall appoint the minority members, with the majority having a one vote margin.

Case 1:21-cv-02198-BAH   Document 5-2   Filed 10/19/21   Page 3 of 16
USCA Case #22-5252   Document #1988603   Filed: 03/04/2023   Page 26 of 192

(3)(A) The majority leader of the Senate and the minority leader of the Senate shall be ex officio members of the select committee but shall have no vote in the Committee and shall not be counted for purposes of determining a quorum.

(B) The Chairman and Ranking Member of the Committee on Armed Services (if not already a member of the select Committee) shall be ex officio members of the select Committee but shall have no vote in the Committee and shall not be counted for purposes of determining a quorum.

(b) At the beginning of each Congress, the Majority Leader of the Senate shall select a chairman of the select Committee and the Minority Leader shall select a vice chairman for the select Committee. The vice chairman shall act in the place and stead of the chairman in the absence of the chairman. Neither the chairman nor the vice chairman of the select committee shall at the same time serve as chairman or ranking minority member of any other committee referred to in paragraph 4(e)(1) of rule XXV of the Standing Rules of the Senate.

(c) The select Committee may be organized into subcommittees. Each subcommittee shall have a chairman and a vice chairman who are selected by the Chairman and Vice Chairman of the select Committee, respectively.

SEC. 3. (a) There shall be referred to the select committee all proposed legislation, messages, petitions, memorials, and other matters relating to the following:

(1) The Office of the Director of National Intelligence and the Director of National Intelligence.

(2) The Central Intelligence Agency and the Director of the Central Intelligence Agency.

(3) Intelligence activities of all other departments and agencies of the Government, including, but not limited to, the intelligence activities of the Defense Intelligence Agency, the National Security Agency, and other agencies of the Department of Defense; the Department of State; the Department of Justice; and the Department of the Treasury.

(4) The organization or reorganization of any department or agency of the Government to the extent that the organization or reorganization relates to a function or activity involving intelligence activities.

(5) Authorizations for appropriations, both direct and indirect, for the following:

126

JA 22

(A) The Office of the Director of National Intelligence and the Director of National Intelligence.

(B) The Central Intelligence Agency and the Director of the Central Intelligence Agency.

(C) The Defense Intelligence Agency.

(D) The National Security Agency.

(E) The intelligence activities of other agencies and subdivisions of the Department of Defense.

(F) The intelligence activities of the Department of State.

(G) The intelligence activities of the Federal Bureau of Investigation.

(H) Any department, agency, or subdivision which is the successor to any agency named in clause (A), (B), (C) or (D); and the activities of any department, agency, or subdivision which is the successor to any department, agency, bureau, or subdivision named in clause (E), (F), or (G) to the extent that the activities of such successor department, agency, or subdivision are activities described in clause (E), (F), or (G).

(b)(1) Any proposed legislation reported by the select Committee except any legislation involving matters specified in clause (1), (2), (5)(A), or (5)(B) of subsection (a), containing any matter otherwise within the jurisdiction of any standing committee shall, at the request of the chairman of such standing committee, be referred to such standing committee for its consideration of such matter and be reported to the Senate by such standing committee within 10 days after the day on which such proposed legislation, in its entirety and including annexes, is referred to such standing committee; and any proposed legislation reported by any committee, other than the select Committee, which contains any matter within the jurisdiction of the select Committee shall, at the request of the chairman of the select Committee, be referred to the select Committee for its consideration of such matter and be reported to the Senate by the select Committee within 10 days after the day on which such proposed legislation, in its entirety and including annexes, is referred to such committee.

(2) In any case in which a committee fails to report any proposed legislation referred to it within the time limit prescribed in this subsection, such Committee shall be automatically discharged from further consideration of such

127

proposed legislation on the 10th day following the day on which such proposed legislation is referred to such committee unless the Senate provides otherwise, or the Majority Leader or Minority Leader request, prior to that date, an additional 5 days on behalf of the Committee to which the proposed legislation was sequentially referred. At the end of that additional 5 day period, if the Committee fails to report the proposed legislation within that 5 day period, the Committee shall be automatically discharged from further consideration of such proposed legislation unless the Senate provides otherwise.

(3) In computing any 10 or 5 day period under this subsection there shall be excluded from such computation any days on which the Senate is not in session.

(4) The reporting and referral processes outlined in this subsection shall be conducted in strict accordance with the Standing Rules of the Senate. In accordance with such rules, committees to which legislation is referred are not permitted to make changes or alterations to the text of the referred bill and its annexes, but may propose changes or alterations to the same in the form of amendments.

(c) Nothing in this resolution shall be construed as prohibiting or otherwise restricting the authority of any other committee to study and review any intelligence activity to the extent that such activity directly affects a matter otherwise within the jurisdiction of such committee.

(d) Nothing in this resolution shall be construed as amending, limiting, or otherwise changing the authority of any standing committee of the Senate to obtain full and prompt access to the product of the intelligence activities of any department or agency of the Government relevant to a matter otherwise within the jurisdiction of such committee.

SEC. 4. (a) The select committee, for the purposes of accountability to the Senate, shall make regular and periodic, but not less than quarterly, reports to the Senate on the nature and extent of the intelligence activities of the various departments and agencies of the United States. Such committee shall promptly call to the attention of the Senate or to any other appropriate committee or committees of the Senate any matters requiring the attention of the Senate or such other committee or committees. In making such report, the select committee shall proceed in a manner consistent with section 8(c)(2) to protect national security.

(b) The select committee shall obtain an annual report from the Director of National Intelligence, the Director of the Central Intelligence Agency, the Secretary of Defense, the Secretary of State, and the Director of the Federal Bureau of Investigation. Such reports shall review the intelligence activities of the agency or department concerned and the intelligence activities of foreign countries directed at the United States or its interest. An unclassified version of each report may be made available to the public at the discretion of the select committee. Nothing herein shall be construed as requiring the public disclosure in such reports of the names of individuals engaged in intelligence activities for the United States or the divulging of intelligence methods employed or the sources of information on which such reports are based or the amount of funds authorized to be appropriated for intelligence activities.

(c) On or before March 15 of each year, the select committee shall submit to the Committee on the Budget of the Senate the views and estimates described in section 301(c) of the Congressional Budget Act of 1974 regarding matters within the jurisdiction of the select committee.

SEC. 5. (a) For the purposes of this resolution, the select committee is authorized in its discretion (1) to make investigations into any matter within its jurisdiction, (2) to make expenditures from the contingent fund of the Senate, (3) to employ personnel, (4) to hold hearings, (5) to sit and act at any time or place during the sessions, recesses, and adjourned periods of the Senate, (6) to require, by subpoena or otherwise, the attendance of witnesses and the production of correspondence, books, papers, and documents, (7) to take depositions and other testimony, (8) to procure the service of individual consultants or organizations thereof, in accordance with the provisions of section 202(i) of the Legislative Reorganization Act of 1946, and (9) with the prior consent of the government department or agency concerned and the Committee on Rules and Administration, to use on a reimbursable basis the services of personnel of any such department or agency.

(b) The chairman of the select committee or any member thereof may administer oaths to witnesses.

(c) Subpoenas authorized by the select committee may be issued over the signature of the chairman, the vice chairman or any member of the select committee designated by the chairman, and may be served by any person

designated by the chairman or any member signing the subpoenas.

Sec. 6. No employee of the select committee or any person engaged by contract or otherwise to perform services for or at the request of such committee shall be given access to any classified information by such committee unless such employee or person has (1) agreed in writing and under oath to be bound by the rules of the Senate (including the jurisdiction of the Select Committee on Ethics) and of such committee as to the security of such information during and after the period of his employment or contractual agreement with such committee; and (2) received an appropriate security clearance as determined by such committee in consultation with the Director of National Intelligence. The type of security clearance to be required in the case of any such employee or person shall, within the determination of such committee in consultation with the Director of National Intelligence, be commensurate with the sensitivity of the classified information to which such employee or person will be given access by such committee.

Sec. 7. The select committee shall formulate and carry out such rules and procedures as it deems necessary to prevent the disclosure, without the consent of the person or persons concerned, of information in the possession of such committee which unduly infringes upon the privacy or which violates the constitutional rights of such person or persons. Nothing herein shall be construed to prevent such committee from publicly disclosing any such information in any case in which such committee determines the national interest in the disclosure of such information clearly outweighs any infringement on the privacy of any person or persons.

Sec. 8. (a) The select committee may, subject to the provisions of this section, disclose publicly any information in the possession of such committee after a determination by such committee that the public interest would be served by such disclosure. Whenever committee action is required to disclose any information under this section, the committee shall meet to vote on the matter within five days after any member of the committee requests such a vote. No member of the select committee shall disclose any information, the disclosure of which requires a committee vote, prior to a vote by the committee on the question of the

130

disclosure of such information or after such vote except in accordance with this section.

(b)(1) In any case in which the select committee votes to disclose publicly any information which has been classified under established security procedures, which has been submitted to it by the Executive branch, and which the Executive branch requests be kept secret, such committee shall—

    (A) first, notify the Majority Leader and Minority Leader of the Senate of such vote; and

    (B) second, consult with the Majority Leader and Minority Leader before notifying the President of such vote.

(2) The select committee may disclose publicly such information after the expiration of a five-day period following the day on which notice of such vote is transmitted to the Majority Leader and the Minority Leader and the President, unless, prior to the expiration of such five-day period, the President, personally in writing, notifies the committee that he objects to the disclosure of such information, provides his reasons therefore, and certifies that the threat to the national interest of the United States posed by such disclosure is of such gravity that it outweighs any public interest in the disclosure.

(3) If the President, personally, in writing, notifies the Majority Leader and Minority Leader of the Senate and the select Committee of his objections to the disclosure of such information as provided in paragraph (2), the Majority Leader and Minority Leader jointly or the select Committee, by majority vote, may refer the question of the disclosure of such information to the Senate for consideration.

(4) Whenever the select committee votes to refer the question of disclosure of any information to the Senate under paragraph (3), the Chairman shall not later than the first day on which the Senate is in session following the day on which the vote occurs, report the matter to the Senate for its consideration.

(5) One hour after the Senate convenes on the fourth day on which the Senate is in session following the day on which any such matter is reported to the Senate, or at such earlier time as the majority leader and the minority leader of the Senate jointly agree upon in accordance with paragraph 5 of rule XVII of the Standing Rules of the Senate, the Senate shall go into closed session and the matter

shall be the pending business. In considering the matter in closed session the Senate may—

(A) approve the public disclosure of all or any portion of the information in question, in which case the committee shall publicly disclose the information ordered to be disclosed,

(B) disapprove the public disclosure of all or any portion of the information in question, in which case the committee shall not publicly disclose the information ordered not to be disclosed, or

(C) refer all or any portion of the matter back to the committee, in which case the committee shall make the final determination with respect to the public disclosure of the information in question.

Upon conclusion of the consideration of such matter in closed session, which may not extend beyond the close of the ninth day on which the Senate is in session following the day on which such matter was reported to the Senate, or the close of the fifth day following the day agreed upon jointly by the majority and minority leaders in accordance with paragraph 5 of rule XVII of the Standing Rules of the Senate (whichever the case may be), the Senate shall immediately vote on the disposition of such matter in open session, without debate, and without divulging the information with respect to which the vote is being taken. The Senate shall vote to dispose of such matter by one or more of the means specified in clauses (A), (B), and (C) of the second sentence of this paragraph. Any vote of the Senate to disclose any information pursuant to this paragraph shall be subject to the right of a Member of the Senate to move for reconsideration of the vote within the time and pursuant to the procedures specified in rule XIII of the Standing Rules of the Senate, and the disclosure of such information shall be made consistent with that right.

(c)(1) No information in the possession of the select committee relating to the lawful intelligence activities of any department or agency of the United States which has been classified under established security procedures and which the select committee, pursuant to subsection (a) or (b) of this section, has determined should not be disclosed shall be made available to any person by a Member, officer, or employee of the Senate except in a closed session of the Senate or as provided in paragraph (2).

132

JA 28

STANDING ORDERS OF THE SENATE 〔81〕

(2) The select committee may, under such regulations as the committee shall prescribe to protect the confidentiality of such information, make any information described in paragraph (1) available to any other committee or any other Member of the Senate. Whenever the select committee makes such information available, the committee shall keep a written record showing, in the case of any particular information, which committee or which Members of the Senate received such information. No Member of the Senate who, and no committee which, receives any information under this subsection, shall disclose such information except in a closed session of the Senate.

(d) It shall be the duty of the Select Committee on Ethics to investigate any unauthorized disclosure of intelligence information by a Member, officer or employee of the Senate in violation of subsection (c) and to report to the Senate concerning any allegation which it finds to be substantiated.

(e) Upon the request of any person who is subject to any such investigation, the Select Committee on Ethics shall release to such individual at the conclusion of its investigation a summary of its investigation together with its findings. If, at the conclusion of its investigation, the Select Committee on Ethics determines that there has been a significant breach of confidentiality or unauthorized disclosure by a Member, officer, or employee of the Senate, it shall report its findings to the Senate and recommend appropriate action such as censure, removal from committee membership, or expulsion from the Senate, in the case of a Member, or removal from office or employment or punishment for contempt, in the case of an officer or employee.

SEC. 9. The select committee is authorized to permit any personal representative of the President, designated by the President to serve as a liaison to such committee, to attend any closed meeting of such committee.

SEC. 10. Upon expiration of the Select Committee on Governmental Operations With Respect to Intelligence Activities, established by Senate Resolution 21, Ninety-fourth Congress, all records, files, documents, and other materials in the possession, custody, or control of such committee, under appropriate conditions established by it, shall be transferred to the select committee.

SEC. 11. (a) It is the sense of the Senate that the head of each department and agency of the United States should

133

keep the select committee fully and currently informed with respect to intelligence activities, including any significant anticipated activities, which are the responsibility of or engaged in by such department or agency: *Provided,* That this does not constitute a condition precedent to the implementation of any such anticipated intelligence activity.

(b) It is the sense of the Senate that the head of any department or agency of the United States involved in any intelligence activities should furnish any information or document in the possession, custody, or control of the department or agency, or person paid by such department or agency, whenever requested by the select committee with respect to any matter within such committee's jurisdiction.

(c) It is the sense of the Senate that each department and agency of the United States should report immediately upon discovery to the select committee any and all intelligence activities which constitute violations of the constitutional rights of any person, violations of law, or violations of Executive orders, Presidential directives, or departmental or agency rules or regulations; each department and agency should further report to such committee what actions have been taken or are expected to be taken by the departments or agencies with respect to such violations.

Sec. 12. Subject to the Standing Rules of the Senate, no funds shall be appropriated for any fiscal year beginning after September 30, 1976, with the exception of a continuing bill or resolution, or amendment thereto, or conference report thereon, to, or for use of, any department or agency of the United States to carry out any of the following activities, unless such funds shall have been previously authorized by a bill or joint resolution passed by the Senate during the same or preceding fiscal year to carry out such activity for such fiscal year:

(1) The activities of the Office of the Director of National Intelligence and the Director of National Intelligence.

(2) The activities of the Central Intelligence Agency and the Director of the Central Intelligence Agency.

(3) The activities of the Defense Intelligence Agency.

(4) The activities of the National Security Agency.

(5) The intelligence activities of other agencies and subdivisions of the Department of Defense.

(6) The intelligence activities of the Department of State.

(7) The intelligence activities of the Federal Bureau of Investigation.

SEC. 13. (a) The select committee shall make a study with respect to the following matters, taking into consideration with respect to each such matter, all relevant aspects of the effectiveness of planning, gathering, use, security, and dissemination of intelligence:

(1) the quality of the analytical capabilities of United States foreign intelligence agencies and means for integrating more closely analytical intelligence and policy formulation;

(2) the extent and nature of the authority of the departments and agencies of the Executive branch to engage in intelligence activities and the desirability of developing charters for each intelligence agency or department;

(3) the organization of intelligence activities in the Executive branch to maximize the effectiveness of the conduct, oversight, and accountability of intelligence activities; to reduce duplication or overlap; and to improve the morale of the personnel of the foreign intelligence agencies;

(4) the conduct of covert and clandestine activities and the procedures by which Congress is informed of such activities;

(5) the desirability of changing any law, Senate rule or procedure, or any Executive order, rule, or regulation to improve the protection of intelligence secrets and provide for disclosure of information for which there is no compelling reason for secrecy;

(6) the desirability of establishing a standing committee of the Senate on intelligence activities;

(7) the desirability of establishing a joint committee of the Senate and the House of Representatives on intelligence activities in lieu of having separate committees in each House of Congress, or of establishing procedures under which separate committees on intelligence activities of the two Houses of Congress would receive joint briefings from the intelligence agencies and coordinate their policies with respect to the safeguarding of sensitive intelligence information;

135

(8) the authorization of funds for the intelligence activities of the Government and whether disclosure of any of the amounts of such funds is in the public interest; and

(9) the development of a uniform set of definitions for terms to be used in policies or guidelines which may be adopted by the executive or legislative branches to govern, clarify, and strengthen the operation of intelligence activities.

(b) The select committee may, in its discretion, omit from the special study required by this section any matter it determines has been adequately studied by the Select Committee To Study Governmental Operations With Respect to Intelligence Activities, established by Senate Resolution 21, Ninety-fourth Congress.

(c) The select committee shall report the results of the study provided for by this section to the Senate, together with any recommendations for legislative or other actions it deems appropriate, no later than July 1, 1977, and from time to time thereafter as it deems appropriate.

SEC. 14. (a) As used in this resolution, the term "intelligence activities" includes (1) the collection, analysis, production, dissemination, or use of information which relates to any foreign country, or any government, political group, party, military force, movement, or other association in such foreign country, and which relates to the defense, foreign policy, national security, or related policies of the United States, and other activity which is in support of such activities; (2) activities taken to counter similar activities directed against the United States; (3) covert or clandestine activities affecting the relations of the United States with any foreign government, political group, party, military force, movement or other association; (4) the collection, analysis, production, dissemination, or use of information about activities of persons within the United States, its territories and possessions, or nationals of the United States abroad whose political and related activities pose, or may be considered by any department, agency, bureau, office, division, instrumentality, or employee of the United States to pose, a threat to the internal security of the United States, and covert or clandestine activities directed against such persons. Such term does not include tactical foreign military intelligence serving no national policy-making function.

136

(b) As used in this resolution, the term "department or agency" includes any organization, committee, council, establishment, or office within the Federal Government.

(c) For purposes of this resolution, reference to any department, agency, bureau, or subdivision shall include a reference to any successor department, agency, bureau, or subdivision to the extent that such successor engages in intelligence activities now conducted by the department, agency, bureau, or subdivision referred to in this resolution.

SEC. 15. (a) In addition to other committee staff selected by the select Committee, the select Committee shall hire or appoint one employee for each member of the select Committee to serve as such Member's designated representative on the select Committee. The select Committee shall only hire or appoint an employee chosen by the respective Member of the select Committee for whom the employee will serve as the designated representative on the select Committee.

(b) The select Committee shall be afforded a supplement to its budget, to be determined by the Committee on Rules and Administration, to allow for the hire of each employee who fills the position of designated representative to the select Committee. The designated representative shall have office space and appropriate office equipment in the select Committee spaces. Designated personal representatives shall have the same access to Committee staff, information, records, and databases as select Committee staff, as determined by the Chairman and Vice Chairman.

(c) The designated employee shall meet all the requirements of relevant statutes, Senate rules, and committee security clearance requirements for employment by the select Committee.

(d) Of the funds made available to the select Committee for personnel—

(1) not more than 60 percent shall be under the control of the Chairman; and

(2) not less than 40 percent shall be under the control of the Vice Chairman.

SEC. 16. Nothing in this resolution shall be construed as constituting acquiescence by the Senate in any practice, or in the conduct of any activity, not otherwise authorized by law.

137

JA 33

SEC. 17. (a)(1) Except as provided in subsections (b) and (c), the Select Committee shall have jurisdiction to review, hold hearings, and report the nominations of civilian individuals for positions in the intelligence community for which appointments are made by the President, by and with the advice and consent of the Senate.

"(2) Except as provided in subsections (b) and (c), other committees with jurisdiction over the department or agency of the Executive Branch which contain a position referred to in paragraph (1) may hold hearings and interviews with individuals nominated for such position, but only the Select Committee shall report such nomination.

"(3) In this subsection, the term 'intelligence community' means an element of the intelligence community specified in or designated under section 3(4) of the National Security Act of 1947 (50 U.S.C. 3003(4)).

"(b)(1) With respect to the confirmation of the Assistant Attorney General for National Security, or any successor position, the nomination of any individual by the President to serve in such position shall be referred to the Committee on the Judiciary and, if and when reported, to the Select Committee for not to exceed 20 calendar days, except that in cases when the 20-day period expires while the Senate is in recess, the Select Committee shall have 5 additional calendar days after the Senate reconvenes to report the nomination.

"(2) If, upon the expiration of the period described in paragraph (1), the Select Committee has not reported the nomination, such nomination shall be automatically discharged from the Select Committee and placed on the Executive Calendar.

"(c)(1) With respect to the confirmation of appointment to the position of Director of the National Security Agency, Inspector General of the National Security Agency, Director of the National Reconnaissance Office, or Inspector General of the National Reconnaissance Office, orany successor position to such a position, the nomination of any individual by the President to serve in such position, who at the time of the nomination is a member of the Armed Forces on active duty, shall be referred to the Committee on Armed Services and, if and when reported, to the Select Committee for not to exceed 30 calendar days, except that in cases when the 30-day period expires while the Senate is in recess, the Select Committee shallhave 5 additional

calendar days after the Senate reconvenes to report the nomination.

"(2) With respect to the confirmation of appointment to the position of Director of the National Security Agency, Inspector General of the National Security Agency, Director of the National Reconnaissance Office, or Inspector General or the National Reconnaissance Office, or any successor position to such a position, the nomination of any individual by the President to serve in such position, who at the time of the nomination is not a member of the Armed Forces on active duty, shall be referred to the Select Committee and, if and when reported, to the Committee on Armed Services for not to exceed 30 calendar days, except that in cases when the 30-day period expires while the Senate is in recess, the Committee on Armed Services shall have an additional 5 calendar days after the Senate reconvenes to report the nomination.

"(3) If, upon the expiration of the period of sequential referral described in paragraphs (1) and (2), the committee to which the nomination was sequentially referred has not reported the nomination, the nomination shall be automatically discharged from that committee and placed on the Executive Calendar.".

[S. Res. 400, 94–2, May 19, 1976, as amended S. Res. 470, 113–2, July 7, 2014; S. Res. 4, Feb. 4, 1977; S. Res. 445, 108–2, Oct. 9, 2004, Pub. L. 109–77, § 506. 120 Stat. 247. 247 (2005), and S. Res. 50, 110–1, Feb. 14, 2007.]

HOMELAND SECURITY AND INTELLIGENCE OVERSIGHT     **82**

To eliminate certain restrictions on service of a Senator on the Senate Select Committee on Intelligence.

*Resolved,*

SEC. 100. Purpose.

It is the purpose of titles I through V of this resolution to improve the effectiveness of the Senate Select Committee on Intelligence, especially with regard to its oversight of the Intelligence Community of the United States Government, and to improve the Senate's oversight of homeland security.

TITLE I—HOMELAND SECURITY OVERSIGHT REFORM     **82.1**

SEC. 101. Homeland Security.

(a) COMMITTEE ON HOMELAND SECURITY AND GOVERNMENT AFFAIRS.—The Committee on Governmental

# Exhibit B

Memorandum of Points and Authorities in Support of
Defendants' Motion to Dismiss

*Musgrave v. Warner, et al.*, Civil Action No. 1:21-cv-02198-BAH

| 97th Congress 1st Session } | COMMITTEE PRINT | { No. 5 |
| --- | --- | --- |

# REPORT

### OF THE

# COMMITTEE ON THE JUDICIARY
# HOUSE OF REPRESENTATIVES

## NINETY-SEVENTH CONGRESS

### FIRST SESSION

#### IDENTIFYING

## COURT PROCEEDINGS AND ACTIONS OF VITAL INTEREST TO THE CONGRESS

---

### CURRENT TO
### SEPTEMBER 1, 1979

---



Printed for the use of the Committee on the Judiciary

---

**U.S. GOVERNMENT PRINTING OFFICE**
WASHINGTON : 1980

61-795 O

## COMMITTEE ON THE JUDICIARY

PETER W. RODINO, Jr., New Jersey, *Chairman*

| | |
|---|---|
| JACK BROOKS, Texas | ROBERT McCLORY, Illinois |
| ROBERT W. KASTENMEIER, Wisconsin | TOM RAILSBACK, Illinois |
| DON EDWARDS, California | HAMILTON FISH, Jr., New York |
| JOHN CONYERS, Jr., Michigan | M. CALDWELL BUTLER, Virginia |
| JOHN F. SEIBERLING, Ohio | CARLOS J. MOORHEAD, California |
| GEORGE E. DANIELSON, California | JOHN M. ASHBROOK, Ohio |
| ROMANO L. MAZZOLI, Kentucky | HENRY J. HYDE, Illinois |
| WILLIAM J. HUGHES, New Jersey | THOMAS N. KINDNESS, Ohio |
| SAM B. HALL, Jr., Texas | HAROLD S. SAWYER, Michigan |
| MIKE SYNAR, Oklahoma | DAN LUNGREN, California |
| PATRICIA SCHROEDER, Colorado | F. JAMES SENSENBRENNER, Jr., |
| BILLY LEE EVANS, Georgia | Wisconsin |
| DAN GLICKMAN, Kansas | BILL McCOLLUM, Florida |
| HAROLD WASHINGTON, Illinois | |
| BARNEY FRANK, Massachusetts | |

Alan A. Parker, *General Counsel*
Garner J. Cline, *Staff Director*
Franklin G. Polk, *Associate Counsel*

(II)

## FOREWORD

In 1971, the Joint Committee on Congressional Operations began publishing this series of reports on legal proceedings of importance to the Congress as a constitutionally established institution. The reports have contained descriptions of such proceedings, the texts of court decisions, and related documents.

During the 95th Congress, the Select Committee on Congressional Operations published these reports in conjunction with the Senate Committee on Rules and Administration. Since 1971, 23 regular and special reports have been published in this series.

The Select Committee was not reconstituted in the 96th Congress. The Committee on House Administration conducted a study of the functions of the Select Committee and recommended to the Speaker that this reporting responsibility be assigned to the Committee on the Judiciary. The Speaker concurred.

This particular report is the second to be published by the Committee on the Judiciary. The first report was prepared by the Select Committee and was ready for publication prior to the expiration of the Select Committee's authority.

Due to the change in Committee assignment and personnel this report will reflect only those matters current to September 1, 1979. It is the intention of the House Committee on the Judiciary to adhere to a biannual publishing date henceforth. Twice a year on a regular basis, the Committee will publish and issue an updated report on all court proceedings and actions of vital interest to the Congress.

Many of the cases included in this report focus upon crucial, complex, and fundamental questions concerning the scope of Congressional power and the boundaries of permissible legislative activity. It is my hope that these reports will provide a valuable tool to which Members and non-Members alike may turn for guidance or information in their efforts to more fully understand the powers and limitations of Congress and its Members within the American system of government.

PETER W. RODINO, Jr., *Chairman,*
*Committee on the Judiciary.*

(III)

JA 39

# C O N T E N T S

COURT PROCEEDINGS AND ACTIONS OF VITAL INTEREST TO THE
CONGRESS

|  | Page |
|---|---|
| Foreword | iii |
| Explanatory Note | 1 |
| Case Summaries | 1 |
| Cases: | |
| I. Constitutional Immunity of Members of Congress Under the Speech or Debate Clause: | |
|     *Hutchinson* v. *Proxmire* | 7 |
|     *Rusack* v. *Harsha* | 17 |
|     *Davis* v. *Passman* | 20 |
|     *Boland* v. *Blakey* | 29 |
|     *United States* v. *Helstoski* | 30 |
|     *Helstoski* v. *Meanor* | 30 |
|     *Chase* v. *Kennedy* | 40 |
|     *Clancey* v. *Albert* | 41 |
|     *Littlejohn* v. *Talmadge* | 43 |
|     *United States* v. *Eilberg* (criminal action) | 45 |
|     *Ragas* v. *Davis* | 49 |
|     *Common Cause* v. *Bolger* (formerly Bailar, formerly Klassen) | 50 |
|     *In re Grand Jury* | 68 |
|     *McSurely* v. *McAdams* (formerly McClellan) | 75 |
| II. Constitutional Powers of Congress: | |
|     *Idaho* v. *Freeman* (formerly Goulding) | 87 |
|     *Laxalt* v. *Kimmitt* | 89 |
|     *Chadha* v. *Immigration and Naturalization Service* | 92 |
|     *Schwartz* v. *United States Department of Justice* | 94 |
|     *Goland* v. *Central Intelligence Agency* | 97 |
|     *Exxon Corp.* v. *Federal Trade Commission* | 106 |
|     *Kerr-McGee Corp.* v. *Federal Trade Commission* | 106 |
|     *Union Carbide Corp.* v. *Federal Trade Commission* | 106 |
|     *Socialist Workers 1974 National Campaign Committee* v. *Henshaw* (formerly Jennings) | 112 |
|     *Goldwater* v. *Carter* | 116 |
|     *McCrae* v. *United States Department of Health, Education, and Welfare* | 119 |
| III. Powers of Congressional Committees: | |
|     *International Union of Bricklayers and Allied Craftsmen* v. *Harris* | 123 |
|     *Iowa Beef Processors Inc.* v. *Smith* (formerly Bagley) | 125 |
|     *Koniag Inc.* v. *Andrus* (formerly Kleppe) | 131 |
|     *In re Beef Industry Antitrust Litigation* | 136 |
|     *United States* v. *Kim* | 141 |

VI

## OTHER ACTIONS OF INTEREST

| | Page |
|---|---|
| *Lewis* v. *Chisholm* | 143 |
| *Trible* v. *Brown* | 144 |
| *United States* v. *Diggs* (criminal action) | 147 |
| *United States* v. *Diggs* (civil action) | 148 |
| *AFL-CIO* v. *Kahn* | 149 |
| *United States* v. *Eilberg* (civil action) | 153 |
| *Holy Spirit Association for the Unification of World Christianity* v. *Fraser* | 156 |
| *United States ex rel. Joseph* v. *Cannon* | 158 |
| *Moreau* v. *Tonry* | 159 |
| *In re Japanese Electronic Products Antitrust Litigation* | 162 |
| *Duplantier* v. *United States* | 163 |
| *Nixon* v. *Solomon* | 166 |
| *United States* v. *Flood* | 170 |

## RECENT DECISIONS

| | |
|---|---|
| *Hutchinson* v. *Proxmire* | 175 |
| *Davis* v. *Passman* | 209 |
| *United States* v. *Helstoski* | 245 |
| *Helstoski* v. *Meanor* | 271 |

## SUPREME COURT DECISIONS INTERPRETING THE SPEECH OR DEBATE CLAUSE

| | |
|---|---|
| *United States* v. *Johnson* | 285 |
| *Dombrowski* v. *Eastland* | 303 |
| *United States* v. *Brewster* | 307 |
| *Gravel* v. *United States* | 361 |
| *Doe* v. *McMillian* | 413 |
| *Eastland* v. *United States Servicemen's Fund* | 449 |

## APPENDIX

| | |
|---|---|
| The Constitution of the United States | 477 |

94

sional action having the effect of law, but, since the one-House veto is not subject to Presidential veto, it is unconstitutional.

Finally, Mr. Chadha asserts that the one-House veto provision violates the requirement of a bicameral legislature. According to Mr. Chadha, the Framers of the Constitution intended that every power of the legislative branch not expressly granted to a single House must be exercised by both concurrently. Therefore, since the one-House veto provision allows a single House to make law without the concurrence of the other, it is unconstitutional.

On October 27, 1977, respondent INS filed a suggestion to invite the submission of *amici curiae* briefs by the U.S. Senate and House of Representatives.

Clerk's letters were sent on November 17, 1977, inviting the President of the Senate and the Speaker of the House to file briefs *amicus curiae* within 30 days.

On February 27, 1978, an *amicus curiae* brief on behalf of the Senate, pursuant to Senate Resolution 338 of the 95th Congress, and a separate *amicus curiae* brief on behalf of Representative Frank Thompson, Jr., Chairman of the Committee on House Administration of the U.S. House of Representatives, were filed. Each of the briefs opposed Mr. Chadha's petition and contended, *inter alia,* that the one-House veto is constitutional and that Chadha lacked standing to challenge the constitutionality of the one-House veto.

The petition was argued on April 10, 1978.

*Status.*—The petition is pending before the U.S. Court of Appeals for the Ninth Circuit. No further action has been taken.

### Schwartz v. *United States Department of Justice*

No. 78–1334 (D.C. Cir.)

This suit was filed on November 4, 1976, under the Freedom of Information Act, 5 U.S.C. § 3552 (hereinafter "FOIA"), by Robert Bennett Schwartz, to compel the release of materials relating to the investigation of the conduct of Peter R. Schlam, an Assistant United States Attorney for the Eastern District of New York, during the unsuccessful extortion and conspiracy prosecution of then-Representative Angelo Roncallo. Named as defendants in the complaint were the United States Department of Justice; Edward H. Levi, at that time Attorney General of the United States; and Peter A. Rodino, Jr., Chairman of the Judiciary Committee of the U.S. House of Representatives. Mr. Levi and Congressman Rodino were sued in their official capacities.

Mr. Schwartz alleged in the complaint that pursuant to the FOIA he was entitled to inspect and copy the documents in the possession of the Justice Department and the Judiciary Committee, and that he had exhausted all available administrative remedies in an attempt to secure such access. The complaint sought declaratory and injunctive relief providing for an order directing the defendants to produce the requested documents immediately, and expediting the complaint as provided in the FOIA.

Along with the complaint, Mr. Schwartz filed an application for leave to proceed in *forma pauperis.* On November 3, 1976, District Judge George L. Hart, Jr., granted the application and also dismissed the action under 28 U.S.C. § 1915(d), which provides for the

JA 42

Case 1:21-cv-02198-BAH   Document 5-3   Filed 10/19/21   Page 8 of 10
SCA Case #22-5252      Document #1988603      Filed: 03/04/2023   Page 47 of 19

95

dismissal of an action in *forma pauperis* if the allegation of poverty is untrue, or if the court is satisfied that the action is frivolous or malicious.

On November 17, 1976, Mr. Schwartz filed a notice of appeal from the order dismissing the action. Leave to appeal without prepayment of costs was denied as frivolous and not taken in good faith by District Judge Hart on November 17, 1976.

The United States Court of Appeals for the District of Columbia Circuit granted the motion of Mr. Schwartz to proceed on appeal in *forma pauperis* on January 19, 1977.

On March 4, 1977, a *per curiam* order was issued, *sua sponte*, vacating the order of the District Court and remanding the case to the District Court with instructions to serve the defendants with summonses in accordance with Rule 4(a) of the Federal Rules of Civil Procedure.

On July 11, 1977, Defendants, Department of Justice and Griffin B. Bell, Attorney General, who was automatically substituted in place of Mr. Levi, filed an answer to the complaint. The answer claimed, *inter alia,* that: the complaint failed to state a claim upon which relief could be granted; the court lacked subject matter jurisdiction; and Griffin B. Bell was not a proper party to the action.

On July 11, 1977, Representative Rodino filed a motion to dismiss and a supporting memorandum of points and authorities, in which he asserted that as Chairman of the House Judiciary Committee, he was not a proper party to the action, that the court lacked subject matter jurisdiction and that the complaint failed to state a claim upon which relief could be granted.

Chairman Rodino argued in particular that neither he nor the House Judiciary Committee were within the purview of the FOIA. He noted that the act applied to "agencies" of the executive branch of the Federal Government and that the FOIA specifically excluded the Congress from its disclosure requirements.

Mr. Schwartz filed an affidavit in opposition to Congressman Rodino's motion to dismiss. In the affidavit, he requested that Representative Rodino be directed to appear and answer the complaint. The affidavit further stated that Congressman Rodino was sued under an asserted general common law right of plaintiff to inspect public records.

On August 30, 1977, District Judge Pratt issued a memorandum opinion denying the motion to dismiss. The memorandum opinion held that the historic common law right to inspect and copy public records has been recognized in the District of Columbia Circuit, that the general rule is that all three branches of Government are subject to the common law, and that Congressman Rodino had set forth no persuasive reason why Congress should be exempt from the common law rule. Judge Pratt stated that, absent a showing that the matters sought by plaintiff are not "public records" within the meaning of the common law rule or that Mr. Schwartz does not possess any "interest" required for application of the rule, the motion to dismiss could not be granted. He also noted that Congress could exempt itself from the common law rule if it so desired, but had not done so.

Case 1:21-cv-02198-BAH   Document 5-3   Filed 10/19/21   Page 9 of 10
USCA Case #22-5252      Document #1988603      Filed: 03/04/2023    Page 48 of 192

96

On September 30, 1977, Representative Rodino filed a motion to dismiss or, in the alternative, for summary judgment. The grounds put forth for the motion were that the court lacked subject matter jurisdiction and that there was no dispute as to any issue of material fact. In an affidavit attached to the motion, Congressman Rodino stated that no investigation or inquiry of any kind relating to the matters alluded to in the complaint had ever been undertaken by the committee or any staff person employed by the committee. An affidavit of Edmund L. Henshaw, Clerk of the United States House of Representatives was also attached to the motion. Mr. Henshaw stated that a search failed to turn up any documents or papers relating to any investigaton of Peter Schlam by the committee.

A supplement to the motion to dismiss or, in the alternative, for summary judgment and a second affidavit of Congressman Rodino were filed on December 7, 1977. Attached to the affidavit were a number of documents related to statements made by former Representative Roncallo on the floor of the House of Representatives and in a letter to Representative Rodino. The supplement to the motion reiterated that there were no House records within the scope of Mr. Schwartz' request.

A Memorandum Order was issued by District Judge Pratt on December 12, 1977, granting the motion of Congressman Rodino for summary judgment, denying the motion of the Department of Justice for a protective order and directing the Department of Justice to answer plaintiff's first set of interrogatories on or before January 6, 1978. The memorandum order noted that Congressman Rodino had indicated by sworn affidavit that he had directed a thorough records search and filed and delivered copies of all material compiled by his committee. Judge Pratt stated that a reviewing court must grant summary judgment in defendant's behalf when the defendant, in candor and good faith, has indicated that all available records have been turned over to the plaintiff. In denying the motion of the Department of Justice for a protective order, the memorandum order noted that plaintiff, proceeding *pro se*, had filed the action in November of 1976 and had been delayed over 1 year in his efforts to secure the information at issue. The court also noted that the interrogatories did not strike the court as unduly burdensome and they might assist plaintiff in his attempt to locate additional relevant documents.

On January 6, 1978, the Department of Justice filed a response to Mr. Schwartz' interrogatories. The Department released some of the documents requested by Mr. Schwartz and refused to release other documents, asserting that they were exempt from disclosure under the Freedom of Information Act. Also filed by the Justice Department on January 6, 1978, was a motion for summary judgment on the grounds that there existed no genuine issue as to any material fact. In a "statement of material facts pursuant to local rule 19(h) as to which there is no genuine issue" and a memorandum of points and authorities in support of its motion, the Department of Justice argued that the withholding of those documents denied to Mr. Schwartz was proper under FOIA exemptions 5, 6, 7(c) and 7(d) 5 U.S.C. § 552(b).

On February 9, 1978, District Judge Pratt issued a memorandum order granting the Department's motion to dismiss. The liability of the Attorney General in his official capacity was treated as incorporated into that of the Department of Justice. The memorandum order stated that the documents were variously protected by FOIA exemption 7(c), which exempts from mandatory disclosure investigatory records compiled for law enforcement purposes to the extent that the production of such records would constitute an unwarranted invasion of privacy; by FOIA exemption 7(d), which exempts from mandatory disclosure investigatory records compiled for law enforcement purposes to the extent the production of such records would disclose the identity of a confidential source; and by FOIA exemption 6, which protects from disclosure personnel and medical files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. Since the District Court held all of the documents in question to be protected by FOIA exemption 6, 7(c) or 7(d), the applicability of exemption 5, which protects interagency or intraagency communications which would not be available by law to a party other than an agency in litigation with the agency, was not reached in the opinion.

On March 3, 1978, Mr. Schwartz filed a notice of appeal from the memorandum order of February 9, 1978.

On April 5, 1979 the Court of Appeals issued its decision. The judgment of the District Court was affirmed on the basis of Judge Pratt's Memorandum Order of February 9, 1978. No opinion accompanied the Circuit Court's decision.

*Status.*—The case has been closed.

The District Court's memorandum opinion of August 30, 1977 is printed in the "Decisions" section of the report *Court Proceedings and Actions of Vital Interest to the Congress,* current to December 31, 1978.

The District Court's memorandum order of December 12, 1977 is printed in the "Decisions" section of the report *Court Proceedings and Actions of Vital Interest to the Congress,* current to December 31, 1978.

The District Court's memorandum order of February 9, 1978 is printed in the "Decisions" section of the report *Court Proceedings and Actions of Vital Interest to the Congress,* current to December 31, 1978.

## *Goland* v. *Central Intelligence Agency*
No. 76-1800 (D.C. Cir.)

Plaintiffs, Susan D. Goland and Patricia B. Skidmore, filed suit on January 26, 1976, pursuant to the Freedom of Information Act, as amended, 5 U.S.C. § 552 (hereinafter "FOIA"). Named as defendants in the suit were the Central Intelligence Agency (hereinafter "CIA") and the Information Coordinator of the CIA.

This action was the result of a request of documents which was first made by Sara Holtz. On May 2, 1975, Sara Holtz, who is not a party to the suit, filed an FOIA request with the CIA seeking access to "all records concerning the legislative history" of the National Security Act of 1947, 50 U.S.C. § 403 (1970), the CIA Act of 1949, 50 U.S.C. §§ 403a-403j (1970), and two bills introduced into Congress in 1948 providing for the administration of the Agency.

# Exhibit C

Memorandum of Points and Authorities in Support of
Defendants' Motion to Dismiss

*Musgrave v. Warner, et al.*, Civil Action No. 1:21-cv-02198-BAH

| 95th Congress 2d Session | COMMITTEE PRINT | PART 6 |
| --- | --- | --- |

# REPORT

### OF THE

# SELECT COMMITTEE
# ON CONGRESSIONAL OPERATIONS

## U.S. HOUSE OF REPRESENTATIVES

#### PURSUANT TO

### HOUSE RESOLUTION 420
### NINETY-FIFTH CONGRESS

##### AND THE

# COMMITTEE ON
# RULES AND ADMINISTRATION

## U.S. SENATE

#### PURSUANT TO

### SENATE RULE XXV, (n)(2)

##### IDENTIFYING

## COURT PROCEEDINGS AND ACTIONS OF VITAL
## INTEREST TO THE CONGRESS

*Current to December 31, 1978*



Printed for the use of the House Select Committee on Congressional
Operations and the Senate Committee on Rules and Administration

U.S. GOVERNMENT PRINTING OFFICE

37-148 O                    WASHINGTON : 1978

### SELECT COMMITTEE ON CONGRESSIONAL OPERATIONS

#### U.S. HOUSE OF REPRESENTATIVES

JACK BROOKS, Texas, *Chairman*

| | |
|---|---|
| ROBERT N. GIAIMO, Connecticut | JAMES C. CLEVELAND, New Hampshire |
| JAMES L. OBERSTAR, Minnesota | JOHN M. ASHBROOK, Ohio |
| JOHN L. BURTON, California | |
| ADAM BENJAMIN, JR., Indiana | |

#### COMMITTEE ON RULES AND ADMINISTRATION

#### U.S. SENATE

CLAIBORNE PELL, Rhode Island, *Chairman*

| | |
|---|---|
| HOWARD W. CANNON, Nevada | MARK O. HATFIELD, Oregon |
| ROBERT C. BYRD, West Virginia | ROBERT P. GRIFFIN, Michigan |
| HARRISON A. WILLIAMS, JR., New Jersey | HOWARD H. BAKER, JR., Tennessee |
| DICK CLARK, Iowa | |

II

JA 48

# CONTENTS

------

### Court Proceedings and Actions of Vital Interest to the Congress

| | Page |
|---|---|
| Introduction | ix |
| I. Constitutional Qualifications of Members of Congress: | |
| *Clancey v. Albert* | 1 |
| *Laxalt v. Kimmitt* | 2 |
| II. Constitutional Immunity of Members of Congress: | |
| *Davis v. Passman* | 7 |
| *McSurely v. McAdams* (formerly McClellan) | 14 |
| *Hutchinson v. Proxmire* | 23 |
| *United States v. Helstoski* | 28 |
| *Helstoski v. Meanor* | 28 |
| *Chase v. Kennedy* | 37 |
| *Rusack v. Harsha* | 38 |
| III. Powers of Congressional Committees: | |
| *United States v. American Telephone and Telegraph Co.* | 43 |
| *Koniag Inc. v. Andrus* (formerly Kleppe) | 50 |
| *Exxon Corp. v. Federal Trade Commission* | 55 |
| *Kerr-McGee Corp. v. Federal Trade Commission* | 55 |
| *Union Carbide Corp. v. Federal Trade Commission* | 55 |
| *United States v. Berrellez* | 62 |
| *United States v. Gerrity* | 63 |
| *Holy Spirit Association v. Fraser* | 64 |
| *In re Beef Industry Antitrust Litigation* | 65 |
| *Iowa Beef Processors, Inc. v. Bagley* | 66 |
| *United States v. Powell* | 68 |
| *Application of Senate Select Committee on Ethics* | 69 |
| *Application of House Select Committee on Assassinations* | 69 |
| IV. Constitutional Powers of the Congress: | |
| *Chadha v. Immigration and Naturalization Service* | 71 |
| *Nixon v. Sampson* | 73 |
| *Nixon v. Solomon* | 92 |
| *Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp* | 93 |
| *Goland v. Central Intelligence Agency* | 95 |
| *Daughtrey v. Carter* | 101 |
| *Schwartz v. United States Department of Justice* | 106 |
| *Goldwater v. Carter* | 109 |
| V. Officers, Employees, and Agents of the Congress: | |
| *Socialist Workers v. Henshaw* (formerly Jennings) | 113 |
| *United States v. Elko* | 116 |
| *Brislin v. United States* | 116 |

# IV

|  | Page |
|---|---|
| V. Officers, Employees, and Agents of the Congress—Continued | |
| *Common Cause* v. *Bolger* (formerly Bailar, formerly Klassen) | 117 |
| *Lewis* v. *Chisholm* | 135 |
| *Abney* v. *United States Capitol Hill Policeman* | 136 |
| *Martin Tractor Co.* v. *Federal Election Commission* | 136 |
| VI. Disputed Elections: | |
| *Moreau* v. *Tonry* | 141 |
| VII. Other Actions Involving Members in a Representative Capacity: | |
| *Dellums* v. *Powell* | 145 |
| *Powell* v. *Dellums* | 145 |
| *Wilson* v. *Dellums* | 145 |
| *Sportservice Corp.* v. *Steiger* | 149 |
| *Reuss* v. *Balles* | 150 |
| *United States* v. *Podell* | 155 |
| *Clay* v. *Bauman* | 157 |
| *McRae* v. *Califano* | 158 |
| *Ray* v. *Proxmire* | 161 |
| *Young* v. *New York Times* | 162 |
| *Rosen* v. *Young* | 163 |
| *Gardner* v. *Young* | 164 |
| *Helstoski* v. *Goldstein* | 164 |
| *Cervase* v. *Rangel* | 165 |
| *United States* v. *Goldberg* | 167 |
| *United States ex rel. Joseph* v. *Cannon* | 172 |
| *United States* v. *Hanna* | 173 |
| *United States* v. *Passman* | 174 |
| *United States* v. *Diggs* | 175 |
| *Community-Service Broadcasting of Mid-America, Inc.* v. *Federal Communications Commission* | 176 |
| *Patterson* v. *Griffin* | 180 |
| *Littlejohn* v. *Talmadge* | 181 |
| *United States* v. *Clark* | 182 |
| *United States* v. *Flood* | 183 |
| *United States* v. *Eilberg* | 184 |
| *In re Japanese Electronic Products Antitrust Litigation* | 184 |

## Decisions

| | |
|---|---|
| *Rusack* v. *Harsha* | 189 |
| *Exxon Corp.* v. *Federal Trade Commission* | 215 |
| *Kerr-McGee Corp.* v. *Federal Trade Commission* | 215 |
| *Union Carbide Corp.* v. *Federal Trade Commission* | 215 |
| *Iowa Beef Processors, Inc.* v. *Bagley* (District Court, February 13, 1978) | 237 |
| *Iowa Beef Processors, Inc.* v. *Bagley* (District Court, November 24, 1978) | 249 |
| *Iowa Beef Processors, Inc.* v. *Bagley* (Court of Appeals) | 251 |
| *Nixon* v. *Sampson* | 257 |
| *Schwartz* v. *United States Department of Justice* (August 30, 1977) | 273 |
| *Schwartz* v. *United States Department of Justice* (December 12, 1977) | 275 |

V

### DECISIONS—Continued

|  | Page |
|---|---|
| *Schwartz* v. *United States Department of Justice* (February 9, 1978) | 277 |
| *Lewis* v. *Chisholm* | 283 |
| *Martin Tractor Co.* v. *Federal Election Commission* | 285 |
| *Dellums* v. *Powell* | 293 |
| *Cervase* v. *Rangel* | 313 |
| *United States* v. *Passman* | 321 |
| *United States* v. *Clark* | 335 |

### APPENDIX

Members of the 95th Congress parties to or directly concerned with litigation affecting Congress ............................... 345

### INDEX

Table of Cases Reported ............................................... 349

## HOUSE RESOLUTION 420 (95TH CONG., 1ST SESS.)

### SELECT COMMITTEE ON CONGRESSIONAL OPERATIONS

•        •        •        •        •        •        •

#### FUNCTIONS OF SELECT COMMITTEE

SEC. 3. (a) The select committee shall continue the functions of the Joint Committee on Congressional Operations for the House, as follows:

•        •        •        •        •        •        •

(2) Identifying any court proceeding or action which, in the opinion of the select committee, is of vital interest to the Congress, or to the House of Representatives as a constitutionally established institution of the Federal Government, and calling such proceeding or action to the attention of the House.—

•        •        •        •        •        •        •

## SENATE RULE XXV, (n)(2)

### COMMITTEE ON RULES AND ADMINISTRATION

•        •        •        •        •        •        •

Such committee shall also—

•        •        •        •        •        •        •

(B) Identify any court proceeding or action which in the opinion of the committee, is of vital interest to the Congress as a constitutionally established institution of the Federal Government and call such proceeding or action to the attention of the Senate.

VII

JA 52

## INTRODUCTION

In accordance with the provisions of House Resolution 420 of the 95th Congress and Senate Rule XXV, the Select Committee on Congressional Operations and the Senate Committtee on Rules and Administration are continuing the practice of reporting on court cases and actions of importance to the Congress as a constitutionally established institution of the Federal Government.

This report, the sixth report for the 95th Congress, provides case briefs, accounts of the status of court proceedings and the full text of decisions in cases which the committees have identified as being of vital interest to the Congress. Major changes in the briefs of previously reported cases appear in bold type. Those filed before the publication of the most recent preceding report but appearing in the reporting series for the first time are described as "(Newly Reported Cases)." Cases filed after the publication of the most recent preceding report are designated as "(New Cases)."

The committees intend to continue the practice of publishing reports of court proceedings and actions periodically throughout the 96th Congress. In addition, the committees also intend to publish a complete collection of the cases which have appeared in this series.

We encourage comments from all Members of Congress and others who use this report as an information source and research document. We also would welcome and appreciate any information or suggestions as to pending court proceedings and actions which do not appear in this report.

JACK BROOKS, *Chairman,*
*House Select Committee on*
*Congressional Operations.*

CLAIBORNE PELL, *Chairman,*
*Senate Committee on Rules*
*and Administration.*

ix

106

*Bush*, 553 F.2d at 212-13. Once a bill becomes law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public. *Harrington* v. *Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975); accord, *Harrington* v. *Bush*, 553 F.2d at 213. Thus, in this case, the injury suffered by the congressional appellants is in no way unique to their status as legislators. [Slip Opinion at 14.]

As to the interest of all the appellants, as citizens, in the proper administration of the law, specifically the enforcement of the Immigration and Nationality Act by the Attorney General, the Court of Appeals held an injury to this interest to be an abstract, generalized interest insufficent to confer standing.

*Status.*—No further action has been taken. The time for further appeal has expired.

The July 25, 1978 decision of the Court of Appeals is printed in the "Decisions" section of *Court Proceedings and Actions of Vital Interest to the Congress*, Part 5, September 15, 1978.

### *Schwartz* v. *United States Department of Justice* (Newly Reported Case)

No. 78-1334 (D.C. Cir.)

*Brief.*—This suit was filed on November 4, 1976, under the Freedom of Information Act, 5 U.S.C. § 3552 (hereinafter "FOIA"), by Robert Bennett Schwartz, to compel the release of materials relating to the investigation of the conduct of Peter R. Schlam, an Assistant United States Attorney for the Eastern District of New York, during the unsuccessful extortion and conspiracy prosecution of then-Representative Angelo Roncallo. Named as defendants in the complaint were the United States Department of Justice; Edward H. Levi, at that time Attorney General of the United States; and Peter A. Rodino, Jr., Chairman of the Judiciary Committee of the U.S. House of Representatives. Mr. Levi and Congressman Rodino were sued in their official capacities.

Mr. Schwartz alleged in the complaint that pursuant to the FOIA he was entitled to inspect and copy the documents in the possession of the Justice Department and the Judiciary Committee, and that he had exhausted all available administrative remedies in an attempt to secure such access. The complaint sought declaratory and injunctive relief providing for an order directing the defendants to produce the requested documents immediately, and expediting the complaint as provided in the FOIA.

Along with the complaint, Mr. Schwartz filed an application for leave to proceed in *forma pauperis*. On November 3, 1976, District Judge George L. Hart, Jr., granted the application and also dismissed the action under 28 U.S.C. § 1915(d), which provides for the dismissal of an action in *forma pauperis* if the allegation of poverty is untrue, or if the court is satisfied that the action is frivolous or malicious.

On November 17, 1976, Mr. Schwartz filed a notice of appeal from the order dismissing the action. Leave to appeal without prepayment of costs was denied as frivolous and not taken in good faith by District Judge Hart on November 17, 1976.

The United States Court of Appeals for the District of Columbia Circuit granted the motion of Mr. Schwartz to proceed on appeal in *forma pauperis* on January 19, 1977.

On March 4, 1977, a *per curiam* order was issued, *sua sponte*, vacating the order of the District Court and remanding the case to the District Court with instructions to serve the defendants with summonses in accordance with Rule 4(a) of the Federal Rules of Civil Procedure.

On July 11, 1977, Defendants, Department of Justice and Griffin B. Bell, Attorney General, who was automatically substituted in place of Mr. Levi, filed an answer to the complaint. The answer claimed, *inter alia*, that: the complaint failed to state a claim upon which relief could be granted; the court lacked subject matter jurisdiction; and Griffin B. Bell was not a proper party to the action.

On July 11, 1977, Representative Rodino filed a motion to dismiss and a supporting memorandum of points and authorities, in which he asserted that as Chairman of the House Judiciary Committee, he was not a proper party to the action, that the court lacked subject matter jurisdiction and that the complaint failed to state a claim upon which relief could be granted.

Chairman Rodino argued in particular that neither he nor the House Judiciary Committee were within the perview of the FOIA. He noted that the act applied to "agencies" of the executive branch of the Federal Government and that the FOIA specifically excluded the Congress from its disclosure requirements.

Mr. Schwartz filed an affidavit in opposition to Congressman Rodino's motion to dismiss. In the affidavit, he requested that Representative Rodino be directed to appear and answer the complaint. The affidavit further stated that Congressman Rodino was sued under an asserted general common law right of plaintiff to inspect public records.

On August 30, 1977, District Judge Pratt issued a memorandum opinion denying the motion to dismiss. The memorandum opinion held that the historic common law right to inspect and copy public records has been recognized in the District of Columbia Circuit, that the general rule is that all three branches of Government are subject to the common law, and that Congressman Rodino had set forth no persuasive reason why Congress should be exempt from the common law rule. Judge Pratt stated that, absent a showing that the matters sought by plaintiff are not "public records" within the meaning of the common law rule or that Mr. Schwartz does not possess any "interest" required for application of the rule, the motion to dismiss could not be granted. He also noted that Congress could exempt itself from the common law rule if it so desired, but had not done so.

On September 30, 1977, Representative Rodino filed a motion to dismiss or, in the alternative, for summary judgment. The grounds put forth for the motion were that the court lacked subject matter jurisdiction and that there was no dispute as to any issue of material fact. In an affidavit attached to the motion, Congressman Rodino stated that no investigation or inquiry of any kind relating to the matters alluded to in the complaint had ever been undertaken by the committee or any staff person employed by the commit-

Case 1:21-cv-02198-BAH   Document 5-4   Filed 10/19/21   Page 11 of 21
USCA Case #22-5252   Document #1988603   Filed: 03/04/2023   Page 60 of 192

108

tee. An affidavit of Edmund L. Henshaw, Clerk of the United States House of Representatives was also attached to the motion. Mr. Henshaw stated that a search failed to turn up any documents or papers relating to any investigaton of Peter Schlam by the committee.

A supplement to the motion to dismiss or, in the alternative, for summary judgment and a second affidavit of Congressman Rodino were filed on December 7, 1977. Attached to the affidavit were a number of documents related to statements made by former Representative Roncallo on the floor of the House of Representatives and in a letter to Representative Rodino. The supplement to the motion reiterated that there were no House records within the scope of Mr. Schwartz' request.

A memorandum order was issued by District Judge Pratt on December 12, 1977, granting the motion of Congressman Rodino for summary judgment, denying the motion of the Department of Justice for a protective order and directing the Department of Justice to answer plaintiff's first set of interrogatories on or before January 6, 1978. The memorandum order noted that Congressman Rodino had indicated by sworn affidavit that he had directed a thorough records search and filed and delivered copies of all material compiled by his committee. Judge Pratt stated that a reviewing court must grant summary judgment in defendant's behalf when the defendant, in candor and good faith, has indicated that all available records have been turned over to the plaintiff. In denying the motion of the Department of Justice for a protective order, the memorandum order noted that plaintiff, proceeding *pro se*, had filed the action in November of 1976 and had been delayed over 1 year in his efforts to secure the information at issue. The court also noted that the interrogatories did not strike the court as unduly burdensome and they might assist plaintiff in his attempt to locate additional relevant documents.

On January 6, 1978, the Department of Justice filed a response to Mr. Schwartz' interrogatories. The Department released some of the documents requested by Mr. Schwartz and refused to release other documents, asserting that they were exempt from disclosure under the Freedom of Information Act. Also filed by the Justice Department on January 6, 1978, was a motion for summary judgment on the grounds that there existed no genuine issue as to any material fact. In a "statement of material facts pursuant to local rule 19(h) as to which there is no genuine issue" and a memorandum of points and authorities in support of its motion, the Department of Justice argued that the withholding of those documents denied to Mr. Schwartz was proper under FOIA exemptions 5, 6, 7(c) and 7(d) 5 U.S.C. § 552(b).

On February 9, 1978, District Judge Pratt issued a memorandum order granting the Department's motion to dismiss. The liability of the Attorney General in his official capacity was treated as incorporated into that of the Department of Justice. The memorandum order stated that the documents were variously protected by FOIA exemption 7(c), which exempts from mandatory disclosure investigatory records compiled for law enforcement purposes to the extent that the production of such records would constitute an unwarranted invasion of privacy; by FOIA exemption 7(d), which exempts

Case 1:21-cv-02198-BAH Document 5-4 Filed 10/19/21 Page 12 of 21
USCA Case #22-5252 Document #1988603 Filed: 03/04/2023 Page 61 of 192

109

from mandatory disclosure investigatory records compiled for law enforcement purposes to the extent the production of such records would disclose the identity of a confidential source; and by FOIA exemption 6, which protects from disclosure personnel and medical files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. Since the District Court held all of the documents in question to be protected by FOIA exemption 6, 7(c) or 7(d), the applicability of exemption 5, which protects interagency or intraagency communications which would not be available by law to a party other than an agency in litigation with the agency, was not reached in the opinion.

On March 3, 1978, Mr. Schwartz filed a notice of appeal from the memorandum order of February 9, 1978.

*Status.*—The appeal is pending before the United States Court of Appeals for the District of Columbia Circuit.

The District Court's memorandum opinion of August 30, 1977 is printed in the "Decisions" section of this report at 273.

The District Court's memorandum order of December 12, 1977 is printed in the "Decisions" section of this report at 275.

The District Court's memorandum order to February 9, 1978 is printed in the "Decisions" section of this report at 277.

***Goldwater* v. *Carter*** (New Case)

Civil Action No. 78–2412 (D.D.C.)

*Brief.*—Plaintiffs, Members of the Senate and House of Representatives, filed suit on December 22, 1978, in the United States District Court for the District of Columbia, against President Carter and Secretary of State Cyrus Vance. Plaintiffs include Senator Barry Goldwater, Senator Strom Thurmond, Senator Carl Curtis, Senator Jake Garn, Senator Jesse A. Helms, Senator-elect Gordon Humphrey, Congressman Robert Bauman, Congressman Steve Symms, Congressman Larry McDonald, Congressman Robert Daniel, Jr., Congressman Bob Stump, Congressman Eldon Rudd, Congressman John Ashbrook and Congressman George Hansen.

The plaintiffs seek to have the court declare unconstitutional and illegal, and to enjoin, set aside, annul, suspend, or otherwise declare invalid and of no effect, the purported notice by President Carter to the Republic of China of the termination of the 1954 Mutual Defense Treaty (hereinafter "Defense Treaty"), TIAS 3178, 6 UST 433 (1955), between the United States and the Republic of China. Plaintiffs further seek to have the court declare that the termination of the 1954 Treaty cannot be legally accomplished, nor can notice be given of the intended termination of such treaty, without the advise and consent of the United States Senate, or the approval of both Houses of Congress.

The Congressional plaintiffs first assert that the Defense Treaty itself stipulates the only method for its abrogation. Article X of the Defense Treaty states in its entirety:

> This Treaty shall remain in force indefinitely. Either Party may terminate it one year after notice has been given to the other Party.

They then assert that Article 2 of the Vienna convention on the Law of Treaties defines the term "party" as "a State which has

# United States District Court for the District of Columbia

Civil Action No. 76-2039

ROBERT BENNETT SCHWARTZ, PLAINTIFF,

*v.*

DEPARTMENT OF JUSTICE ET AL., DEFENDANTS.

## MEMORANDUM

This is an action in which plaintiff seeks certain records from the Department of Justice and Peter A. Rodino, Jr., Chairman of the Committee on the Judiciary of the United States House of Representatives, on the investigation of one Peter R. Schlam. The Department of Justice is sued under the Freedom of Information Act. Mr. Rodino is sued under the common law right of access to public records. The matter is now before the Court on Mr. Rodino's motion to dismiss. Mr. Rodino claims that Congress is not subject to the common law rule which gives citizens a right of access to public records.

The historic common law right to inspect and copy public records is recognized in this jurisdiction. *United States* v. *Mitchell*, 551 F.2d 1252, 1257 (D.C. Cir. 1976). The general rule is that all three branches of government, legislative, executive, and judicial, are subject to the common law right. *Courier-Journal & Louisville Times Co.* v. *Curtis*, 335 S.W.2d 934, 936 (Ky. 1959), *cert. denied*, 364 U.S. 910 (1960), *partially overruled on other grounds, St. Matthews* v. *Voice of St. Matthews Inc.*, 519

Case 1:21-cv-02198-BAH   Document 5-4   Filed 10/19/21   Page 14 of 21
USCA Case #22-5252      Document #1988603      Filed: 03/04/2023      Page 63 of 192

274

S.W.2d 811 (Ky. 1974): 66 Am. Jur. 2d *Records and Recording Laws* § 15 (1973).

Defendant Rodino has set forth no persuasive reason why Congress should be exempted from the common law rule. It is true that Congress has exempted itself from the requirements of the Freedom of Information Act, 5 U.S.C. § 552, by 5 U.S.C. § 551(1)(A). That Act, however, is not coextensive with the common law rule under discussion. It applies to *all* matters in Government files; the common law rule applies only to "public records" Moreover, we can find no inconsistency or conflict between the Freedom of Information Act and the common law rule. Even if there were an inconsistency or conflict, the Act would have to be construed narrowly, favoring application of the common law, because the Freedom of Information Act is in derogation of the common law.

Accordingly, we hold that Congress is subject to the common law rule which guarantees the public a right to inspect and copy public records. Absent a showing that the matters sought by plaintiff are not "public records" within the meaning of the common law rule or that plaintiff does not possess any "interest" required by the rule, we cannot grant defendant Rodino's motion for dismissal.

If Congress wishes to exempt itself from the common law rule or to impose standards for its application, it has the means to do so readily at its disposal. It has, however, not done so and therefore remains subject to the common law rule.

An order will issue accordingly.

Dated: August 24, 1977.

JOHN H. PRATT,
*United States District Judge.*

————

275

## United States District Court for the District of Columbia

---

Civil Action No. 76–2039

### Robert B. Schwartz, plaintiff,

*v.*

### Department of Justice et al., defendants.

---

### Memorandum Order

Three matters regarding this Freedom of Information Act suit are currently before this Court. The motion of defendant Peter Rodino to dismiss the action as to him, or in the alternative for summary judgment, must be evaluated. In addition, plaintiff's motion to compel discovery and defendant Department of Justice's motion for a protective order merit this Court's attention.

A. *Motion of defendant Peter Rodino,* On September 30, 1977, defendant Rodino filed a motion to dismiss or, in the alternative, for summary judgment. That motion was opposed on October 11 and thereafter supported by a second affidavit and various documents on December 7, 1977.

It is the opinion of this Court that defendant Rodino's motion for summary judgment must be granted. Mr. Rodino has, by sworn affidavit, indicated that he has directed a thorough records search and that "no stone was left unturned in this matter." He has filed and delivered copies of all materials compiled by this Committee. When the defendant, in candor and good faith, indicates that all available records have been turned over to the plaintiff, a reviewing court must grant summary judgment in defendant's behalf. See *Nolen* v. *Rumsfeld,* 535 F.2d 890, 891 (5th Cir. 1976), *cert. denied,*

JA 60

276

429 U.S. 1104 (1977); *Weisberg* v. *U.S. Department of Justice,* Civil Action No. 75–226 (D.D.C. Oct. 5, 1977).

B. & C. Motion of Plaintiff to Compel Discovery and Motion of Defendant Department of Justice for Protective Order. On August 1, 1977, plaintiff filed interrogatories in connection with this action. After being served with a motion to compel discovery on September 19, defendant Department of Justice indicated that it had not received the interrogatories via plaintiff's alleged service of process but that it would "initiate the preparation of appropriate responses." Plaintiff was not satisfied with this representation, and by reply of October 5 and letter to this Court on October 30 renewed his motion to compel.

On November 22 defendant Department of Justice filed a motion for protective order asserting that a dispositive motion was to be "imminently filed" and that discovery would be superfluous in the Freedom of Information Act context. Plaintiff opposed this motion on December 2. On December 9 this Court was advised that the Department of Justice would prepare a dispositive motion and a catalogue of relevant documents by January 23, 1978.

We cannot endorse defendant's request for a protective order. Plaintiff, proceeding *pro se,* filed this action in November 1976 and has been delayed over one year in his efforts to secure the information at issue. The interrogatories do not strike this Court as unduly burdensome, and they may assist plaintiff in his attempts to locate additional relevant documents.

For these reasons, it is by this Court this 12th day of December, 1977,

ORDERED, that the motion of defendant Peter Rodino for summary judgment be, and the same hereby is, granted; and it is further

ORDERED, that the motion of defendant Department of Justice for a protective order be, and the same hereby is, denied; and it is further

ORDERED, that defendant Department of Justice shall answer plaintiff's first set of interrogatories on or

before January 6, 1978. No further extensions will be granted.

J. H. PRATT,
*United States District Judge.*

— —

## United States District Court for the District of Columbia

——————

## Civil Action No. 76–2039

ROBERT B. SCHWARTZ, PLAINTIFF,

*v.*

DEPARTMENT OF JUSTICE ET AL., DEFENDANTS.

——————

### MEMORANDUM ORDER

Defendant Department of Justice has moved for summary judgment in this Freedom of Information Act (FOIA) action, producing numerous documents and withholding others pursuant to FOIA exemptions 5, 6, 7(C) and 7(D). 5 U.S.C. § 552(b). In support of its motion, defendant has submitted *Vaughn* v. *Rosen* affidavits analyzing in detail the documents themselves, and where pertinent, citing the provisions of the statute relied upon. We previously, by Order of December 13, 1977, granted summary judgment for the remaining defendant Peter Rodino, who was sued in his official capacity as Chairman of the House Judiciary Committee: defendant Rodino by sworn affidavit informed this Court that no records existed in his files responsive to plaintiff's request and that relevant background materi-

278

al voluntarily was being supplied to plaintiff by defendant Rodino.[1]

At issue in this action are documents pertaining to an investigation regarding the conduct of Peter Schlam, an Assistant United States Attorney for the Eastern District of New York, in the unsuccessful extortion and conspiracy prosecution of United States Representative Angelo Roncallo. Schlam fell ill during the final days of that trial as a result of the ingestion of a quantity of drugs, possibly self induced, and his illness attracted substantial public attention. Plaintiff seeks documents relating to the investigation of that drugging incident by the Department of Justice. Because we find that the documents are protected from disclosure by exemptions 6, 7(C) and 7(D), we do not find it necessary to analyze the applicability of exemption 5 as advanced by defendant.[2]

A. *Exemption 7(C)*. The FOIA exempts from mandatory disclosure "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would * * * (C) constitute an unwarranted invasion of personal privacy." Our review of the itemizations of documents convinces us that the withheld documents were compiled for law enforcement purposes. It is not necessary that further enforcement proceedings be imminent in order to qualify under exemption 7. *Rural Housing Alliance* v. *U.S. Department of Agriculture*, 498 F.2d 73 (D.C. Cir. 1974) (compilation of records for adjudicatory purposes sufficient to achieve protection of exemption 7); *see Koch* v. *Department of Justice*, 376 F. Supp. 313, 315 (D.D.C. 1974) (records compiled for enforcement of regulatory provisions protected); *Green* v. *Kleindienst*, 378 F. Supp. 1397, 1400 (D.D.C. 1974) (business review letters protected). We find that these records were compiled for law en-

---

[1] The Attorney General of the United States also was joined as defendant, in his official capacity, and his liability will be treated as incorporated into that of the Department of Justice.

[2] We have reviewed the itemizations of the withheld documents carefully, but do not in this memorandum discuss the individual documents. Notably, exemptions 6 and 7(C) are asserted for each and every document withheld.

Case 1:21-cv-02198-BAH   Document 5-4   Filed 10/19/21   Page 19 of 21
USCA Case #22-5252      Document #1988603      Filed: 03/04/2023      Page 68 of 192

279

forcement purposes relating to alleged improprieties in the prosecution of Congressman Roncallo, particularly noting that a letter of reprimand was placed in Schlam's file as a result of the investigation. *See* Defendant's Motion for Summary Judgment, Exhibit I (letter of V. Rakestraw, at 4).

It is also our opinion that release of intimate details regarding the drugging incident would constitute "an unwarranted invasion of personal privacy." Since we also hold that the release would constitute a *clearly* unwarranted invasion meriting exemption from disclosure pursuant to exemption 6 (see discussion, *infra*), we are satisfied that the less demanding burden on the Government in meeting the privacy invasion aspects of exemption 7 has been satisfied. *See Department of the Air Force* v. *Rose*, 425, U.S. 352, 378–79 n.16 (1976).

We therefore conclude that these documents are protected from disclosure by exemption 7(C).

B. *Exemption 7(D)*. Exemption 7(D) protects "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would * * * (D) disclose the identity of a confidential source * * *." Defendant asserts that disclosure of the requested information would jeopardize the confidential relationships which enabled the Government to secure the information at issue, since a person familiar with this incident would be able to ascertain the identity of the source by an analysis of information involved. *See* Defendant's Motion for Summary Judgment, Exhibit III (Affidavit of G. R. Schweickhardt at 7–10). We accept this sworn testimony, and determine that these records are protected by exemption 7(D). *See Harbolt* v. *Alldredge*, 464 F.2d 1243, 1244 (10th Cir.), *cert. denied*. 409 U.S. 1025 (1972) (FBI interrogation reports not subject to disclosure).

C. *Exemption 6*. Exemption 6 protects from disclosure "personnel and medical files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." To determine the applicability of this exemption, it is necessary to balance the privacy interest of Peter Schlam against the public interest purpose

which would be satisfied by the production of the documents at issue,[3] recognizing that we should tilt the balance in favor of disclosure. *Getman* v. *N.L.R.B.,* 450 F.2d 670, 674–75 (D.C. Cir. 1971). In reaching our conclusion, we endorse the reasoning employed by the court in *Hiss* v. *Department of Justice,* C.A. No. 76Civ4672 (S.D. N.Y. Oct. 18, 1977) in upholding the applicability of exemption 6 to protect from disclosure records relating to the conduct of a private investigator engaged in the defense of Alger Hiss before the House Un-American Activities Committee. The Court there determined that disclosure of information relating to the investigator's relationship with government intelligence agencies would be embarrassing and clearly unwarranted. Plaintiff in this action protests the nondisclosure of unverified opinions and reports regarding Schlam's personal, social, professional and medical status, and it is this Court's conclusion that disclosure would constitute a serious privacy invasion. *See Columbia Packing Co., Inc.* v. *Department of Agriculture,* 417 F. Supp. 651, 654 (D. Mass. 1976).

In balancing the interests at issue in this litigation, we have evaluated plaintiff Schwartz's assertions that the public interest would be advanced by release of this information. Plaintiff asserts that such release would enable him "to judge the quality and fairness of [the Roncallo] judicial proceedings and the conduct of AUSA Peter R. Schlam." Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment at 2. While we find that this proffered interest may be a legitimate one, we do not find that it is sufficient to tip the balance in favor of disclosure. Furthermore, in the context of this case, we are prone to believe that plaintiff's real motivation may lie elsewhere.

---

[3] We must evaluate the public interest with reference to the advantages to be secured by release *to this plaintiff. See Rural Housing Alliance* v. *Department of Agriculture, supra,* at 77; *Getman* v. *N.L.R.B.,* 450 F.2d 670, 677 n.24 (D.C. Cir. 1974). *But see Dictlow* v. *Schultz,* 517 F.2d 166, 171 (D.C. Cir. 1975) (dictum) (evaluation should be with reference to the advantages to be secured by release to the general public). Our decision in this action would not be altered by application of the standard suggested in *Ditlow.*

281

In *Hiss* v. *Department of Justice, supra,* slip op. at 7, the Court in rejecting plaintiff's assertions that release of the information would be in furtherance of the public interest in the conduct of government prosecutions, characterized them as being invoked "only to satisfy the requirements of the FOIA," whereas the plaintiff's personal interests were paramount. We find plaintiff Schwartz's attempt to distinquish the *Hiss* case to be unpersuasive, and like the *Hiss* court determine that plaintiff here has not met his burden of demonstrating that the public interest in the disclosure outweighs the clear invasion of privacy which disclosure of these documents would constitute.

For these reasons, it is by the Court this 9th day of February, 1978,

ORDERED, that defendant's motion for summary judgment be granted; and it is further

ORDERED, that this action is dismissed.

JOHN H. PRATT,
*United States District Judge.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT B. SCHWARTZ,

     Plaintiff,

  v.                   Civil Action No. 76-2039

DEPARTMENT OF JUSTICE, ET AL.,

     Defendants.

_____/

F I L E D

JUL 11 1977

JAMES F. DAVEY, Clerk

## MOTION TO DISMISS
### DEFENDANT PETER A. RODINO, JR.

    Defendant Peter A. Rodino, Jr., by his undersigend
attorneys, pursuant to Rule 12(b)(1) and (6), Federal Rules
of Civil Procedure, hereby moves the Court to be dismissed
from this action. The grounds for this motion are that
defendant Rodino is not a proper party to this action, the
Court lacks jurisdiction over the subject matter of this
action against him, and the Complaint fails to state a claim
against him upon which relief may be granted. In support of
this motion, the Court is respectfully referred to defendant's
memorandum of points and authorities in support of his
motion to dismiss filed herewith.

                         Respectfully submitted,


                         _____
                         EARL J. SILBERT
                         United States Attorney

                         _____
                         ROBERT N. FORD
                         Assistant United States Attorney

                         _____
                         JOHN OLIVER BIRCH
                         Assistant United States Attorney

                         Attorneys, Department of Justice
                         Rm. 3600-E, U.S. Courthouse
                         3rd & Constitution Ave., N.W.
                         Washington, D.C.   20001
                         Tel:  472-4726

                         Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT B. SCHWARTZ,

      Plaintiff,

    v.                  Civil Action No. 76-2039

DEPARTMENT OF JUSTICE, ET AL.,

      Defendants.

_____/

FILED

JUL 11 1977

JAMES F. DAVEY, Clerk

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS DEFENDANT RODINO

PRELIMINARY STATEMENT

This action was instituted by plaintiff Robert Bennett
Schwartz, pro se, against defendants, United States Department
of Justice, Edward H. Levi and Peter A. Rodino, Jr.  Plaintiff
has alleged the Freedom of Information Act, 5 U.S.C. §552
(1970 & Supp. V 1975), as amended by Act of September 13,
1976, Pub. L. No. 94-409; 28 U.S.C. §§1361, 1391(e) (1970)
and the U.S. Constitution as the jurisdictional basis for
this proceeding.

Defendants, the Department of Justice and Attorney General
Griffin Bell,[1/] have filed an Answer.  Defendant Rodino now
moves the Court for the entry of an order dismissing him from
the action.

STATEMENT OF FACTS

Plaintiff, by letters dated August 11, 1976, and Sep-
tember 9, 1976, requested the Executive Office for United
States Attorneys to furnish plaintiff with "a copy of the

_____

1/   Since Griffin B. Bell has succeeded the official named
as defendant in the complaint, Edward H. Levi, as Attorney
General of the United States, Mr. Bell is automatically sub-
stituted as defendant in the stead of Mr. Levi.  (Rule 25(d),
F.R. Civ. P.)

JA 68

final opinion and the underlying documents and findings in
an investigation conducted by your agency regarding the con-
duct of Peter R. Schlam, an Assistant U.S. Attorney from the
Eastern District of New York."  The request was denied by the
Executive Office by letter dated November 2, 1976.

Plaintiff alleges that by Certified Mail No. 593361
dated August 13, 1976, and by letter dated September 9,
1976, he requested defendant Rodino, as Chairman of the
House Judiciary Committee, to furnish plaintiff with findings
of fact and conclusions of law made by the Committee con-
cerning its investigation of the conduct of Assistant United
States Attorney Peter R. Schlam.  He alleges that he received
no response to these requests.  (Complaint, paras. 11, 12, 13)

## STATUTES INVOLVED

5 U.S.C. §551 (1970) provides, in pertinent part, that:

> For the purpose of this subchapter
> [Subchapter II, Administrative Procedure,
> 5 U.S.C. §§551-559]
>
> > (1)  "agency" means each authority
> > of the Government of the United States
> > ..., but does not include--
> >
> > > (A)  the Congress;
> > >
> > > (B)  the courts of the United
> > > States ....

5 U.S.C. §552(e) provides that:

> For the purposes of this section
> [§552, the Freedom of Information Act],
> the term 'agency' as defined in section
> 551(1) of this title includes any execu-
> tive department, military department,
> Government corporation, Government con-
> trolled corporation, or other establish-
> ment in the executive branch of the
> Government (including the Executive Office
> of the President), or any independent regu-
> latory agency.

## ARGUMENT

Defendant Rodino now moves the Court to dismiss him
from this action.  He asserts that as Chairman of the House
Judiciary Committee, he is not a proper party to this action,

- 2 -

JA 69

that the Court lacks jurisdiction over the subject matter of
this action, and that the Complaint fails to state a claim
upon which relief may be granted.

The documents sought from defendant Rodino in this action
are those findings of fact and conclusions of law made by the
House Judiciary Committee of the United States Congress con-
cerning an alleged investigation by that Committee of the
conduct of Assistant United States Attorney Peter R. Schlam.

Any documents within the custody of defendant Rodino or
the House Judiciary Committee belong to an entity which is
not an agency within the meaning of the Freedom of Infor-
mation Act. Therefore, the Court must dismiss the action
against defendant Rodino for want of personal and subject
matter jurisdiction under the Act. The action should also
be dismissed because plaintiff has consequently failed to
state a claim upon which relief may be granted.

I.   Peter A. Rodino, Jr. is not an "Agency"
     Subject to the Requirements of the
     Freedom of Information Act.

The Freedom of Information Act, 5 U.S.C. §552 (1970 and
Supp. V 1975), as amended by Act of September 13, 1976, Pub.
L. No. 94-409 [hereinafter referred to as FOIA or §552],
grants jurisdiction to the federal district courts "to
enjoin [an] agency from withholding agency records and to
order the production of any agency records improperly with-
held from [a] complainant." §552(a)(4)(B). The definition
of an "agency" for purposes of the FOIA may be found in two
sections of Title 5 of the United States Code. 5 U.S.C.
§551 (1970) provides that for purposes of the subchapter on
Administrative Procedure, which includes the FOIA,

> (1)  "agency" means each authority
> of the Government of the United States,
> ..., but does not include--
>
> > (A) the Congress;
> >
> > (B) the courts of the United
> > States ....

- 3 -

JA 70

5 U.S.C. §552(e), added to the FOIA in 1974 by Public Law

No. 93-502, further provides that

> For purposes of this section [the
> FOIA], the term 'agency' <u>as defined in
> section 551(1) of this title</u> includes
> any executive department, military de-
> partment, Government corporation, Govern-
> ment controlled corporation, or other estab-
> lishment <u>in the executive branch of the
> Government</u> (including the Executive Office
> of the President), or any independent regu-
> latory agency. [Emphasis added.]

Defendant Rodino, an individual, is not an "agency" within

the meaning of the FOIA. <u>Cox</u> v. <u>Levi</u>, Civil No. 76CV470-W-3

(W.D. Mo. November 12, 1976); <u>Russo</u> v. <u>Department of Justice</u>,

Civil No. 76-131-C3 (D. Kan. November 11, 1976); <u>Burke</u> v.

<u>Kelly</u>, Civil Action No. 75-336-C3 (D. Kan. February 11, 1976).

(Copies are attached hereto as Appendices A, B and C, respec-

tively). Thus, this Court clearly lacks personal and subject

matter jurisdiction under the Act, §552(a)(4)(B), and should

dismiss the action against defendant Rodino. Furthermore, the

entity of which Mr. Rodino is chairman, and which would have

custody of any documents within the ambit of plaintiff's re-

quest, the House Judiciary Committee, is likewise not an "agency"

within the meaning of the FOIA. It is clear from the wording

of both §551(1)(A) and §552(e) that the term "agency", as

used in the FOIA, does not include Congressional committees.

Section 551(1)(A) specifically excludes Congress from the

scope of §§551 through 559 of Title 5, and therefore from

the scope of §552. An expanded definition of "agency" was

added by the 1974 Amendments to the FOIA for purposes of

that section, but the applicability of the §551(1) definition

to the FOIA was not altered. Rather, Congress reiterated

the continued relevance of §551(1) by specifying in §552(e)

that the term agency is in fact "defined in section 551(1)

of this title." The FOIA definition of agency simply expands

and clarifies the meaning of an "authority of the Government

- 4 -

of the United States," §551(1), for purposes of the FOIA
"to include ... [all] establishment[s] in the executive
branch of the Government" and independent regulatory agencies.
§552(e).  This expanded FOIA definition thus extends applica-
bility of the FOIA only to those agencies of the executive
branch which may not be included in the first sentence of
the §551(1) definition.  It does not extend the applicability
of the FOIA to those entities specifically excluded from the
§551(1) definition.  See §551(1)(A)-(H).

The legislative history of the 1974 Amendments to the
FOIA reflect the Congressional intent that the definition of
agency in §551(1) remain applicable to the FOIA and that the
expanded FOIA definition include only establishments within
the executive branch of the Government.  A House Conference
Report concerning the amendments refers to the continued
significance of §551(1).  See Conference Report No. 93-1200,
reprinted in [1974] U.S. Code Cong. & Ad. News 6285, 6293.
Furthermore, relevant House and Senate Reports use the terms
"federal," "government" and "executive branch" interchangeably
in referring to agencies and agency records subject to the
FOIA.  See H. Rep. No. 93-876, 93d Cong., 2d Sess., reprinted
in [1974] U.S. Code Cong. & Ad. News 6267, 6274; S. Rep. No.
93-854, 93d Cong. 2d Sess. 35 (1974).  Also, the House
Report clearly states that the intended effect of the FOIA
definition is "to insure inclusion under the Act of Government
corporations, Government controlled corporations, or other
establishments within the executive branch ..." [1974] U.S.
Code Cong. & Ad. News 6274.  [Emphasis added.]  Nowhere in
any of the reports is reference made to the legislative or
judicial branches of government. Both are expressly excluded
from the definition of agency in §551(1).  Clearly, Congress
did not intend that §552(e) effect such a major change in
the scope of the FOIA.

- 5 -

JA 72

Since passage of the 1974 Amendments to the FOIA, two federal district courts have held that the courts of the United States are not subject to the requirements of the FOIA.  See Santoro v. Attorney General of the United States, 76 Civ. 1803 (S.D. N.Y. October 8, 1976).  Blue v. Bureau of Prisons, Civil No. C75-2092 (N.D. Ga. August 10, 1976).  (Copies are attached hereto as Appendices D and E, respectively.)  Both courts based their decisions on the exclusion of the judiciary from the definition of agency in §551(1)(B).  Thus, the courts have recognized that §551(1) does indeed continue to apply to the FOIA in conjunction with §552(e).  See also Cox v. Levi, supra at 2 (term "agency" not intended to include individuals, but intended to refer to "department[s] of the executive branch which [have] custody of ... agency records) (Emphasis added).

Any documents which plaintiff seeks from defendant Rodino, or which plaintiff may seek from the House Judiciary Committee, are thus not "agency records" within the meaning of the FOIA. Defendant Rodino, an individual, is not an agency and is therefore not subject to the disclosure requirements of the Act.  The House Judiciary Committee is also not an agency within the meaning of the FOIA.  Congress is expressly excluded from the definition of "agency" in §551(1)(A) and does not fall within the definition in §552(e).  Furthermore, the legislative history of the 1974 Amendments to the FOIA, as well as recent case law, indicate that only agencies within the executive branch of the Government are subject to the Act's disclosure requirements.

- 6 -

## CONCLUSION

For the foregoing reasons, defendant Rodino's Motion
to Be Dismissed from This Action should be granted.

Respectfully submitted,

EARL J. SILBERT
United States Attorney

ROBERT N. FORD
Assistant United States Attorney

JOHN OLIVER BIRCH
Assistant United States Attorney

Attorneys, Department of Justice
Rm. 3600-E, U.S. Courthouse
3rd & Constitution Ave., N.W.
Washington, D.C.   20001
Tel:  472-4726

Attorneys for Defendants

- 7 -

JA 74

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT B. SCHWARTZ,                    )
                                       )
              Plaintiff,               )
                                       )
         v.                            )      Civil Action No. 76-2039
                                       )
DEPARTMENT OF JUSTICE, ET AL.,         )      **FILED**
                                       )
              Defendants.              )      AUG 1 i 1977
                                       )
_____)
                                              JAMES F. DAVEY, Clerk

DEFENDANTS' SUPPLEMENTARY MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS

Preliminary Statement

     Plaintiff brings this action against Peter A. Rodino, Jr.,
Chairman of the House Judiciary Committee,*/ requesting that he
be provided with the findings of fact and conclusions of law
made in the House Judiciary Committee's investigation into the
conduct of Assistant United States Attorney Peter R. Schlam.
On July 11, 1977, counsel for defendants filed a Motion to Dismiss
plaintiff's action against Mr. Rodino asserting that Mr. Rodino
is not an "Agency" subject to the requirements of the Freedom of
Information Act, 5 U.S.C. §552, et seq.  On July 26, 1977, plain-
tiff mailed a pleading styled as an "Affidavit In Opposition"
to counsel for defendants in which plaintiff acknowledges that
he is not entitled to bring an action for the documents requested
from Mr. Rodino under the Freedom of Information Act.  However,
plaintiff asserts that he is entitled to bring an action for
these documents under the "general common law right of plaintiff
to inspect public records"; 28 U.S.C. §1361; 44 U.S.C. §903, et seq.;
and Article 6, clauses 2 and 3 of the United States Constitution.
     Defendants contend that plaintiff continues to lack juris-
diction to bring an action against Mr. Rodino.

_____

*/  Plaintiff has also requested records from the Department of
Justice in his action which are not addressed in defendants'
Motion to Dismiss.

- 2 -

Clause 3 of Article 6 of the Constitution, cited by plaintiff as a jurisdictional basis for his action, does not exist. Clause 2 of Article 6 of the Constitution states that the Constitution, laws and treaties of the United States are the supreme law of the land and bind judges of the States regardless of the provisions of State Constitutions and laws. Clearly this section of the Constitution does not provide a jurisdictional basis for plaintiff's action.

The statutes cited by plaintiff also provide no basis for this action. The statutes cited by plaintiff dealing with the Congressional Record, 44 U.S.C. §903, et seq., do not create jurisdiction for any action against a member of Congress, much less of the nature alleged by plaintiff. Additionally, 28 U.S.C. §1361 does not create a jurisdictional basis for an action against a member of Congress of the nature asserted by plaintiff.

Finally, while <u>United States of America</u> v. <u>John Mitchell</u>, <u>et al.</u>, No. 75-1409 (D.C. Cir., filed October 26, 1976), may recognize a common law right to request some public records maintained by the Judicial Branch of the United States government, its clear that the opinion cannot be read to recognize a right to receive records maintained by the Congressional Branch of the United States government. Clearly, a court should be extremely reluctant to extend the principle of law apparently established by this opinion to the Congressional Branch of the United States government.

Conclusion

For the foregoing reasons, defendant Rodino respectfully requests that plaintiff's action be dismissed.

EARL J. SILBERT
United States Attorney

ROBERT N. FORD
Assistant United States Attorney

JOHN OLIVER BIRCH
Assistant United States Attorney



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PENTAGEN TECHNOLOGIES
   INTERNATIONAL LTD., et al.,

        Plaintiffs,

    v.

COMMITTEE ON APPROPRIATIONS
   OF THE U.S. HOUSE OF
   REPRESENTATIVES, et al.,

        Defendants.

Case No. 1:98cv00047 (GK)

FILED

MAR 16 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

RECEIVED

Mar 16   3 27 PM '98

N. MAYER-WHITTINGTON
CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**DEFENDANTS' MOTION TO DISMISS**

Pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, defendants

Committee on Appropriations of the U.S. House of Representatives ("Committee"), and the

Honorable Bob Livingston, the Representative of Louisiana's 11th congressional district and

Chairman of the Committee, through counsel, respectfully move for an order dismissing the

Complaint in this matter with prejudice.  A proposed order is attached and oral argument is not

requested.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**Introduction**

Pursuant to a supposed "common law right of access to public records," plaintiffs

Pentagen Technologies and Russell Varnado seek in this action to obtain access to certain non-

public, confidential reports prepared for internal Committee use by the Committee's investigative

staff (the Surveys and Investigations Staff).  Specifically, plaintiffs seek to review and copy all

Ex. B

investigative staff reports prepared after June 1993 that relate to the Department of Defense's

Sustaining Base Information Services ("SBIS") program.  Complaint at 7 (Jan. 9, 1998).[1]  The

investigative staff prepared the reports in question to aid the Committee in carrying out its

legislative responsibility to recommend appropriate funding levels for the program.

It is unclear for what precise purpose plaintiffs seek the investigative staff reports,

although the Complaint suggests that plaintiff Pentagen Technologies, an English software

company, intends to use the documents in connection with U.S. ex rel. Pentagen Technologies

International, et al. v. CACI International, et al., No. 96 Civ 7827 (S.D.N.Y.), a False Claims Act

case against several defense contractors.  See Complaint at ¶ 16.  In this respect, plaintiffs'

lawsuit is the functional equivalent of a subpoena duces tecum.  Plaintiff Varnado is not

identified in the Complaint other than as a resident of Fort Washington, Maryland.  Id. at ¶ 3.[2]

### Factual Background

The House Appropriations Committee is charged, among other things, with

"[a]ppropriati[ng] . . . revenue for the support of the Government."  Rule X.1(b)(1), Rules of the

---

[1]      SBIS is a U.S. Army program designed to create a "comprehensive national automated information system."  H.R. Conf. Rep. 104-863, at 913 (1996).  See also U.S. v. CACI International, Inc., 953 F. Supp. 74, 75 (S.D.N.Y. 1995) (SBIS intended "to modernize [U.S. Army] installation information management systems").  For the convenience of the Court, copies of the pertinent pages of H.R. Conf. Rep. 104-863 and other House reports and documents referred to in this memorandum are attached collectively as Exhibit A.

[2]      According to press reports, Mr. Varnado "managed information technology acquisition for the Army Material Command until 1992."  W. Wayt Gibbs, Battling the Enemy Within, Scientific American, April 1996, at 35.  He is also, apparently, a plaintiff in the False Claims Act case.

2

House of Representatives (105th Cong.) (referred to hereafter as "House Rules").[3]  "[T]o assist it in the determination of matters within its jurisdiction," the Committee is vested with authority to "conduct such studies and examinations of the organization and operation of executive departments and other executive agencies . . . as it may deem necessary."  House Rule X.2(b)(3).[4]  See also  2 U.S.C. § 72a(b) (authorizing House and Senate Appropriations Committees to retain professional staff to conduct studies and examinations of matters within their jurisdictions).  The Surveys and Investigations Staff is the professional investigative staff that performs this function for the House Appropriations Committee.

Section 8 of the Committee's rules addresses the procedure applicable to studies and examinations conducted pursuant to House Rule X.2(b)(3) and 2 U.S.C. § 72a(b).  A request for such a study or examination is initiated by a majority vote of a subcommittee, with the approval of the Chairman and Ranking Minority Member of the full Committee or, alternatively, by a majority vote of the full Committee.  Section 8(b), Rules of the House Committee on Appropriations (105th Cong.).[5]  Section 8 goes on to provide, in pertinent part, that

> [a]ny information obtained by such staff [appointed to conduct the study or examination] shall be reported to the chairman of the subcommittee requesting such study and examination and to the Chairman and Ranking Minority Member, shall be made available

---

[3]     For the convenience of the Court, copies of the pertinent parts of Rule X and other House and Committee rules referred to in this memorandum are attached collectively as Exhibit B.

[4]     The authority set forth in Rule X.2(b)(3) was first given to the Committee in 1943, and  incorporated into the rules of the House in 1953.  See Constitution, Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. 104-272, 104th Cong., 2d Sess. 428 (1997).

[5]     In practice, the Chairman and Ranking Member of the full Committee, as well as the Chairman and Ranking Member of the pertinent Subcommittee, must sign off on a directive to the investigative staff to initiate a study or examination.

JA 79

> to the members of the subcommittee concerned, and *shall not be
> released for publication until the subcommittee so determines.*

Section 8(d), Rules of the House Committee on Appropriations (105th Cong.) (emphasis added).

Investigative staff reports are rarely, if ever, disseminated publicly, either in whole or in part. Many of the reports contain classified or proprietary information, and they are specifically intended for internal use, that is "to assist [the Committee] in reaching decisions on specific funding levels" for the projects and activities studied. H.R. Rep. 104-870, at 12 (1996). Sometimes, although not often, information from investigative staff reports may be extracted and used in other Committee-prepared reports in accordance with Committee Rules. See id. at 14 ("[I]nformation may be released for publication only when the Subcommittee so determines as provided by Section 8 of the Committee's rules.").

In this case, pursuant to Section 8, the Committee's Subcommittee on Defense (now the Subcommittee on National Security) ("Subcommittee") first asked the investigative staff in or about 1994 to study the SBIS program. Between 1994 and 1996, the investigative staff compiled several reports that addressed the SBIS program (among other things). As noted above, none of these investigative staff reports have been made public. On several occasions and in connection with various appropriations bills, the Committee issued public reports — to which plaintiffs have full access — that discuss the SBIS program.[6] Plaintiffs' attorney requested that the Committee provide him with copies of the investigative staff reports, but the Committee declined.

---

[6]   See, e.g., H.R. Rep. No. 105-206, at 155 (1997); H.R. Rep. No. 104-863, at 913-14 (1996); H.R. Rep. No. 104-617, at 143 (1996); H.R. Rep. No. 103-562, at 57-58 (1994). See also H.R. Rep. 105-132, at 51 (1997) (report of House Committee on National Security).

4

JA 80

## Argument

I.     Plaintiffs' Claim Is Barred by the Speech or Debate Clause of the Constitution.

As an initial matter, plaintiffs' claim against the Committee and Chairman Livingston for

access to investigative staff reports is barred by the Speech or Debate Clause of the Constitution.

U.S. Const., art. I, § 6, cl. 1 ("for any Speech or Debate in either House, they [the Representatives

and Senators] shall not be questioned in any other place.").

The protections of the Speech or Debate Clause apply to all activities

> within the "legislative sphere". . . even though the[] conduct, if
> performed in other than legislative contexts, would in itself be
> unconstitutional or otherwise contrary to criminal or civil statutes.

Doe v. McMillan, 412 U.S. 306, 312-13 (1973) (quoting Gravel v. U.S., 408 U.S. 606, 624-25

(1972)).  The "legislative sphere" includes all activities that are

> "an integral part of the deliberative and communicative processes
> by which Members participate in committee and House
> proceedings with respect to the consideration and passage or
> rejection of proposed legislation or with respect to other matters
> which the Constitution places within the jurisdiction of either
> House."

Eastland v. United States Servicemen's Fund, 421 U.S. 491, 504 (1975) (quoting Gravel, 408

U.S. at 625).[7]  Moreover, the Speech or Debate Clause "applies not only to a Member but also to

his aides insofar as the conduct of the latter would be a protected legislative act if performed by

the Member himself." Gravel, 408 U.S. at 618.

Below, we first describe the history, purpose and scope of the Speech or Debate Clause,

---

[7]     See also Kilbourn v. Thompson, 103 U.S. 168, 204 (1881) (Speech or Debate
immunity extends to any act "generally done in a session of the House by one of its members in
relation to the business before it.").

5

## JA 81

and then discuss its specific application to this case.

    A.    <u>History, Purpose and Scope of the Speech or Debate Clause</u>.

The Speech or Debate Clause privilege is rooted in the epic struggle for parliamentary

supremacy in 16th and 17th century England:

> Behind these simple phrases lies a history of conflict between the
> Commons and the Tudor and Stuart monarchs during which
> successive monarchs utilized the criminal and civil law to suppress
> and intimidate critical legislators.

<u>U.S. v. Johnson</u>, 383 U.S. 169, 178 (1966).

> As Parliament achieved increasing independence from the Crown,
> its statement of the privilege grew stronger.  In 1523, Sir Thomas
> More could make only a tentative claim. . . . In 1668, after a long
> and bitter struggle, Parliament finally laid the ghost of Charles I,
> who had prosecuted Sir John Elliot and others for "seditious"
> speeches in Parliament. . . .  In 1689, the Bill of Rights declared in
> unequivocal language:  "That the Freedom of Speech, and Debates
> or Proceedings in Parliament, ought not to be impeached or
> questioned in any Court or Place out of Parliament."

<u>Tenney v. Brandhove</u>, 341 U.S. 367, 372 (1951).

As a result of the English experience, "[f]reedom of speech and action in the legislature

was taken as a matter of course" by the Founders, and reflected in the Speech or Debate Clause

of the Constitution.  <u>Id</u>.  The Speech or Debate Clause was intended by the Founders

> to insure that the legislative function the Constitution allocates to
> Congress <u>may be performed independently</u>.
>     . . . .
> [T]he "central role" of the Clause is to "prevent intimidation of
> legislators by the Executive and accountability before a possibly
> hostile judiciary . . . ."

6

# JA 82

Eastland, 421 U.S. at 502 (emphasis added) (quoting Gravel, 408 U.S. at 617).[8]  "In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." Johnson, 383 U.S. at 178.

"[T]he guarantees of th[e Speech or Debate] Clause are vitally important to our system of government and therefore are entitled to be treated by the courts with the sensitivity that such important values require." Helstoski v. Meanor, 442 U.S. 500, 506 (1979).  Accordingly, the Supreme Court has "[w]ithout exception . . . read the Speech or Debate Clause broadly to effectuate its purposes." Eastland, 421 U.S. at 501.[9]

The Speech or Debate privilege, as it has been construed by the Supreme Court and the lower courts, has two broad aspects.  First, the clause provides immunity from lawsuits for all actions "within the 'legislative sphere,' . . . even though the [] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." McMillan, 412 U.S. at 312-13 (quoting Gravel, 408 U.S. at 624-25).  This legislative immunity extends to civil suits as well as criminal prosecutions.[10]

---

[8]     See also Eastland, 421 U.S. at 510 n.16 ("The speech or debate protection provides an absolute immunity from judicial interference."); U.S. v. Brewster, 408 U.S. 501, 507 (1972); Johnson, 383 U.S. at 178-82; Tenney, 341 U.S. at 373.

[9]     See also McMillan, 412 U.S. at 311; Gravel, 408 U.S. at 618; Johnson, 383 U.S. at 179; Kilbourn, 103 U.S. at 204.

[10]    Civil Suits:  Eastland, 421 U.S. 491 (dismissing suit to enjoin Senate committee investigation); McMillan, 412 U.S. 306 (dismissing as against House committee Members suit to enjoin preparation and publication of committee report); Dombrowski v. Eastland, 387 U.S. 82 (1967) (dismissing as against Senate committee Members civil conspiracy claim relating to their receipt of documents); Kilbourn, 103 U.S. 168 (dismissing trespass action against House Members).

Criminal Prosecutions:  Johnson, 383 U.S. 169 (reversing conspiracy conviction based in part
(continued...)

# JA 83

Second, the Speech or Debate Clause provides a testimonial privilege.  <u>Gravel</u>, 408 U.S.
606.  This aspect of the privilege operates to protect those to whom it applies from being
compelled to give testimony as to privileged matters,[11] and from being compelled to produce
privileged documents.[12]

The Supreme Court has drawn no distinctions between the immunity from suit and the
testimonial aspects of the privilege.  Rather, it has stated unequivocally that when the Speech or
Debate privilege applies, it is "absolute."

> The question to be resolved is whether the actions of the petitioners
> fall within the "sphere of legitimate legislative activity."  If they do,
> the petitioners "shall not be questioned in any other Place" about
> those activities since <u>the prohibitions of the Speech or Debate
> Clause are absolute.</u>

---

[10](...continued)
on Speech or Debate evidence); <u>U.S. v. Helstoski</u>, 442 U.S. 477 (1979) (excluding evidence of
legislative acts in criminal prosecution of House Member); <u>Brewster</u>, 408 U.S. at 512 ("[A] Member
of Congress may be prosecuted under a criminal statute provided that the Government's case does
not rely on legislative acts or the motivation for legislative acts.").

[11]    <u>See, e.g.</u>, <u>Dennis v. Sparks</u>, 449 U.S. 24, 30 (1980) (dicta); <u>Gravel</u>, 408 U.S. at 615-
16; <u>Miller v. Transamerican Press, Inc.</u>, 709 F.2d 524, 528-29 (9th Cir. 1983) (denying motion to
compel testimony from former congressman).

[12]    <u>See, e.g.</u>, <u>Maddox v. Williams</u>, 855 F. Supp. 406, 413 (D.D.C. 1994), <u>aff'd sub nom</u>.
<u>Brown & Williamson Tobacco Corp. v. Williams</u>, 62 F.3d 408 (D.C. Cir. 1995); <u>Minpeco, S.A. v.
Conticommodity Services</u>, 844 F.2d 856, 859-61 (D.C. Cir. 1988) (quashing document subpoena to
congressional subcommittee); <u>McSurely v. McClellan</u>, 553 F.2d 1277, 1296-97 (D.C. Cir. 1976) (en
banc); <u>Dombrowski v. Burbank</u>, 358 F.2d 821, 823-24 (D.C. Cir. 1966) (dicta), <u>aff'd in part and rev'd
in part</u>, 387 U.S. 82 (1967); <u>Hearst v. Black</u>, 87 F.2d 68, 71-72 (D.C. Cir. 1936); <u>United
Transportation Union v. Springfield Terminal Ry. Co.</u>, 132 F.R.D. 4, 5-7 (D. Maine 1990) (quashing
document subpoena to Senator); <u>U.S. Football League v. National Football League</u>, 1986-1 Trade
Cas. (CCH) ¶ 67,123 (S.D.N.Y. 1986); <u>U.S. v. Peoples Temple of the Disciples of Christ</u>, 515 F.
Supp. 246, 248-49 (D.D.C. 1981) (quashing document subpoena to congressional committee).

Eastland, 421 U.S. at 501 (emphasis added).[13]

B.      Application of the Speech or Debate Clause to This Case.

As noted above, the Speech or Debate privilege applies to all activities of a Member of

Congress that are within the  "legislative sphere."  Activities within the legislative sphere include

more than words spoken in debate.  The cases "have plainly not taken a literalistic approach in

applying the privilege. . . . Committee reports, resolutions and the act of voting are equally

covered."  Gravel, 408 U.S. at 617.  Similarly, committee investigations and hearings have also

long been held to be activities within the legislative sphere.  See, e.g., Eastland, 421 U.S. 491.

The investigative staff reports addressing the SBIS program are clearly legislative in

nature.  They were prepared by Committee staffers at the request of the Subcommittee to assist

the Committee in carrying out its principal legislative responsibility, namely "reaching decisions

on specific funding levels" with respect to the SBIS program.  H.R. Rep. 104-870, at 12 (1996).

Accordingly, whether this case is viewed as the functional equivalent of a subpoena duces tecum,

or an attempt by plaintiffs to obtain the testimony of the investigative staff (in the form of the

written advice the staff provided to the Committee), it must fall under the testimonial privilege

prong of the Speech or Debate Clause.  See, e.g., Gravel, 408 U.S. at 618 (congressional aide

cannot be compelled to testify about legislative matters); Maddox v. Williams, 855 F. Supp. at

_____

[13]      Eastland repeatedly reaffirmed the absoluteness of the privilege.  See 421 U.S. at 503
("The applicability of the Clause to private civil actions is supported by the absoluteness of the term
'shall not be questioned,' and the sweep of the term 'in any other Place.'"); id. at 507 ("[T]he Speech
or Debate Clause provides complete immunity for the Members . . . ."); id. at 509-10 ("[Respondents'
argument] ignores the absolute nature of the speech or debate protection and our cases which have
broadly construed that protection"); id. at 510 n.16 ("[B]alancing plays no part.  The speech or debate
protection provides an absolute immunity from judicial interference.").  See also Barr v. Matteo, 360
U.S. 564, 569 (1959) ("[T]he Constitution itself gives an absolute privilege to members of both
Houses of Congress in respect to any speech, debate, vote, report, or action done in session.").

9

JA 85

413 ("[T]he Speech or Debate Clause stands as an insuperable obstacle to [a party's] attempt to acquire by compulsion documents or copies of documents in the possession of the Congress."), aff'd sub nom. Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408.  See also cases cited supra at note 12.

Just as clearly, the Subcommittee's decision not to make the investigative staff reports public constitutes a "legislative activity."  Accordingly, if the case is viewed as a challenge to the Subcommittee's decision not to release the documents, it also fails because the Committee and Chairman Livingston are immune from suit under the Speech or Debate Clause.  See cases cited supra at note 10.

For all these reasons, plaintiffs' claim against the Committee and Chairman Livingston is barred by the Speech or Debate Clause of the Constitution.

II.     Plaintiffs' Claim Is Barred by the Rulemaking and Journal Clauses of the
        Constitution Because the Documents Sought Are Deemed Confidential by House
        Rules.

The Rules of the House provide an independent basis for protecting from disclosure the records sought by plaintiffs here.

The House is authorized under the Rulemaking Clause of the Constitution to "determine the Rules of its Proceedings."  U.S. Const., art, I, § 5, cl. 2.  The Rulemaking Clause is "a broad grant of authority," Consumer's Union of the United States, Inc. v. Periodical Correspondent's Ass'n, 515 F.2d 1341, 1343 (D.C. Cir. 1975), cert. denied, 423 U.S. 1051 (1976), that sits "[a]t the very core of our constitutional separation of powers."  Walker v. Jones, 733 F.2d 923, 938 (D.C. Cir.) (MacKinnon, J., concurring in part and dissenting in part), cert. denied, 469 U.S. 1036 (1984).

JA 86

The Rulemaking Clause, coupled with the Journal Clause — U.S. Const., art. I, § 5, cl. 3

("[e]ach House shall keep a Journal of its Proceedings, and from time to time publish the same,

excepting such Parts as may in their Judgment require Secrecy.") — clearly provides the House

with the constitutional authority to keep its records confidential when it chooses.  As the Court of

Appeals for this Circuit has held, "Congress has undoubted authority to keep its records secret,

authority rooted in the Constitution, longstanding practice, and current Congressional rules."

Goland v. CIA, 607 F.2d 339, 346 (D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980).

Here, the House exercised its constitutional authority to protect the confidentiality of

information provided to the Committee by its investigative staff.  The House delegated to the

Committee authority to adopt rules not inconsistent with the Rules of the House.  House Rule

XI.2(a).  The Committee, in turn, adopted Section 8 which, as noted above, provides that "[a]ny

information obtained by such [investigative] staff . . . shall not be released for publication until

the subcommittee so determines."  The confidential nature of investigative staff reports is

highlighted by the fact that — absent an affirmative decision of the subcommittee — they are not

even available to Members of the Committee, other than the Chairman, the Ranking Minority

Member, and the Members of the subcommittee for whom the information was prepared.[14]

In short, pursuant to an unquestionably valid exercise of its rulemaking powers, the

---

[14]     Section 8 is not, however, unique.  The House has, by rule, determined to keep other
records confidential.  See, e.g., House Rule X.4(e)(2)(F) (requiring that information received by, and
activities, reports and proceedings of, House Committee on Standards of Official Conduct be kept
confidential); House Rule XXXVI (requiring that certain archived records be kept confidential for
certain periods of time); Rule 22, Rules of the Committee on National Security (105th Cong.) (all
classified information deemed to have been received in executive session); Rule 20, Rules of the
Committee on International Relations (105th Cong.) (prohibiting divulgence to unauthorized persons
of classified information).

House has given confidential treatment to the Committee documents at issue here.  Accordingly,

granting plaintiffs' claims would unconstitutionally intrude upon the rulemaking powers of the

House and, for this additional reason, the complaint must be dismissed.  U.S. v. Ballin, 144 U.S.

1, 5 (1892) (House Rules may not ignore constitutional restraints or violate fundamental rights,

but are otherwise "absolute and beyond the challenge of any other body or tribunal.").[15]

III.    This Court Is Not Bound By, and Should Not Follow, U.S. v. Schwartz.

The sole articulated basis for plaintiffs' claim is a supposed common law right of access

to public records.  Complaint at ¶ 23 (citing Schwartz v. U.S. Dept. of Justice, 435 F. Supp. 1203

(D.D.C. 1977)).  In a very brief opinion, the District Court in Schwartz — relying on U.S. v.

Mitchell, 551 F.2d 1252 (D.C. Cir. 1976), for the proposition that such a common law right was

generally recognized in this circuit — held that "Congress is subject to the common law rule

which guarantees the public a right to inspect and copy public records."  435 F. Supp. at 1204.

However, contrary to the suggestion in plaintiffs' Complaint, Schwartz was not affirmed

by the D.C. Circuit.  Moreover, Schwartz is a complete anomaly which this Court can and should

disregard.  To assist the Court in understanding why it should disregard Schwartz, we describe

what happened in that case in some detail.  The following discussion is based on pleadings filed

---

[15]     In In re Grand Jury, 821 F.2d 946, 958-59 (3rd Cir. 1987), cert. denied, 484 U.S. 1025
(1988), the Third Circuit held that "confidential deliberative communications" of state legislators
might be protected by a common law privilege analogous to the "deliberative process privilege"
applicable to executive branch officials.  The Third Circuit said this privilege would apply "to
confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice."
Id. at 959.  Were this Court to accede to plaintiffs' claim here,  the effect would be to provide less
protection to confidential communications of Members of Congress (to whom the Speech or Debate,
Rulemaking and Journal Clauses of the Constitution apply) than to confidential communications of
state legislators (to whom none of those constitutional precepts apply).  We do not believe the Court
would intend, or should countenance, this result.

JA 88

in the Schwartz case which we obtained from the National Records Center in Suitland, Maryland, and copies of which are attached collectively as Exhibit C.

Mr. Schwartz was a federal prison inmate, acting pro se, when he commenced a FOIA action in the District Court against the Department of Justice and Peter Rodino, then Chairman of the House Judiciary Committee.  Mr. Schwartz sought copies of documents related to alleged Justice Department and Judiciary Committee investigations of a federal prosecutor named Peter Schlam.  Action for Declaratory and Injunctive Relief (June 15, 1977).

Chairman Rodino, represented by the U.S. Attorney, initially moved to dismiss the complaint against him solely on the ground that Congress is exempt from FOIA.  Motion to Dismiss Defendant Peter A. Rodino, Jr. (July 11, 1977).  In response, Mr. Schwartz filed an affidavit in which he referred to U.S. v. Mitchell and asserted that he was suing Chairman Rodino under a common law right of access to public records.  Affidavit in Opposition (July 29, 1997).  Mr. Schwartz did not amend his complaint.  On behalf of Chairman Rodino, the U.S. Attorney then filed a short supplemental memorandum which argued only that the common law right of access was limited under Mitchell to certain judicial records.  Defendants' Supplemental Memorandum . . . in Support of Defendants' Motion to Dismiss (Aug. 11, 1977).  The U.S. Attorney did not assert any constitutional defenses to Mr. Schwartz's "new" claim, and did not note that the Supreme Court had already granted certiorari in Mitchell.[16]  In this procedural context, the District Court denied Chairman Rodino's motion to dismiss in the opinion reported at 435 F. Supp. 1203.  See Order (Aug. 30, 1977).

---

[16]    As discussed below, Mitchell was reversed by the Supreme Court in Nixon v. Warner Communications, Inc., 435 U.S. 589 (1978).

## JA 89

Subsequently, Chairman Rodino moved for summary judgment on the ground that the

Judiciary Committee had not investigated Peter Schlam and neither he nor the Judiciary

Committee had any responsive documents.  Motion to Dismiss or, in the Alternative, for

Summary Judgment (Sept.30, 1977).  Mr. Schwartz responded by questioning the absence of any

records.  Plaintiff's Opposition (Oct. 6, 1977).  Shortly thereafter, Chairman Rodino discovered

certain arguably responsive records, some of which he produced to Mr. Schwartz (including

copies of newspaper clippings, Congressional Record excerpts, a federal criminal indictment, and

other "public domain" documents), and others of which he withheld (including staff notes and

internal memoranda).  Supplement to Motion to Dismiss or, in the Alternative, for Summary

Judgment (Dec. 7, 1977).  The District Court then granted Chairman Rodino's motion for

summary judgment on the ground that "all available records have been turned over to the

plaintiff."  Memorandum Order at 1 (Dec. 13, 1997).

After the claim against Chairman Rodino had been dismissed, the District Court also

granted the Justice Department's motion for summary judgment on the remaining FOIA claim

against the Department.  Memorandum Order (Feb. 9, 1978).  Mr. Schwartz then appealed this

ruling — *and only this ruling* — and the D.C. Circuit affirmed on May 9, 1979.  See Notice of

Appeal (March 3, 1978); Appellant's Brief (July 18, 1978); Judgment (May 9, 1979) (affirming

"on the basis of the Memorandum Order, filed February 9, 1978").  *There was no appeal from the*

*District Court's August 30, 1977 published decision.*[17]

---

[17]     The Federal Reporter incorrectly reports that the Court of Appeals affirmed the
District Court's August 30, 1977 decision which, as noted above, was published at 435 F. Supp.
1203.  See Schwartz v. U.S., 595 F.2d 888 (D.C. Cir. 1979) (unpublished table decision).  We are
taking steps to notify West Publishing and Lexis/Nexis of this error.

Against this backdrop, the Court should disregard the District Court's Schwartz opinion for the following reasons.

First, this Court need not follow Schwartz because that decision was not affirmed by the D.C. Circuit, contrary to the suggestion in plaintiffs' Complaint.  Complaint at ¶ 23.  As noted above, Mr. Schwartz only appealed, and the D.C. Circuit only affirmed, the District Court's February 7, 1979 ruling on the Justice Department's summary judgment motion.

Second, Schwartz was wrongly decided to the extent it purported to extend a common law right of access to Congressional documents that are protected from production by the Speech or Debate Clause and/or the Rulemaking and Journal Clauses of the Constitution.  As noted above, those constitutional defenses were not advanced, and therefore the Schwartz Court did not consider them, at the time it ruled that the common law rule applies to Congress.[18]

Third, in the more than 20 years since Schwartz was decided, no other court — within or without this circuit — has recognized a common law right of access to federal legislative records, has compelled the production of federal legislative records in reliance on such a common law right, or has cited or relied upon Schwartz in a case involving legislative records.

Finally, and perhaps most importantly, Schwartz is undercut by the Supreme Court's later decision in Nixon v. Warner Communications which reversed the D.C. Circuit's decision in U.S. v. Mitchell.  The documents at issue in that case were White House audiotapes that had been admitted as evidence in the Watergate trials and played in open court, and portions of which had

---

[18]    Although it is not entirely clear, the District Court's December 13, 1977 order can be read as accepting Chairman Rodino's argument that internal Judiciary Committee documents and files did not need to be produced.

JA 91

been transcribed and published in the press.  Broadcasters requested court permission to copy

and rebroadcast the tapes.  The D.C. Circuit held that broadcasters' common law right to the

tapes outweighed any hypothetical risks to the Watergate defendants.  551 F.2d at 1261.  During

the time this issue was before the courts, Congress passed the Presidential Recordings Act

governing disclosure of Presidential audiotapes, but the D.C. Circuit did not examine in depth the

application of the Act to the tapes or the Act's relationship to the common law right of access.

The Supreme Court assumed, without expressly so holding, that there is a common law

right of access to public documents.  435 U.S. at 597-99.  However, it held that the existence of

the Presidential Recordings Act made that common law right inapplicable to the White House

audiotapes.  Id. at 607.  More broadly, the Court held that where "Congress has created an

administrative procedure for processing and releasing [documents] to the public," that statutory

scheme controls and the common law right of access does not apply.  Id. at 603.

This holding is directly applicable here because the House has established by rule a

scheme for disclosing records and information to the public.  See, e.g., House Rules XI.2(e)

(delineating type of information committees shall make public); XI.2(l) (requiring committees to

file reports and other matters with House); XIII.2 (requiring committee reports to be delivered to,

and printed by, Clerk); XXXVI (preservation and availability of non-current House records).

This rule-based scheme is the legal equivalent of other statutes that govern access to government

records, such as the Presidential Recording Act and FOIA.[19]  And like the Presidential Recording

---

[19]      House Rules are judicially cognizable and have the force of law.  See, e.g., Yellin v.
U.S., 374 U.S. 109, 114 (1963); Shape of Things to Come v. County of Kane, 588 F. Supp. 1192,
1993 (N.D. Ill. 1984); Randolph v. Willis, 220 F. Supp. 355, 358 (S.D. Cal. 1963).

Act in <u>Nixon</u>, the existence of these House rules renders the common law right of access

inapplicable here.

    For all these reasons, plaintiffs have failed to state a claim.

IV.    Plaintiffs Are Not Entitled to the Investigative Staff Reports Because Those
    Documents Are Not "Public Records" and the Committee's Interest in Keeping the
    <u>Documents Confidential Outweighs the Public Interest in Disclosure.</u>

    Finally, even if plaintiffs were correct that the common law doctrine applies to House

records, and even if the Court were to reject the constitutional defenses articulated above,

plaintiffs are still not entitled to the investigative staff reports.

    The Court of Appeals for this circuit has recognized a general common law right of

access to public records in other contexts grounded in "the public's interest in keeping a

'watchful eye on the workings of public agencies.'" <u>U.S. v. El-Sayegh</u>, 131 F.3d 158, 161 (D.C.

Cir. 1997) (judicial records). <u>See</u> <u>also</u> <u>Washington Legal Foundation v. U.S. Sentencing</u>

<u>Commission</u>, 17 F.3d 1446, 1451-52 (D.C. Cir. 1994) (executive agency records). This common

law right, however, is not absolute. First, the right applies only to "public records." <u>Id</u>. Second,

if the document sought is a "public record," then the court must "balance the government's

interest in keeping the document secret against the public's interest in disclosure." <u>Id.</u> at 1451-52.

Plaintiffs can surmount neither of these hurdles.

    1. "[A]s a matter of federal common law," this Circuit has defined "public record" as a

"government document created and kept for the purpose of memorializing or recording an

official action, decision, statement, or other matter of legal significance, broadly conceived."

<u>Washington Legal Foundation v. U.S. Sentencing Commission</u>, 89 F.3d 897, 905 (D.C. Cir.

1996). A "public record," however, does "not encompass the preliminary materials upon which

# JA 93

an official relied in making a decision or other writings incidental to the decision itself." Id.  In

Washington Legal Foundation, for example, the plaintiff sought access to "internal documents

and memoranda" of the Advisory Working Group of the Sentencing Commission, which had

been established to "develop and recommend" sentencing guidelines to the Commission. Id. at

899.  The Court found that the documents sought  were not public records because they were

either "preliminary" or "merely incidental" to the official report written and made public by the

Advisory Group.[20]

And so it is here.  Plaintiffs' claim fails because the investigative staff reports are not

"public records."  As discussed above, the responsibility of the Committee's investigative staff is

to conduct studies and examinations of matters within the Committee's jurisdiction in order to

assist the Committee in making legislative decisions about such matters.  Obviously, the

Committee can consider, rely on, ignore, or reject information provided to it by the investigative

staff to whatever extent the Committee chooses.  As such, the investigative staff reports are

clearly "preliminary or merely incidental to" the final decisions made by the Committee.  The

investigative staff reports are not final decisions themselves, nor  do they represent any official

action of the Committee.[21]

---

[20]    See also El-Sayegh, 131 F.3d at 162 (hallmark of a public record is that it
memorializes an official decision or final action of the governmental body; in holding that press had
no common law right to access to a rejected plea agreement, Court stated that common law right of
access "assumes a judicial decision.  If none occurs, documents are just documents; with nothing
judicial to record, there are no judicial records.").

[21]    Indeed, the Complaint itself appears to acknowledge as much in asserting that the
reports sought were "delivered" to Members of the Committee "for their consideration," Complaint
at 7, and were "relied" upon by the Committee in making decisions regarding the SBIS program.
Id. at ¶ 20.

JA 94

2.  Even if the documents sought were deemed to be "public records," plaintiffs would still be unable to demonstrate that the public interest in disclosure outweighs the Committee's interest in non-disclosure.  Given the nature of the investigative staff's role in assisting the Committee, the type of information contained in the investigative staff reports, Section 8 of the Committee's Rules mandating confidentiality for such reports, and the lack of any clear benefit that would accrue to the public (or to plaintiffs for that matter) from the release of the reports, plaintiffs' "public interest" argument must fail as a matter of law.

For these reasons, plaintiffs have failed to state a claim upon which relief may be granted.

### Conclusion

For all the reasons given, defendants' Motion to Dismiss should be granted.

Respectfully submitted,

GERALDINE R. GENNET
General Counsel

KERRY W. KIRCHER
Deputy General Counsel

CAROLYN BETZ
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700

Counsel for Defendants Committee on
Appropriations and the Honorable Bob Livingston

March 16, 1998

JA 95

CERTIFICATE OF SERVICE

I certify that on March 16, 1998, I served one copy of the foregoing Defendants' Motion

to Dismiss by first-class mail, postage prepaid, on:

> Joel Z. Robinson, Esq.
> Law Offices of Joel Z. Robinson & Co.
> 67 Wall Street
> New York, NY 10005-3101

Kerry W. Kircher

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PENTAGEN TECHNOLOGIES INTERNATIONAL, <u>et al.</u>, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:98CV00047 (GK) ) |
| COMMITTEE ON APPROPRIATIONS OF THE U.S. HOUSE OF REPRESENTATIVES, <u>et al.</u>, | ) ) ) ) |
| Defendants. | ) ) |

**FILED**

MAR 1 7 1998

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**ERRATA**

On page 15 of the Motion to Dismiss filed on March 16, 1998, by defendants Committee

on Appropriations of the U.S. House of Representatives and Chairman Bob Livingston, the third

sentence (lines 5-6) incorrectly reads ". . . the District Court's February 7, 1979 ruling . . . ."  That

sentence should read ". . . the District Court's February 9, 1978 ruling . . . ."

Respectfully submitted,

GERALDINE R. GENNET
General Counsel

KERRY W. KIRCHER
Deputy General Counsel

CAROLYN BETZ
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building

Washington, D.C. 20515
202/225-9700

Counsel for Defendants Committee on
Appropriations and Chairman Bob Livingston

March 17, 1998

JA 98

CERTIFICATE OF SERVICE

I certify that on March 17, 1998, I served one copy of the foregoing Errata by first-class

mail, postage prepaid, on:

        Joel Z. Robinson, Esq.
        Law Offices of Joel Z. Robinson & Co.
        67 Wall Street
        New York, NY 10005-3101

                Kerry W. Kircher

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PENTAGEN TECHNOLOGIES INTERNATIONAL LTD., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:98cv00047 (GK) |
| COMMITTEE ON APPROPRIATIONS OF THE U.S. HOUSE OF REPRESENTATIVES, et al., | ) ) ) ) |
| Defendants. | ) ) |

FILED

APR – 6 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**DEFENDANTS' REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

This case asks whether the House Committee on Appropriations ("Committee") can be

forced to release internal reports that are confidential under Committee rules and were prepared

by the Committee's investigative staff to assist it in carrying out its core legislative function of

deciding on appropriate funding levels for government programs.  The answer is clearly no

because (i) plaintiffs' claim is constitutionally barred by the Speech or Debate and the

Rulemaking and Journal Clauses of the Constitution; (ii) <u>Schwartz v. U.S. Department of Justice</u>,

435 F. Supp. 1203 (D.D.C. 1977), the sole basis for plaintiffs' supposed common law right of

access to congressional records is not good law; and (iii) in any event, the reports sought are not

"public records."  <u>See</u> Defendants' Motion to Dismiss (March 16, 1998).

Plaintiffs have filed an opposition to our motion which demonstrates convincingly that

their claim is baseless and should be dismissed immediately.  <u>See</u> Plaintiffs' Memo in Opposition

*12*

JA 100

to Defendants' Motion to Dismiss (March 27, 1998) ("Opposition").  We now reply briefly to

plaintiffs' arguments.

**Discussion**

I.  The Speech or Debate Clause Most Assuredly Does Bar Plaintiffs' Claim.

We have already described the history, purpose and scope of the Speech or Debate

Clause, and have explained why it bars plaintiffs' claim here.  Motion to Dismiss at 5-10.  Given

the "absoluteness" of the Speech or Debate Clause privilege, Eastland v. United States

Servicemen's Fund, 421 U.S. 491, 501, 503, 507, 509-10, 510 n.16 (1975), and its self-evident

applicability to plaintiffs' suit against the Committee and Chairman Livingston, it is not

surprising that plaintiffs' efforts to refute that constitutional defense fall woefully short of the

mark.

Plaintiffs argue first that they are "not seek[ing] direct 'legislative' material."  Opposition

at 3.  Whatever this means, it does not alter the fact that what they are seeking — internal staff

reports designed to assist the Committee in carrying out its legislative responsibility to decide on

funding levels for a Department of Defense program — is unquestionably "an integral part of the

deliberative and communicative processes by which Members participate in committee and

House proceedings with respect to the consideration and passage or rejection of proposed

legislation."  Eastland, 421 U.S. at 504.  As such, the reports are clearly legislative in nature and,

therefore, protected from production by the Speech or Debate Clause privilege.  Motion to

Dismiss at 9-10.

Plaintiffs also quote out of context language from U.S. v. American Telephone &

Telegraph Co., 567 F.2d 121, 129 (D.C. Cir. 1977) — "the [Speech or Debate] Clause does not

JA 101

and was not intended to immunize congressional investigatory actions from judicial review" —

for the proposition that the Speech or Debate Clause does not apply here.  Opposition at 4.

However, AT&T is not on point and only stands, at most, for the proposition that Congress may

not use the Speech or Debate Clause offensively to force compliance with a congressional

subpoena.

In that case, a congressional committee issued a subpoena to AT&T for phone records,

and the Justice Department sued AT&T (not the committee) to enjoin the company from

responding on the ground that compliance with the subpoena might harm the national security.

The committee, through its chairman, intervened to assert its interest in having AT&T comply

with the subpoena.  Each branch of the government claimed that its determination of the

propriety of its acts was conclusive on the Court.  In particular, the committee argued that

judicial interference with its subpoena was barred by the Speech or Debate Clause.  Id. at 128.

The Court rejected the committee's argument noting that the Speech or Debate Clause

was intended to protect legislators from executive and judicial interference, but did not prevent a

court from adjudicating a "challenge to congressional investigatory activity . . . raised as a

defense" (by, for example, the recipient of a congressional subpoena).  Id. at 129 (emphasis

added).  In the AT&T case, no one sought to question a member of Congress or compel the

production of documents from Congress, and the Court emphasized that

> no member of the Subcommittee . . . has been made a defendant in
> a judicial proceeding. . . . What the cases establish is that the
> immunity from judicial inquiry afforded by the Speech or Debate
> Clause is personal to members of Congress.  Where they are not
> harassed by personal suit against them, the clause cannot be
> invoked to immunize the congressional subpoena from judicial
> scrutiny.

3

JA 102

Id. at 130.[1]

Here, obviously, the Committee and its chairman are not attempting to use the Speech or Debate Clause to force compliance with a congressional subpoena. Moreover, unlike in AT&T, the Committee and its chairman have been named as defendants and are asserting the constitutional privilege as a defensive bar to the claims asserted against them, exactly as it was intended to be used. Motion to Dismiss at 7-8.

II.    The Rulemaking and Journal Clauses Also Bar Plaintiffs' Claim.

We argued secondly that the Committee had chosen, by validly adopted rules, to keep confidential its investigative staff reports (such as those sought here), and that the Committee had the constitutional authority under the Rulemaking and Journal Clauses of the Constitution to do precisely that. Motion to Dismiss at 10-12.

Plaintiffs do not, because they cannot, dispute that the Committee's own rules permit it to decline to produce the records sought here. Instead, plaintiffs argue that the Rulemaking Clause "does not alter [sic] judicial responsibility to say what rules Congress cannot adopt because of constitutional infirmity." Opposition at 5. However, even if that statement is true, it is irrelevant. Plaintiffs have not asserted that the Committee has acted unconstitutionally or that its rules are unconstitutional.[2] Plaintiffs claim only that they have a common law right to inspect

---

[1]    Thus, for example, if a congressional committee sought enforcement of a congressional subpoena by means of a prosecution for contempt of Congress, the witness would be entitled to contest the validity of the subpoena and challenge the committee's jurisdiction, and the Speech or Debate Clause would not prevent the witness from defending himself by raising these issues. See, e.g., Barenblatt v. U.S., 360 U.S. 109 (1959); Watkins v. U.S., 354 U.S. 178 (1957).

[2]    We note that no Court in this nation's history has ever struck down a House rule of proceeding.

and copy Committee records, a right that, even if it did exist, would have to yield to the House's

constitutional authority to keep its records secret. Cf. Goland v. CIA, 607 F.2d 339, 346 (D.C.

Cir. 1978), cert. denied, 445 U.S. 927 (1980) ("Congress has undoubted authority to keep its

records secret, authority rooted in the Constitution, longstanding practice, and current

Congressional rules.").

Plaintiffs also suggest that Section 8 of the Committee's rules — which says that

investigative reports "shall not be released for publication until the subcommittee so determines"

— only prevents the Committee from "publishing" the reports, and does not speak to the issue of

"inspection and copying." Opposition at 5-7. This is silly. The intent of Section 8 is plain: to

prohibit investigative staff reports from being made public unless the Committee itself

affirmatively decides to make them public (as it has not so decided here). That certainly is how

the Committee construes the rule. In any event, even if the meaning of Section 8 were unclear,

that would not help plaintiffs because ambiguous congressional rules are non-justiciable:

> [T]he Rulemaking Clause of Article I clearly reserves to each
> House of the Congress the authority to make its own rules, and
> judicial interpretation of an ambiguous House Rule runs the risk of
> the court intruding into the sphere of influence reserved to the
> legislative branch under the Constitution. . . . Where . . . a court
> cannot be confident that its interpretation is correct, there is too
> great a chance that it will interpret the Rule differently than would
> the Congress itself; in that circumstance, the court would
> effectively be making the Rules--a power that the Rulemaking
> Clause reserves to each house alone.

U.S. v. Rostenkowski, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995).

5

JA 104

III.   Schwartz v. U.S. Dept. of Justice Is Not a Sound Basis for Plaintiffs' Common Law
       Claim.

We explained at some length in our motion that Schwartz v. U.S. Dept. of Justice, 435 F.

Supp. 1203 (D.D.C. 1977), the sole articulated basis for plaintiffs' claim, is not good law and

should not be followed by this Court.  Motion to Dismiss at 12-17.  Plaintiffs are unable to

acknowledge any of the flaws in that decision.

Plaintiffs first assert, remarkably, that Schwartz was "affirmed by the Court of Appeals."

Opposition at 7.  This is patently untrue, Motion to Dismiss at 12-14, regardless of what sorts of

intellectual contortions plaintiffs are prepared to engage in on this point.  The fact remains that

no party appealed the Schwartz Court's August 30, 1977 published decision, and the Court of

Appeals neither considered nor ruled on that decision.  Schwartz, therefore, is not binding on this

Court.[3]  See  Brookens v. White, 795 F.2d 178 (D.C. Cir. 1986) (appellant's failure to specify in

his notice of appeal a particular order "by name . . . or otherwise to evidence his intent to pursue

an appeal from that order, renders the notice [of appeal] inapplicable to th[at] order").[4]

Plaintiffs say secondly, citing the two Washington Legal Foundation cases, that the D.C.

Circuit subsequently approved the District Court's published opinion in Schwartz.  Opposition at

9-10.  This is also wrong.  The Washington Legal Foundation cases involved the applicability of

_____

[3]      West Publishing has already corrected its electronic database to reflect (i) that the
Court of Appeals' decision in the Schwartz case, 595 F.2d 888 (D.C. Cir. 1979) (unpublished table
decision), only affirmed the District Court's unpublished February 9, 1978 order, and (ii) that there
was no appeal from the District Court's August 30, 1977 published decision.  See Attachment.
Lexis/Nexis has not yet corrected its database, but we expect that it will do so soon.

[4]      In the Schwartz case, not only did the plaintiff, Mr. Schwartz, not evidence an intent
to appeal from the District Court's August 30, 1977 published decision, he would have had no reason
to appeal that order since he had prevailed in that ruling.  Only Chairman Rodino would have had
reason to appeal  the August 30, 1977 published decision, and he obviously did not do so.

the common law right of access to the U.S. Sentencing Commission (an executive branch

agency),  not to Congress.  Moreover, although both cases cited Schwartz, neither decision

approved of Schwartz's holding that the common law right of access applies to Congress.  In

Washington Legal Foundation v. U.S. Sentencing Commission, 17 F.3d 1446, 1451 (D.C. Cir.

1994), the Court only cited Schwartz in connection with the unremarkable proposition that "the

common law right extends only to 'public records,' not to every document contained in

government files."  In Washington Legal Foundation v. U.S. Sentencing Commission, 89 F.3d

897, 903 (D.C. Cir. 1996), the Court only mentioned Schwartz for the purpose of contrasting it

with other cases that had recognized a common law right of access to judicial records.  In short,

the correctness of Schwartz's holding that a common law right of access applies to Congress was

simply not an issue in the Washington Legal Foundation cases, and those decisions cannot be

read as an endorsement of that holding.[5]

Finally, plaintiffs deny that the House rules that deal with the disclosure of records and

information to the public render the common law right of access inapplicable to Congress

because they are not like FOIA or the Presidential Records Act.  Opposition at 11-12.  While we

acknowledge that the House rules are not identical to FOIA or the Presidential Records Act, they

do constitute a scheme for disclosing records and information to the public that renders  the

common law right of access inapplicable to Congress under Nixon v. Warner Communications,

---

[5]       Plaintiffs point out correctly that both Washington Legal Foundation cases "noted
that Schwartz had been affirmed."  Opposition at 9.  However, both decisions  were obviously
unaware that the Court of Appeals had not in fact affirmed the District Court's published opinion in
Schwartz and, in all likelihood, they were simply reiterating erroneous information obtained from
West Publishing or Lexis/Nexis.

JA 106

Inc., 435 U.S. 589, 603 (1978).  While plaintiffs may not like that conclusion, their quarrel in this

regard is with the Supreme Court's holding, not with the Committee or its chairman.

IV.     The Staff Reports Are Not Public Records.

We argued finally that even if plaintiffs were correct that the common law doctrine

applies to House  records, and even if the Court were to reject our constitutional defenses,

plaintiffs would still not be entitled to the investigative staff reports because they are not "public

records."  Motion to Dismiss at 17-19.  Plaintiffs dispute this conclusion on no less than six

meritless grounds.  Opposition at 13-17.

First, attempting to quote Washington Legal Foundation, 89 F.3d at 905, plaintiffs say

that investigative staff reports are "government document[s] created and kept for the purpose of

memorializing [and recording] an official action, decision[,] statement[,] or other matter of legal

significance, broadly conceived."  Opposition at 13-14.  Plaintiffs base this conclusion largely on

the fact that the Surveys and Investigations Staff is a creature of statute and House rule.

However, plaintiffs miss the point.  The Surveys and Investigations Staff does not produce

reports of its own volition.  It only conducts studies and examinations, and then reports to the

Committee, when so requested by the Committee.  Motion to Dismiss at 3-4.  Furthermore, the

sole purpose of investigative staff reports is to assist the Committee in making appropriate

decisions about funding levels for government programs and operations, and those reports have

no independent legal significance.  As such, they clearly are not public records because they are

"preliminary materials" that are "incidental to" official decisions reached by the Committee and

the House itself.  Id. at 17-18.

8

JA 107

Second, plaintiffs argue that the investigative staff reports are "public records" because they are prepared by persons of "competence and objectivity." Opposition at 14-15. This is irrelevant. While we agree that the members of the Surveys and Investigations Staff are both competent and objective, this has no bearing on whether the staff's written reports to the Committee are "public records."

Third, plaintiffs say that the reports they seek are "'final' reports, not merely 'working papers.'" Id. at 15. This is a semantic conclusion, unsupported by any legal analysis. Regardless of whether an investigative staff report is "final" in the sense that it is the end product of the staff's efforts, the point is that such a report lacks independent legal significance because it does not reflect the "final decision" of a governmental body — in this case the Committee and the House — with the authority to take official action.

Fourth, plaintiffs say the reports are public records because "there is no other mechanism for the release of the material sought." Id. This is, charitably, a lapse in logic. Obviously, plaintiffs have no preordained right to the investigative staff reports, and their lack of an alternative "mechanism" for obtaining access has no bearing on whether the reports are "public records" in the first instance.

Fifth, plaintiffs say defendants must be wrong because our "argument would result in any and all Congressional material being held to be non 'public record' . . ." Id. at 16 (emphasis omitted). This is incorrect. Under our analysis, many committee reports, House resolutions, and the like would constitute "public records" (assuming that the common law right of access

9

JA 108

otherwise applied).[6]

Plaintiffs argue lastly that the Committee "has effectively acknowledged that the reports are 'public records' because it has already released some of the information contained in the Reports in question." Id. This is factually and legally inaccurate. The Committee, while referring to certain facts contained in the investigative staff reports, has never released the reports themselves. Moreover, the Committee's reference to those facts does not in any way constitute an "acknowledgment" that the reports are "public records." Indeed, the Committee has consistently taken the opposite position, both in this litigation and with plaintiffs informally prior to the initiation of this case. Finally, the Committee has the discretion under its own rules to release investigative staff reports in whole or in part. Motion to Dismiss at 4. Therefore, even if the Committee had released some information from an investigative staff report, that would not foreclose the Committee's right to decline to produce the remainder of the report.[7]

---

[6]      Needless to say, these kinds of documents are already available to the public.

[7]      Plaintiffs spend the last five pages of their brief arguing  that if the reports they seek were public records, their interest in disclosure would outweigh the Committee's interest in non-disclosure.  Opposition at 17-21.  This discussion is purely academic inasmuch as the reports are not public records, and plaintiffs are not otherwise entitled to review them.  Moreover, the discussion greatly exaggerates plaintiffs' interest in obtaining the records, and ignores the Committee's interest in maintaining the confidentiality of the reports it receives from its investigative staff.  See Motion to Dismiss at 4, 19.

## Conclusion

For all the reasons given above and in our Motion to Dismiss, the Motion to Dismiss

should be granted.

Respectfully submitted,

GERALDINE R. GENNET
General Counsel

KERRY W. KIRCHER
Deputy General Counsel

CAROLYN BETZ
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700

Counsel for Defendants Committee on
Appropriations and the Honorable Bob Livingston

April 6, 1998

11

JA 110

CERTIFICATE OF SERVICE

I certify that on April 6, 1998, I served one copy of the foregoing Defendants' Reply to

Plaintiffs' Opposition to Defendants' Motion to Dismiss by first-class mail, postage prepaid, on:

Joel Z. Robinson, Esq.
Law Offices of Joel Z. Robinson & Co.
67 Wall Street
New York, NY 10005-3101

_____
Kerry W. Kircher

**Insta-Cite**                                                                              **Page 1**

Date of Printing: APR 06,1998

### INSTA-CITE

CITATION: 435 F.Supp. 1203
=>              1 **Schwartz v. U. S. Dept. of Justice,** 435 F.Supp. 1203, 3 Media L. Rep. 1335
                     (D.D.C., Aug 30, 1977) (NO. CIV. 76-2039)

### Secondary Sources

**Corpus Juris Secundum (C.J.S.) References**
              76 C.J.S. Records Sec.62 Note 61
              76 C.J.S. Records Sec.62 Note 62

FILED

APR - 6 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

© Copyright West Group 1998

JA 112

**Insta-Cite**                                                        **Page 2**

Date of Printing: APR 06,1998

**INSTA-CITE**

CITATION: 595 F.2d 888

**Direct History**

    1  Schwartz v. Department of Justice, 3 Media L. Rep. 1990 (D.D.C., Feb 09, 1978)
        (NO. 76-2039) (TEXT NOT AVAILABLE ON WESTLAW)
    Affirmed by
= >    2  **Schwartz v. U.S. Department of Justice,** 595 F.2d 888, 194 U.S.App.D.C. 81
        (D.C.Cir., Apr 05, 1979) (TABLE, NO. 78-1334)

**FILED**

APR - 6 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

© Copyright West Group 1998

[ORAL ARGUMENT NOT YET SCHEDULED]

## No. 15-5183

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN CIVIL LIBERTIES UNION FOUNDATION,

*Appellants*,

v.

CENTRAL INTELLIGENCE AGENCY, *et al.*,

*Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRIEF OF *AMICUS CURIAE* SENATOR JOHN D. ROCKEFELLER IV IN
SUPPORT OF APPELLANTS**

November 23, 2015

Susanne Peticolas (Bar No. 478827)
Lawrence Lustberg
Ana Muñoz
Gibbons PC
1 Gateway Center
Newark, NJ 07102
T: 973.596.4875
F: 973.639.6392
speticolas@gibbonslaw.com

Ex. C

## <u>STATEMENT REGARDING CONSENT TO FILE</u>

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae*

John D. Rockefeller IV represents that all parties have consented to the filing of

this brief.  In addition, pursuant to Fed. R. App. 29(c), counsel for *amicus curiae*

states that no counsel for a party authored this brief in whole or in part, and no

person other than *amicus curiae* or his counsel made a monetary contribution to its

preparation or submission.

JA 115

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* certifies that:

### A.  Parties and Amicus

Except for Senator John D. Rockefeller IV and any other *amici* who have

not yet entered an appearance in this proceeding, all parties appearing in the court

below and before this Court are listed in the Brief for the Appellants.

### B.  Rulings Under Review

References to the rulings at issue appear in the opening Brief for the

Appellants.

### C.  Related Cases

References to the related cases appear in the Brief for the Appellants.

### D.  Statutes and Regulations

All applicable statutes and regulations are contained in the Brief for the

Appellants.

<u>**TABLE OF CONTENTS**</u>

**Page**

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF INTEREST OF AMICUS CURIAE ........................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................... 2

ARGUMENT .................................................................................... 5

CONCLUSION ................................................................................ 13

     CERTIFICATE OF COMPLIANCE ............................................. 14

     CERTIFICATE OF SERVICE ....................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU v. CIA*,
    2015 U.S. Dist. LEXIS 65724, (D.D.C. May 20, 2015) ................................... passim

*Judicial Watch, Inc. v. United States Secret Service*,
    726 F.3d 208 (D.C. Cir. 2013) ........................................................................... 5, 11

*Paisley v. CIA*,
    712 F.2d 686 (D.C. Cir. 1983) ........................................................................... 5, 10

**Other Authorities**

60 Cong. Rec. S 6405, 6406
    (Statement of Senator John D. Rockefeller IV, Dec. 9, 2014) .......................... passim

Senate Select Committee on Intelligence,
    *Committee Study of the CIA's Detention and Interrogation Program:*
    *Executive Summary, Chairman's Foreword* at 3 (Dec. 3, 2014) ............................ 10

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Senator John D. Rockefeller IV is a former United States Senator who served on the Senate Select Committee on Intelligence ("Committee" or "SSCI") for fourteen years, including as the Committee's chairman from 2007 - 2009.[1]   In the final five years of his service, Senator Rockefeller was intimately involved in the investigation and production of the SSCI's Report on the Central Intelligence Agency's ("CIA") Detention and Interrogation Program ("the Report").  The Senator helped broker agreements with agencies concerning access to materials at the outset of the SSCI's investigation.  He worked directly with staff members who researched and drafted the Report.  He participated in the extensive negotiations with the Executive Branch over redactions to the Report's Executive Summary.   And he supported the decision to transmit the full Report to the President and multiple federal agencies.  Based on his tenure on the SSCI, as well his three decades in the Senate, the Senator is uniquely positioned to explain Congress's intent when it released the full Report to the defendants in this case.

---

[1]   The Supreme Court has accepted similar *amicus* briefs from members of Congress in the past.  *See* Br. of Members of Congress and State Legislatures as *Amici Curiae* in Support of Respondents, (Jan. 28, 2015), *filed in King v. Burwell*, No. 14-114, 135 S. Ct. 2480 (2015) available at: http://tinyurl.com/p6n247m, Br. of Reps. F. James Sensenbrenner, Jr., John Conyers, Jr., Steve Chabot, Jerrold Nadler, Melvin L. Watt, and Robert C. Scott as *Amici Curiae* in Support of Respondents, (Feb. 1, 2013), *filed in Shelby County v. Holder*, No. 12-96, 133 S.Ct. 2612 (2013), available at: http://tinyurl.com/p2vnpgv.

*Amicus* Senator Rockefeller has a profound interest in ensuring that courts understand why the Senator and his colleagues did not seek to make the full Report public in December of 2014, and why the Senator and his colleagues chose to release the full 6,800-page Report to the Executive Branch.  In that regard, the Senator submits this brief to address the district court's error in holding that Congress did not relinquish control of the full Report when it transmitted it to the President in December of 2014.  As the Senator knows from his almost fifteen years as a member of the SSCI, such an interpretation is inconsistent with the agreement between the SSCI and the CIA at the outset of the SSCI's investigation, the negotiations over redactions in the Report's Executive Summary, and the SSCI's ultimate decision to transmit the full Report to federal agencies.

## **INTRODUCTION AND SUMMARY OF THE ARGUMENT**

As *Amicus* stated on the Senate floor, "the arc of this story comprises more than a decade of [his] thirty years of work in the Senate, and one of the hardest fights of [his] career."  60 Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV, Dec. 9, 2014).  Senator Rockefeller first learned of the CIA's Detention and Interrogation Program in 2003, as the Committee's then-Vice Chairman, and, for the next ten years, fought tirelessly to learn about the extent and nature of the program.  *Id*.  His efforts, and those of his colleagues, culminated in a Report that was "both shocking and deeply troubling."  *Id*.  The SSCI never

intended for that Report to remain only in the Senate's hands.  Instead, "it [was] [the Senator's] hope and expectation that . . . the entire 6800 page Study will eventually be made public with the appropriate redactions." *Id.*

Thus, the district court erred when it misread the record in this case and concluded that the Senator and his colleagues intended to retain control over the Report.  *See ACLU v. CIA*, 2015 U.S. Dist. LEXIS 65724, at *30 (D.D.C. May 20, 2015).  To the contrary, the Senator and his colleagues released the full Report to the Executive Branch with the intent that agencies have the power to utilize it as they saw fit, in particular, so that they might "develop forward looking lessons that must be central to all future intelligence activities."  60 Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV).  The district court reached a different conclusion because it misunderstood the dynamics underlying the investigation and the SSCI's release of the full Report.  *Amicus* submits this brief in order to assist this Court in deciding this case, so that it does not labor under the same misunderstanding.

The district court's opinion errs in three relevant respects.  First, the lower court misconstrued the SSCI's June 2009 agreement with the CIA as indicating an intent by the SSCI to maintain control of the future and final Report.  *See ACLU*, 2015 U.S. Dist. LEXIS 65724 at *20.  Second, the court mistook the Senator's and his colleagues' urgency to release the Report's Executive Summary as a desire to

shield the full Report from the public eye.  *Id.* at *28.  And finally, the court misinterpreted the letter from Senator Dianne Feinstein, then-Chairman of the SSCI, transmitting the full Report to the President, failing to understand that she and her colleagues intended to allow agencies to thereafter assume control over the full Report.  *Id.* at *27.

Those who oversaw the investigation well understood that the secrecy necessary at the outset of the investigation would, and should, fall away at the conclusion of it.  When the investigation began, *Amicus* Senator Rockefeller and his colleagues had struggled for years to obtain information about the CIA's Detention and Interrogation Program; they agreed to limits on their work product in order to secure access to information long withheld from Congress.  Once their investigation concluded, mindful of the time it would take to negotiate the declassification of the full Report, the Senator and his colleagues focused on the declassification of the Executive Summary, engaging in exhaustive and lengthy negotiations with the Executive Branch.  And when Senator Dianne Feinstein, then-Chairman, transmitted the full Report to the Executive Branch, she, with her colleagues, did so with the expectation that agencies would have the power to freely use the full Report to "fully learn[] the necessary lessons from this dark episode in our nation's history, and . . . ensur[e] that this never happens again."  60 Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV).

For these reasons, as more fully set forth below, this Court should reverse the district court's decision.

## <u>ARGUMENT</u>

Courts weigh two factors when determining if a congressional document has become an "agency record" subject to the Freedom of Information Act. The inquiry turns on whether Congress has "relinquish[ed] control over the record[]" to an agency, and allowed "the agency to use and dispose of the record as it sees fit." *Judicial Watch, Inc. v. United States Secret Service*, 726 F.3d 208, 218 (D.C. Cir. 2013) (citations omitted). As Appellants correctly note in this case, "this two-factor test boils down to a question of congressional intent." Appellants' Br. at 20. The burden remains on the government to prove a "clear congressional intent to maintain control." *Paisley v. CIA*, 712 F.2d 686, 693–95 (D.C. Cir. 1983), vacated in part on other grounds, 724 F.2d 201 (D.C. Cir. 1984). Here, the Senator and his colleagues never intended to maintain exclusive control over the full Report, and transmitted the full Report to the Executive Branch so that agencies would have the power to use the Report as they saw fit. To hold otherwise, as the district court did, misunderstands the history of the  investigation in three ways.

*First*, the SSCI insisted that its notes and drafts remain congressional records as part of a broader agreement that related only to its preliminary investigation and was limited to materials that were located in a CIA-controlled building where the

initial iterations of the Report were first drafted.  The Senator and his colleagues never intended to limit the CIA's or other agencies' power to disseminate and utilize the *final*, full Report sent to the Executive Branch by then-Chairman Dianne Feinstein.  *See* Letter from Sen. Dianne Feinstein & Sen. Christopher Bond to the Hon. Leon Panetta (June 2, 2009), JA 92 - 96 (memorializing terms of SSCI's access to CIA documents at a CIA facility).  Thus, the District Court erred when it held that the SSCI's June 2009 agreement with the CIA bore on its decision to cede control over the Report to federal agencies five years later.  *See ACLU*, 2015 U.S. Dist. LEXIS 65724 at *20.

Specifically, in June 2009, the SSCI reached an agreement with the CIA in which the Committee agreed to conduct its review of records inside a CIA facility, but the SSCI was assured that it would maintain control over its work product located at that facility during the pendency of its investigation.  *See* JA 92-94.  This deal must be understood in the context of the SSCI's long fight to get information about the CIA's Detention and Interrogation Program.  *Amicus* "first learned about some aspects of the CIA's Detention and Interrogation Program in 2003," but "at that point, and for years after, the CIA refused to provide [him] with additional information [he] requested about the program." 60 Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV).  "In the years that followed, [he] fought — and lost — many battles to obtain credible information." *Id.*  In 2005,

for example, on behalf of the SSCI, he sought access to over 100 specific documents cited in an internal CIA report, but the CIA refused to cooperate. *Id.* This "challenge of getting accurate information from the CIA persisted," even after the Senator rose to the chairmanship of the SSCI in 2007 and held hearings on the program. *Id.*

For years, then, the CIA resisted the SSCI's efforts to investigate its detention and interrogation practices. When, finally, the SSCI launched its investigation in 2009, it did so with the purpose of securing access to information long withheld. Thus, when the CIA insisted that review of any documents take place in a CIA facility, *see* Higgins Decl. ¶ 10, JA 58, the SSCI — though troubled — consented, even though the CIA would have the potential ability to view materials related to the ongoing SSCI investigation of the CIA, including investigators' work product and investigators' communications.[2] To ensure that the SSCI remained in control of its drafts and internal communications about the investigation that were located in a CIA building, the SSCI inserted a clause in the 2009 agreement that made clear that its internal work product — its "notes,

---

[2] This concern was not unfounded. During the investigation, "the CIA inexplicably conducted an unauthorized search of the Committee's computer files and emails" at the CIA offsite facility with "the intent . . . to suppress the Committee's awareness of an internal CIA review that corroborated parts of the Committee's Study." Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV).

documents, draft and final recommendations, reports or other materials" — would remain under the SSCI's exclusive control notwithstanding that these documents were drafted on a CIA-provided network drive and located within a "Reading Room" provided to the SSCI in a CIA building.  *See* Letter from Sen. Feinstein & Sen. Bond to Hon. Panetta, JA 93-94.  That provision only covered materials that were kept at the SSCI's reading room, a CIA-controlled space, during the ongoing investigation.  The agreement was never intended to limit the SSCI's power to relinquish control over any final report going forward, or any other SSCI materials physically located outside of CIA-controlled spaces.[3]   Instead, it provided protections for preliminary SSCI investigative information that was located in a CIA building during the course of the SSCI's inquiry.  Importantly, the initial draft versions of the Report were eventually re-located to SSCI-controlled physical space in the Hart Senate Office Building, where the final Report was completed.

*Second*, the Senator and his colleagues chose not to seek declassification of the final full Report in order to speed release of information about the CIA's Detention and Interrogation Program.  Certainly, *Amicus* and his colleagues never wished to shield the full Report — with appropriate redactions — from the public eye.  Thus, the district court erred when it assumed that publication of the Report's

---

[3]  For this reason, as Appellants points out, the 2009 agreement refers exclusively to "these documents" and "these letters" rather than to any document or all future documents related to the investigation.  Appellants' Br. at 25.

Executive Summary, rather than the full Report, implied that the Senator and his colleagues intended for the more complete document to forever remain secret. *ACLU*, 2015 U.S. Dist. LEXIS at *28.

The Senator and his colleagues did not have that intent. *Amicus* and his colleagues forewent immediate declassification of the full Report in order avoid a prolonged battle over redactions to it. Indeed, it took nine months to reach an agreement about redactions in the Executive Summary alone. *See* Higgins Decl. at ¶¶ 17 – 20, JA 62 – 64. To the Senator's "deep disappointment," the White House "strong[ly] defer[red] to the CIA throughout the process," which "at times, worked at cross purposes with [the] White House's stated interest in transparency." Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV). Thus, the White House and the CIA insisted "on the unprecedented redaction of fake names in the report," and "also pushed for the redaction of information in the Committee's Study that should not be classified." *Id.* Given the nine months it took to redact and release the 500-page Executive Summary, it would have taken years to negotiate the release of a redacted full Report to the public. Explaining this decision, then-Chairman Feinstein wrote in the Report's foreword, "[s]eeking declassification of the more than six thousand page report would have significantly delayed the release of the Executive Summary." Senate Select Committee on Intelligence, *Committee Study of the CIA's Detention and Interrogation Program:*

*Executive Summary, Chairman's Foreword* at 3 (Dec. 3, 2014), available at http://tinyurl.com/nm6vdsu.  As such, the Senator and his colleagues opted for the most expedient path and sought to make the Executive Summary public in order to shed at least a modicum of light on the CIA's "mistakes," so that Americans could take "a tremendous and consequential step toward" the "self-reflection and scrutiny" necessary to prevent future abuse.  Cong. Rec. S 6405, 6406 (Statement of Senator John D. Rockefeller IV). But that strategic choice did not imply that the Senator and his colleagues wanted the full Report to remain secret.   To the contrary, as the Senator publicly explained, "it [was] [his] hope and expectation that . . . the entire 6800 page Study will eventually be made public with the appropriate redactions." *Id.*

*Third*, Senator's Feinstein's letter to the President transmitting the Report indicated that the SSCI did not intend to maintain control over the document. *Accord Paisley*, 712 F.2d at 693–95 (holding that document was an agency record absent evidence of a "clear congressional intent to maintain control").  At the time, the Report was a formal, final Senate Report; it had been submitted by the SSCI to the full Senate, was no longer subject to modifications by the SSCI, and was ready for release.  Thus, the district court erred when it held that Feinstein's letter, sent in her capacity as Chairman of the SSCI, did not evince the intent to turn over the full Report to the Executive Branch.  *See* Letter from Sen. Dianne Feinstein to The

Hon. Barack Obama (Dec. 10, 2014), JA 133.  To the contrary, the letter indicates that the full Report should be disseminated widely "to the CIA and other components of the Executive Branch."  *Id.*  It makes clear that the Report should be "use[d] as broadly as appropriate to help make sure that this experience is never repeated."  *Id.*  Indeed, Senator Feinstein went so far as to "encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for *all* Executive Branch employees," reminding the President that he could use the full Report "*as [he] [saw] fit.*"  *Id.* (emphasis added).  Thus, the Committee placed no limits on the full Report's use, and, instead, made clear that the Executive Branch could disseminate the full Report, and that agencies could use the full Report in whatever manner the President and his delegates deemed appropriate.  *See Judicial Watch*, *Inc*, 726 F.3d at 218 (explaining that congressional intent depends in part on whether an agency may "use and dispose of the record as it sees fit").  *Amicus* and his colleagues never believed that more was required in order to indicate their intent to relinquish control.

In sum, *amicus* respectfully submits this short brief in order to advise this Court that the lower court fundamentally misunderstood the intention of Congress, which is at the core of this Court's analysis.  *See ACLU*, 2015 U.S. Dist. LEXIS 65724 at *18.  Throughout the time that it investigated the CIA's Detention and

Interrogation Program, the SSCI sought to shed as much light as possible on the CIA's Detention and Interrogation Program.  Because the CIA withheld access to records for so many years, the SSCI took steps in its 2009 agreement that it would not otherwise have taken in order to ensure that it would get access to documents in the CIA's control, specifically agreeing to review the documents at a CIA facility in a reading room provided to the SSCI.  The SSCI's insistence on protecting its work product during the researching of the Report in CIA-controlled spaces in a CIA building must be understood against that background:  It was both responsive to the CIA's concerns at the time and meant to shield that work product from scrutiny from the agency that was the subject of the investigation.  But once it relocated materials to SSCI-controlled spaces at the Hart Senate Office building and completed a final version of the Report in those spaces, the record is clear that the SSCI sought to release as much information as possible, as quickly as possible. For that reason, it made only the Executive Summary public and chose not to embark simultaneously on the arduous process of negotiating redactions of the full Report with the Executive Branch.  And Senator Feinstein's letter transmitting the full Report to the President was, in *amicus*'s experience, typical of letters relinquishing control over a document to the Executive Branch:  Its intent was to release a congressional record to the Executive Branch for "use as broadly as appropriate to help make sure that this experience is never repeated" and

encouraged the President to use the full Report even more widely, "*as [he] [saw] fit.*"  *See* Letter from Sen. Feinstein to The Hon. Barack Obama, JA 133.  Thus, Congress intended to relinquish control over the SSCI's full Report, and that document is now an agency record subject to the FOIA.

## **CONCLUSION**

For these reasons, the decision of the district court misunderstood the intent of the SSCI and should accordingly be reversed.

Respectfully Submitted,

/s/ Susanne Peticolas
Susanne Peticolas
Lawrence S. Lustberg
Ana Muñoz
Gibbons P.C.
1 Gateway Center
Newark, NJ 07102
Phone: (973) 596 – 4731
Email: speticolas@gibbonslaw.com

*Counsel for Amicus Senator John D. Rockefeller IV*

Dated: November 23, 2015

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 29

and 32(a)(7)(B) because it contains 2,937 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because

it has been prepared in a proportionally spaced typeface using Microsoft

Word in 14-point Times New Roman.

*/s/ Susanne Peticolas*

Susan Peticolas
*Counsel for Amicus Curiae*

Date: November 23, 2015

## CERTIFICATE OF SERVICE

On November 23, 2015, I served upon the counsel for Plaintiffs–Appellants

and Defendants–Appellees one copy of *Amicus Curiae*'s  BRIEF IN SUPPORT

OF APPELLANTS via this Court's electronic-filing system.  I further certify that I

filed a true and correct copy of the foregoing brief with the Clerk of the United

States Court of Appeals for the District of Columbia Circuit.  I further certify that I

will cause eight (8) paper copies of this brief to be filed with the Court.


Hina Shamsi
American Civil Liberties Union Foundation
125 Broad Street — 18th Floor
New York, NY 10004
T: 212-549-2500
hshamsi@aclu.org

Thomas Gary Pulham
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
T: 202-514-4332
thomas.pulham@usdoj.gov

*/s/ Susanne Peticolas*
Susan Peticolas
*Counsel for Amicus Curiae*


Date: November 23, 2015

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHAWN MUSGRAVE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:21-cv-02198 (BAH) |
| | * | |
| MARK WARNER, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff Shawn Musgrave submits this Statement of

Material Facts as to Which There Is No Genuine Dispute.

1.      Congress has not passed a statute which addresses the common law right of

access to legislative records or establishes a process for requesting legislative records.

2.      Republishing information included in a Committee report is not protected by the

Speech or Debate Clause.

3.      Some final Committee reports are written with no intentions of continuing

Congressional deliberations on the matter.

JA 134

Date:   March 20, 2022

Respectfully submitted,

/s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiff*

2

JA 135

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DOUGLAS COX,

                Plaintiff,                           **MEMORANDUM AND ORDER**

          v.                                 17-CV-3329 (RPK) (RLM)

DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF INVESTIGATION,
DEPARTMENT OF DEFENSE, OFFICE OF
THE DIRECTOR OF NATIONAL
INTELLIGENCE, and DEPARTMENT OF
STATE,

                Defendants.
-----------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

      Plaintiff Douglas Cox brings this suit under the Freedom of Information Act, 5 U.S.C.

§ 552 *et seq*., to compel five federal agencies to disclose a Senate report concerning the Central

Intelligence Agency's post-9/11 detention and interrogation program, as well as associated

documents.  The parties have now filed cross-motions for summary judgment, and Mr. Cox seeks

discovery.  For the reasons that follow, defendants' motion is granted, and Mr. Cox's motions are

denied.

**BACKGROUND**

**I.**      **Factual Background**

      The following facts are drawn from the parties' declarations, exhibits, and official

government records amenable to judicial notice.  *See Paskar v. City of New York*, 3 F. Supp. 3d

129, 134 (S.D.N.Y. 2014).

      In the days and weeks following the attacks of September 11, 2001, the Central Intelligence

Agency ("CIA") embarked on a covert detention and interrogation program to collect intelligence.

Press Release, Office of Senator Diane Feinstein (Apr. 3, 2014), Decl. of Vanna Blaine Ex. F (Dkt.

                **Ex. D**

#60-2).  Over the next eight years, the CIA detained over one hundred individuals at clandestine facilities, employing "enhanced interrogation techniques" to obtain information.  *Ibid*.  In January 2009, the government terminated the initiative.  *Ibid*.

In March 2009, the Senate Select Committee on Intelligence ("SSCI" or the "Committee") launched an investigation of this program.  Decl. of Neal Higgins ¶ 10, *in* Decl. of Vanna Blaine (Dkt. #60-2) ("Higgins Decl.").  To facilitate the review, which would involve surveying millions of pages of CIA documents, the CIA and the SSCI negotiated terms of access for the SSCI's staffers.  Higgins Decl. ¶ 11; Letter from Sen. Dianne Feinstein to President Barack Obama (Dec. 14, 2012), Decl. of Douglas Cox Ex. F (Dkt. #60-12) ("Dec. 14, 2012 Letter").  In a letter to the CIA's director, the SSCI "agree[d] that the Committee . . . w[ould] conduct the study of the CIA's detention and interrogation program" under certain "procedures and understandings."  Letter from Sen. Dianne Feinstein to Director Leon Panetta (June 2, 2009), Blaine Decl. Ex. D ("June 2, 2009 Letter").  This letter established access protocols.  The SSCI agreed to conduct its review at a CIA location on a CIA-provided computer network.  *Ibid.*; *see* Higgins Decl. ¶ 11.  The SSCI also agreed to certain redaction rules.  June 2, 2009 Letter ¶ 9.

And especially relevant here, the June 2, 2009 letter stated that the SSCI's report would be the SSCI's property.  In particular, the SSCI specified that "[a]ny documents generated on the network drive . . . as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee."  June 2, 2009 Letter ¶ 6.  These documents, the SSCI stated, would "remain congressional records in their entirety," with "disposition and control over these records, even after the completion of the Committee's review, l[ying] exclusively with the Committee."  *Ibid*.  "As such," the letter added, "these records are not CIA records under the Freedom of Information Act or any other law."

*Ibid.* "If the CIA receives any request or demand for access to those records from outside the CIA under the Freedom of Information Act or any other authority," the letter continued, "the CIA . . . will respond to the request or demand based upon the understanding that these are congressional, not CIA, records." *Ibid.*

Parameters established, the SSCI began its review. By December 2012, the Committee had completed a draft report, which the SSCI then circulated to members of the Executive Branch for comment. Dec. 14, 2012 Letter, at 1. After revisions, the SSCI approved the declassification and release of the report's Executive Summary and Findings and Conclusions in April 2014. Letter from Sen. Dianne Feinstein to President Barack Obama (Apr. 7, 2014), Decl. of Vanessa R. Brinkmann Ex. L (Dkt. #60-3) ("Apr. 7, 2014 Letter"). At the same time, Senator Feinstein, who was then the SSCI's Chair, transmitted the full report to the White House. The transmittal letter "encourag[ed] and approv[ed] the dissemination of the updated report to all relevant Executive Branch agencies." *Ibid*.

On December 9, 2014, the SSCI "formally filed the full version of its Study . . . with the Senate and publicly released the declassified Executive Summary and Findings and Conclusions." Letter from Sen. Dianne Feinstein to President Barack Obama (Dec. 10, 2014), Decl. of Vanessa R. Brinkmann Ex. M ("Dec. 10, 2014 Letter"). The SSCI also transmitted the final 6,963-page report to the White House. *See* Letter from Sen. Dianne Feinstein to President Barack Obama (Jan. 16, 2015), Decl. of Douglas Cox Ex. Z ("Jan. 16, 2015 Letter") (describing report length). The accompanying letter from Senator Feinstein stated that:

> the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve that result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit.

3

Dec. 10, 2014 Letter, at 1.

Senator Richard Burr then replaced Senator Feinstein as SSCI Chair.  Letter from Sen. Richard Burr to President Barack Obama (Jan. 14, 2015), Decl. of Vanessa R. Brinkmann Ex. J (Dkt. #60-3) ("Jan. 14, 2015 Letter"); *see Committee Members 114th Congress (2015-2016)*, U.S. Sen. Select Comm. on Intel., https://www.intelligence.senate.gov/about/committee-members-114th-congress-2015-2016.  On January 14, Senator Burr wrote to President Obama requesting the return of all copies of the report in the Executive Branch's possession.  Jan. 14, 2015 Letter. In his letter, Senator Burr stated that he "consider[ed] the report to be a highly classified and committee sensitive document" that "should not be entered into any Executive Branch system of records."  *Ibid*.  Senator Feinstein replied with a letter of her own two days later disagreeing with Senator Burr's request.  Jan. 16, 2015 Letter.

Over the next two years, Senator Feinstein wrote to various Executive Branch officials asking them to retain and read copies of the report.  *See, e.g.*, Letter from Sen. Dianne Feinstein to Secretary of Defense Ashton B. Carter (Feb. 23, 2015), Decl. of Douglas Cox Ex. J (Dkt. #60-12); Letter from Sens. Dianne Feinstein & Patrick Leahy to Att'y Gen. Loretta Lynch (Jul. 14, 2015), Decl. of Douglas Cox Ex. K (Dkt. #60-12) ("Lynch Letter I");  Letter from Sens. Dianne Feinstein & Patrick Leahy to Att'y Gen. Loretta Lynch & Director James Comey (Nov. 5, 2015), Decl. of Douglas Cox Ex. L; Letter from Sens. Dianne Feinstein & Patrick Leahy to Archivist David S. Ferriero (Apr. 13, 2016), Decl. of Douglas Cox Ex. N ("Ferriero Letter").

On May 16, 2016, the D.C. Circuit determined that the SSCI report was a congressional record not subject to the Freedom of Information Act ("FOIA").  *ACLU v. CIA*, 823 F.3d 655, 667-68 (D.C. Cir. 2016).

After the D.C. Circuit's decision, Senator Feinstein continued to encourage Executive

Branch officials to designate the report as a federal record.  Letter from Sen. Dianne Feinstein to Att'y Gen. Loretta Lynch (Nov. 21, 2016), Decl. of Douglas Cox Ex. O ("Lynch Letter II").  She also urged Attorney General Loretta Lynch and then Attorney General Jeff Sessions to "establish[] [the report] as . . . an agency record pursuant to the Freedom of Information Act."  *Ibid.*; Letter from Sens. Dianne Feinstein, Mark R. Warner, Ron Wyden & Martin Heinrich to Att'y Gen. Jeff Sessions, at 2 (Mar. 9, 2017), Decl. of Douglas Cox Ex. P ("Sessions Letter").  Meanwhile, Senator Burr reiterated his request that Executive Branch agencies return all copies of the SSCI report.  Decl. of Eric F. Stein ¶ 12 (Dkt. #60-7) ("Stein Decl."); Email from Amanda J. Wall to Christina Sanford (May 31, 2017, 8:57 AM), Stein Decl. Ex. I ("Wall Email").  Some agencies did so.  Letter from Gen. Counsel Bradley A. Booker to Sen. Richard Burr (June 1, 2017), Decl. of Douglas Cox Ex. Q (describing disposition of several copies); Decl. of Vanessa R. Brinkmann ¶ 13 (Federal Bureau of Investigation ("FBI") copy returned; Department of Justice ("DOJ") copy with U.S. district court); Decl. of Mark H. Herrington ¶¶ 6-7 (Dkt. #60-6) (Department of Defense ("DOD") copies retained); Stein Decl. ¶ 12 (Department of State ("State") copy returned).

## II.       Procedural Background

On December 21, 2016, Mr. Cox submitted FOIA requests to five agencies: the DOJ, the FBI, DOD, the Office of the Director of National Intelligence ("ODNI"), and State.  *See* Second Am. Compl. ¶¶ 45, 66, 81, 95, 107 (Dkt. #26).  These requests sought the SSCI report, drafts the SSCI circulated with the agencies, text of the report excerpted or quoted in other agency records, and agency records detailing the report's transmission and handling.  *Ibid.*  Arguing that the report was a congressional record exempt from FOIA, the agencies declined to search for the report, drafts of the report, or excerpts or quotations from the report.  *See* Mem. & Order 11-22, *Cox v. Dep't of Just.*, No. 17-CV-3329 (RRM) (RLM) (E.D.N.Y. Nov. 30, 2020) (Dkt. #53) ("Mem. & Order").  The agencies did produce records concerning the report's transmission and handling,

JA 140

redacting these records pursuant to FOIA's enumerated exemptions. *Ibid*.

Seeking the withheld records, Mr. Cox filed this suit on June 2, 2017. Compl. ¶ 2 (Dkt. #1). Defendants moved to dismiss Mr. Cox's FOIA claims pertaining to the report, drafts, and quotations and moved for summary judgment on Mr. Cox's claims challenging the redactions to the produced documents. Notice of Mot. to Dismiss and for Summ. J. (Dkt. #52); Mem. & Order 23. On November 30, 2020, then-presiding Judge Roslynn R. Mauskopf granted defendants' motion in part and denied it in part. Mem. & Order 1.

Judge Mauskopf denied defendants' motion to dismiss Mr. Cox's requests for the SSCI report, drafts, and excerpts and quotations. *Id.* at 30. Adopting the D.C. Circuit's framework for determining whether a document qualifies as an "agency record" under FOIA, *id.* at 39 (citing *Judicial Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208 (D.C. Cir. 2013)), Judge Mauskopf nevertheless determined that she could not take judicial notice of defendants' evidentiary submissions on a motion to dismiss. *Id.* at 33. Therefore, she concluded that Mr. Cox's allegations as to the report's status precluded dismissal of his FOIA claims pertaining to the report, drafts, and quotations. *Id.* at 42.

Judge Mauskopf also granted in part and denied in part defendants' motion for summary judgment on Mr. Cox's FOIA claims challenging the withholding of information from the records the agencies did produce. *Id.* at 58-59. She determined that defendants adequately explained their redactions to all documents save those of the FBI. *Id.* at 53, 58. Therefore, she denied summary judgment as to the FBI documents, granted it as to the others, and invited defendants to renew their motion as to the FBI records after supplementing their submissions. *Id.* at 58-59.

Defendants now move for summary judgment on all of Mr. Cox's surviving FOIA claims. Notice of Second Mot. for Summ. J. (Dkt. #60). The remaining claims seek to vindicate Mr. Cox's

requests for copies and drafts of the final SSCI report held by the defendant agencies, as well as "portions [of these documents] that have been cut and pasted into, or quoted" elsewhere in defendants' records.  DOJ FOIA Request (3), Second Am. Compl. Ex. D (Dkt. #26-4) ("DOJ FOIA Request"); *accord* DOJ FOIA Request (1)-(4); FBI FOIA Request (1)-(4), Second Am. Compl. Ex. E (Dkt. #26-5) ("FBI FOIA Request"); DOD FOIA Request (1)-(4), Second Am. Compl. Ex. F (Dkt. #26-6) ("DOD FOIA Request"); ODNI FOIA Request (1)-(3), Second Am. Compl. Ex. G (Dkt. #26-7) ("ODNI FOIA Request"); State FOIA Request (1)-(3), Second Am. Compl. Ex. H (Dkt. #26-8) ("State FOIA Request"); Second Am. Compl. ¶¶ 12-112.  Mr. Cox's claim for FBI documents pertaining to the handling and transmission of the SSCI report also remains.  FBI Request (5)-(6); Second Am. Compl. ¶¶ 60-72.

Mr. Cox has filed a cross-motion for summary judgment.  Pl's Mem. in Opp'n & Cross-Mot. 1 (Dkt. #60-11) ("Pl.'s Mem. in Opp'n").  In the alternative, he seeks discovery under Federal Rule of Civil Procedure 56(d) and moves the Court to conduct an *in camera* review of one redacted FBI document, referred to as "Cox-30."  *Id.* at 1 & 44.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quotations omitted).  In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant.  *See ibid*.  A nonmoving party can survive summary judgment only if there is

sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

In assessing the record, I consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). I view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quotations, alterations, and citation omitted).

Finally, *pro se* litigants typically enjoy special solicitude. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Since Mr. Cox is a practicing lawyer, though, *see* Mem. & Order 30, he is not entitled to this consideration. *Holtz v. Rockefeller & Co. Inc.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (quoting *Harbulak v. County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981)).

## DISCUSSION

Defendants' motion for summary judgment is granted. The SSCI report, as well as drafts of and excerpts and quotations from that report are congressional records, not "agency records." Therefore, FOIA does not apply to these documents. Accordingly, defendants are entitled to summary judgment on Mr. Cox's requests for those materials under FOIA. In addition, since defendants have now adequately explained the redactions to the FBI records, defendants are also entitled to summary judgment on Mr. Cox's requests for materials that the FBI redacted. Mr. Cox's motion for discovery is denied as unmerited by the record, and the Court declines to conduct

Case 1:17-cv-02303-BAH   Document 20-1   Filed 05/27/22   Page 9 of 30   Case 1:17-cv-02303-RDM   Document 61   Filed 05/27/22   Page 9 of 30 PageID #: 2428

USCA Case #22-5252        Document #1988603        Filed: 03/04/2023        Page 148 of 192

an *in camera* review of Cox-30.

## I.      The Freedom of Information Act and Its Limits

Congress enacted FOIA in 1967 to "permit access to official information long shielded unnecessarily from public view." *EPA v. Mink*, 410 U.S. 73, 80 (1973), *superseded by statute on other grounds*.   Under its mandate, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).  District courts, in turn, possess the power to "enjoin" agencies "from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.* § 552(a)(4)(B).

But FOIA strikes a "careful[] balance[]" between transparency and confidentiality. *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980).  First, Congress expressly limited FOIA's application to "*agency* records." 5 U.S.C. § 552(a)(4)(B) (emphasis added).  The records of other components of the federal government—including Congress—are excluded from FOIA's mandate.  *Id.* § 551(1)(A).  Such non-agency records need not be produced at all.  *Kissinger*, 445 U.S. at 150; *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 565-66 (2d Cir. 2016).

Second, Congress exempted nine specific categories of information within "agency records" from disclosure. 5 U.S.C. § 552(b).  The subjects these exemptions cover range from classified materials to federal-employee medical records. 5 U.S.C. §§ 552(b)(1)-(9).  When an exclusion applies, the agency typically must produce the document, but may redact exempted information. 5 U.S.C. § 552(b); *FBI v. Abramson*, 456 U.S. 615, 626 (1982).  The agency must justify any redactions it makes.  *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016).  Thus, while a litigant who seeks non-agency records will come away with nothing, a litigant who seeks "agency records" containing exempted information may still obtain a trove of documents, albeit in redacted

9

form.

## II.      Mr. Cox Is Not Entitled to the SSCI Report, Its Drafts, or Excerpts

Mr. Cox's first set of FOIA requests—for the SSCI report, its drafts, and excerpts—implicates FOIA's distinction between "agency records" and non-agency records.  Mr. Cox argues that he is entitled to redacted copies of those materials because they have become "agency records" within the meaning of Section 552.  But as the D.C. Circuit previously concluded, the SSCI report is a congressional record exempt from FOIA.  So are drafts of, and excerpts from, that report.  Accordingly, defendants are entitled to summary judgment on these requests.

### A.      The *Judicial Watch* test properly implements the statutory distinction between "agency records" and congressional records.

I adhere to Judge Mauskopf's ruling that the D.C. Circuit's test in *Judicial Watch, Inc. v. U.S. Secret Serv.,* 726 F.3d 208 (D.C. Cir. 2013), should be used to decide whether the records in this case are "agency records" covered by FOIA.  *See* Mem. & Order 39.  That test determines whether a congressionally created document in the hands of an agency qualifies as an "agency record" based on (i) "the intent of the document's creator to retain or relinquish control over the records" and (ii) "the ability of the agency to use and dispose of the record as it sees fit."  *Judicial Watch, Inc.*, 726 F.3d at 218; *id*. at 221.  A document's status ultimately "turns on whether Congress manifested a clear intent to control the document."  *Id.* at 221 (quotations omitted).

Typically, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Frommert v. Conkright*, 913 F.3d 101, 109 (2d Cir. 2019) (quoting *DiLaura v. Power Auth*., 982 F.2d 73, 76 (2d Cir. 1992)).  I am not persuaded to depart from that practice here.  The test developed by the D.C. Circuit and adopted by Judge Mauskopf properly accounts for separation-of-powers considerations.  To be sure, as a general matter, "documents may qualify as 'agency records' if they (1) are created or obtained by

Case 1:17-cv-02319-BAH   Document 20-1   Filed 05/27/22   Page 11 of 30
Case 1:17-cv-02319-BAH   Document 61   Filed 05/27/22   Page 11 of 30   PageID #: 2430
USCA Case #22-5252       Document #1988603       Filed: 03/04/2023       Page 150 of 192

an agency, and (2) 'have come into the agency's possession in the legitimate conduct of its official duties.'" *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 76 (2d Cir. 2020) (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)). But when a FOIA request implicates "constitutional prerogative[s]," the doctrine of constitutional avoidance favors giving the term "agency record" a construction that would avoid impinging on those prerogatives. *Id.* at 77.

The *Judicial Watch* test appropriately applies that principle in interpreting the term "agency record" in the context of congressionally created documents. Mr. Cox seeks a sensitive report that Congress created to supervise Executive Branch activities. Attempts to discover this report implicate both Congress's "constitutional prerogative of maintaining secrecy" and its oversight function. *Goland v. CIA*, 607 F.2d 339, 346 (D.C. Cir. 1978) (per curiam). As the D.C. Circuit explained, "Congress has undoubted authority to keep its records secret, authority rooted in the Constitution, longstanding practice, and current congressional rules." *Ibid.* But Congress also "exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress'[s] originating intent." *Ibid.* (citations omitted). If congressional documents were to become agency records whenever they came into an agency's lawful possession, Congress would be forced "either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Ibid.*

The D.C. Circuit's approach in *Judicial Watch* gives effect to FOIA's disclosure mandate while protecting Congress's constitutional prerogatives. It allows for the possibility that materials originating with Congress may indeed become agency records subject to FOIA. *See ACLU v. CIA*, 823 F.3d at 661-65 (discussing the development and application of the test). But it permits Congress to safeguard the secrecy of confidential oversight documents that have been shared with

11

JA 146

an agency but remain subject to continuing congressional control.  Because the *Judicial Watch* test
implements FOIA while giving due respect to constitutional prerogatives, I apply that test here.

### B.      FOIA does not extend to the SSCI report or to drafts of the report.

The draft and final versions of the SSCI report are not "agency records" subject to FOIA.
To demonstrate that the documents in question are congressional documents—rather than agency
documents—under the *Judicial Watch* test, defendants must show that (i) Congress intended "to
retain . . . control over the records," and (ii) the defendant agencies lacked the ability to "use and
dispose of the record[s]" as they "s[aw] fit."  *ACLU v. CIA*, 105 F. Supp. 3d 35, 45 (D.D.C. 2015)
(quoting *Judicial Watch, Inc.*, 726 F.3d at 218), *aff'd*, 823 F.3d 655 (D.C. Cir. 2016).  As Judge
Boasberg has explained, these "two factors represent two sides of the same coin."  *Ibid.*  "[An]
agency—by definition—cannot lawfully 'control' . . . documents" once "Congress has manifested
its own intent to retain control."  *Ibid.* (quoting *Paisley v. CIA*, 712 F.2d 686, 693 (1983)).
Conversely, once Congress has relinquished control, an agency may use the documents as it sees
fit.  *Ibid.*  Therefore, the *Judicial Watch* inquiry may be put more succinctly as simply inquiring
whether "sufficient indicia of congressional intent to control" exist.  *Ibid.* (quoting *United We
Stand Am., Inc. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004)).  If they do, the document remains a
congressional record.

An agency may show that Congress manifested its "intent to retain control over documents
*either* when the documents [were] created *or* when the documents [were] transmitted to an
agency."  *ACLU v. CIA*, 823 F.3d at 664 (emphasis in original).  The agency bears the burden of
demonstrating that the materials are not agency records.  *Doyle*, 959 F.3d at 76.  Once Congress's
intent to control the documents is established, though, that evidence can "only be overcome if the
record reveals that Congress subsequently acted to vitiate the intent."  *ACLU v. CIA*, 823 F.3d at
664.

Case 1:17-cv-03321-BAH Document 20-1 Filed 05/27/22 Page 13 of 30
Case 1:17-cv-03321-BAH Document 61-1 Filed 05/27/22 Page 313 of 30 ID #: 2432
USCA Case #22-5252      Document #1988603      Filed: 03/04/2023      Page 152 of 192

Defendants have shown that the draft and final SSCI report are congressional documents, rather than agency records, under this test. When Congress began its investigation in 2009, it "manifested a clear intent" to control both draft and final versions of the SSCI report. *ACLU v. CIA*, 823 F.3d at 664 (quoting *Judicial Watch, Inc.*, 726 F.3d at 221)). The June 2, 2009 letter to the CIA outlining Congress's understanding of those documents unambiguously states that "[a]ny documents generated on the network drive" designated for use in creating the SSCI report, "as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee." June 2, 2009 Letter ¶ 6. The letter further specifies that "even after the completion of the Committee's review," these documents are to "remain congressional records." *Ibid*. And it specifies that requests for these documents are to be handled "based upon the understanding that these are congressional . . . records." *Ibid*. As the D.C. Circuit has explained, that language demonstrates the SSCI's intent to assert control over the SSCI report and its drafts. *ACLU v. CIA*, 823 F.3d at 664-65. The terms contain no expiration date. *See* June 2, 2009 Letter. And it permits limited disclosure within the Executive Branch only pursuant to "prior written authorization of the Committee." *Id*. ¶ 6. Clearer evidence of an "intent to control" these records is hard to imagine. *ACLU v. CIA*, 823 F.3d at 663 (quoting *Judicial Watch, Inc.*, 726 F.3d at 221).

Mr. Cox offers several arguments to explain away this letter, none of which are persuasive. First, Mr. Cox argues that the letter does not govern the SSCI's final report, but only SSCI work-product located in the CIA Reading Room. Pl.'s Mem. in Opp'n 32-37. This claim runs aground on the letter's plain language, which provides that it applies both to "[a]ny documents generated on the network drive" *and* to "any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members." June 2, 2009 Letter. This

JA 148

Case 1:17-cv-02183-BAH Document 20-1 Filed 03/27/22 Page 14 of 80
Case 1:21-cv-02109-BAH Document 20-1 Filed 05/27/22 Page 304 of 360   PageID #: 2433
USCA Case #22-5252   Document #1988603   Filed: 03/04/2023   Page 153 of 192

text "encompass[es] the Final Full Report, which by its own title is a 'final . . . report[] or other material[] generated by Committee staff or members.'"  *ACLU v. CIA*, 105 F. Supp. 3d at 46 (quoting the June 2, 2009 Letter) (brackets omitted).

Mr. Cox also suggests that the letter ought to be read as part of an incomplete, unincorporated exchange and does not represent the final position of the SSCI.  Pl.'s Mem. in Opp'n 37, 41.  However, this claim lacks a basis in the record.  While the CIA and SSCI exchanged other communications, none contradicted the intent Congress expressed in its June 2, 2009 letter.  *See* Fax from the CIA to the SSCI (June 8, 2009), Decl. of Douglas Cox Ex. T ¶¶ 3, 5.  In fact, the CIA's June 8 fax confirms Congress's control.  In this fax, the CIA refers to the report as "your [i.e., the SSCI's] . . . report," and it asks whether "the SSCI plan[ed] to allow the CIA to review the SSCI final report before publication."  *Id*. ¶ 3.  While the fax discussed a "few issues" that were still to be sorted out between the CIA and SSCI, its language indicates that the matter of who controlled the final SSCI report had already been settled.  *Id*. ¶ 1.  Absent other evidence contradicting the understanding expressed in the June 2, 2009 letter or the June 8, 2009 fax, this argument is speculative, and it is not enough to preclude summary judgment.

Finally, Mr. Cox contends that the June 2, 2009 letter only applies to the CIA.  But while the SSCI drafted the letter in the context of negotiations with the CIA, its language sweeps far more broadly.  In the letter, the SSCI expressly states that the SSCI's "documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee."  June 2, 2009 Letter ¶ 6.  Such language cannot be read to limit the SSCI's assertion of control as against the CIA alone.  In short, Congress "manifested a clear intent to control" the SSCI report and its drafts through its June 2009 letter.  *ACLU v. CIA*, 823 F.3d at 663 (quoting *Judicial Watch, Inc*., 726

F.3d at 221).

Nor did Congress "subsequently act[] to vitiate" its control of the SSCI Report. *ACLU v. CIA.*, 823 F.3d at 664. On December 14, 2012, the SSCI transmitted a rough draft of the report to President Barack Obama to solicit "suggested edits or comments" from the Executive Branch. *See* Dec. 14, 2012 Letter, at 1. By stipulating that the SSCI would choose which edits to "accept[]" and "consider how to handle any public release of the report," the  letter "undeniably reinforced what had already been made clear in the June 2009 Letter, *i.e.*, that the Committee intended to retain control over the Full Report." *ACLU v. CIA*, 823 F.3d at 667. On April 7, 2014, the SSCI transmitted a second version to the President, authorizing its dissemination to "relevant" agencies and explaining that the SSCI intended to release the report's Executive Summary and Findings and Conclusions publicly. Apr. 7, 2014 Letter, at 2. While this letter granted the President discretion in selecting which agencies ought to receive the report, the SSCI's decision to release portions of the report while limiting circulation of other portions underscored its continuing exercise of control.

Finally, on December 10, 2014, the SSCI sent President Obama a final version of the report. Dec. 10, 2014 Letter. In the accompanying letter, Senator Feinstein stated that "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." *Id*. at 1. She encouraged the President to use "the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit." *Ibid.* Here again, Congress expanded the President's discretion over use of the report within the Executive Branch. Affording discretion, though, is not the same as surrendering control. Like the earlier letters, this letter gave congressional directions concerning the permissible uses of

15

Case 1:17-cv-02193-BAH Document 20-1 Filed 05/27/22 Page 16 of 30
Case 1:17-cv-02193-BAH Document 61 Filed 03/27/22 Page 310 of 301 D #: 2435
USCA Case #22-5252        Document #1988603        Filed: 03/04/2023        Page 155 of 192

the report, by specifying purposes for which the report was to be used and establishing or implying limits to the Executive Branch's ability to dispose of the document as it wished. Without more, these letters do not "vitiate the command of the June 2009 Letter." *ACLU v. CIA*, 823 F.3d at 667.

Mr. Cox also argues that Senator Feinstein's subsequent letters show that Congress abandoned control over the SSCI report. Pl.'s Mem. in Opp'n 25-29. However, the subsequent letters are not probative. After Senator Burr replaced Senator Feinstein as SSCI Chair in 2015, the two senators sent dueling missives to various agencies. *Compare* Jan. 14, 2015 Letter *and* Wall Email *with* Jan. 16, 2015 Letter, Lynch Letter I, Ferriero Letter, Lynch Letter II, *and* Sessions Letter. Describing the report "a highly classified and committee sensitive document," Senator Burr directed that it "should not be entered into any Executive Branch system of records." Jan. 14, 2015 Letter. Senator Feinstein and several others, meanwhile, urged Attorney General Jeff Sessions to "establish the [report] as an agency record pursuant to FOIA." Sessions Letter, at 2. Later, Senator Burr reiterated his request that Executive Branch agencies return all copies of the SSCI report, again indicating that he continued to view the report as a congressional document. Stein Decl. ¶ 12; Wall Email. These contradictory letters do not offer a clear indication of subsequent congressional intent either to assert control over the report or to relinquish it after 2014.

By that same token, Mr. Cox's arguments concerning whether the White House established the report as a "presidential record" or the National Archives established it as a "federal record" are beside the point. Pl.'s Mem. in Opp'n 13, 15-19, 33; Pl.'s Reply 2, 7-8. Whether a document is a presidential record or federal record does not determine whether it is also an "agency record" under FOIA. *Compare* 44 U.S.C. §§ 2201, 2203 (presidential records) *and* 44 U.S.C. § 3303 *et seq.* (federal records) *with* 5 U.S.C. §§ 551, 552 (FOIA).

16

Case 1:17-cv-01928-ABJ   Document 61   Filed 03/27/22   Page 17 of 30
Case 1:17-cv-01928-ABJ   Document 20-1   Filed 05/27/22   Page 17 of 30   PageID #: 2436
USCA Case #22-5252      Document #1988603         Filed: 03/04/2023      Page 156 of 192

In sum, as the D.C. Circuit concluded, Congress asserted control over the SSCI report and its drafts in 2009. *ACLU v. CIA*, 823 F.3d at 667-68. The subsequent letters on which plaintiffs relied did not "vitiate the command of the June 2009 Letter." *Id.* at 663. As a result, neither the final SSCI report nor drafts of that report are agency records subject to FOIA.

### C. Mr. Cox is not entitled to excerpts or quotations of the SSCI report contained in agency records.

Since the sections of the SSCI report and its drafts that are quoted in agency documents also fall outside of FOIA, Mr. Cox's claims for "portions" of the report "that have been cut and pasted into, or quoted in," other agency documents are also denied. DOJ FOIA Request (3); *accord* FBI FOIA Request (3); DOD FOIA Request (3); ODNI FOIA Request (2); State FOIA Request (2). *Judicial Watch* looks to "manifest[ations]" of congressional intent, not the actions of agencies, in determining what qualifies as an "agency record." *ACLU v. CIA*, 823 F.3d at 663. Congress's intent to control a document is not affected by an agency's decision to quote or embed that congressional document within an agency report. Indeed, respect for congressional prerogatives dictates that even a portion of an agency-created document that merely reveals the content of a congressional document becomes a "congressional document[] not subject to FOIA." *United We Stand Am., Inc.*, 359 F.3d at 603. That conclusion comports with the principles of constitutional avoidance that underlie *Judicial Watch*. Permitting an agency to turn any congressional document into an agency record by copying it would hamper Congress's ability to engage in oversight while still maintaining control over its documents. Congress would be "forced either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role." *Goland*, 607 F.2d at 346. As the D.C. Circuit has explained, constitutional avoidance counsels against a construction of the term "agency record" that would put Congress to such a choice.

17

*Doyle*, 959 F.3d at 77. Accordingly, Mr. Cox is not entitled to portions of the draft or final SSCI report that are quoted in agency documents.

The same is true of the SSCI report copy that Mr. Cox alleges the DOD uploaded onto its network. *See* Pl.'s Mem. in Opp'n 20. Just as an agency cannot convert a portion of a congressional record into an agency record by copying it, neither can it convert it by copying the whole record. The dispositive question remains Congress's intent to control a document it created, and as explained previously, the record indicates that Congress intended to control the report. *See* pages 12-17, *supra*.

Finally, insofar as Mr. Cox recasts his FOIA inquiry as a request for agency records quoting the SSCI report rather than for the actual quotations themselves, *see* Second Am. Compl. ¶¶ 45, 66, 81, 95, 107; Pl.'s Mem. in Opp'n 38-40; Pl.'s Reply 3-4, Mr. Cox is not entitled to those materials in this lawsuit. Mr. Cox's FOIA requests sought "portions of the *SSCI Report on Torture* that have been cut and pasted into, or quoted in," agency records, DOJ FOIA Request (3); *accord* FBI FOIA Request (3); DOD FOIA Request (3); ODNI FOIA Request (2); State FOIA Request (2), but did not seek agency records themselves. Section 552 only authorizes district courts to order the production of agency records "improperly withheld." 5 U.S.C. § 552(a)(4)(B). Since Mr. Cox never requested agency records containing these excerpts, the agencies cannot be said to have "improperly withheld" them. *Ibid*. Therefore, the Court lacks the power to compel their production. *See Willis v. U.S. Dep't of Just.*, 581 F. Supp. 2d 57, 68 (D.D.C. 2008).

In sum, I grant defendants summary judgment on all of Mr. Cox's requests for the final report, its drafts, and excerpts. These include Mr. Cox's DOJ requests (1)-(4), FBI requests (1)-(4), DOD requests (1)-(4), ODNI requests (1)-(3), and State requests (1)-(3).

## III.    Defendants Sufficiently Explain the Withholding of Information in the FBI Records

Defendants are also entitled to summary judgment on Mr. Cox's challenge to the withholding of information in the requested FBI records. Mr. Cox initially sought FBI records discussing copies of the SSCI report "previously in Department of Justice possession that were . . . disposed of" and records "regarding how the Department of Justice or . . . other entities should handle or treat copies" of the report. FBI Requests (5)-(6). In response, the FBI has produced 154 pages of documents. The FBI and CIA redacted 144 pages pursuant to FOIA's statutory exemptions. Seidel Decl. ¶ 17.

Mr. Cox did not contest the adequacy of the FBI's search. *See* Pl.'s Mem. in Opp'n to Defs.' First Mot. for Summ. J. 24 (Dkt. #52-10) ("Pl.'s First Mem. in Opp'n"). And in response to defendants' first motion for summary judgment, Mr. Cox relinquished his opposition to their assertions of Exemptions 6, 7(C),[1] and 7(E). *Id.* at 35; Pl.'s Sur-Reply 10 (Dkt. #52-37). He also dropped his opposition to defendants' redactions pursuant to Exemption 3, except in Cox-30. Pl.'s First Mem. in Opp'n 27. However, Judge Mauskopf denied defendants summary judgment on Mr. Cox's fifth and sixth FBI requests because defendants did not explain their redactions pursuant to Exemptions 1 and 5 with sufficient specificity. Mem. & Order 49 & 52. Defendants supplemented their filings and also produced one more document, Cox-181. They now move again for summary judgment. Mr. Cox focuses his opposition to the redactions to Cox-30, and he does not contest the redactions to Cox-181. *See* Pl.'s Mem. in Opp'n 42-43 & n.23.

---

[1] While Mr. Cox does not appear to have explicitly abandoned his challenge to the assertions of Exemption 7(C), Judge Mauskopf determined that he had, *see* Mem. & Order 27 ("[I]n his opposition and sur-reply, [Mr.] Cox withdr[e]w any challenges to the Agencies' withholdings pursuant to exemption[] . . . seven."), and Mr. Cox has not challenged her conclusion or renewed his opposition to the exemption's assertion. Therefore, the Court "adhere[s] to" Judge Mauskopf's ruling and treats this challenge as abandoned. *Vaughn v. Phoenix House N.Y. Inc*., 957 F.3d 141, 146-47 (2d Cir. 2020) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." (quotations omitted)).

Since Mr. Cox does not oppose the redactions to Cox-181, the Court grants defendants summary judgment on Cox-181 as unopposed. With their supplement filings, defendants also carry their burden on the remaining contested documents. Therefore, the Court grants defendants summary judgment on Mr. Cox's FBI requests (5) and (6) and declines to conduct an *in camera* review of Cox-30.

### A. The FBI and CIA now adequately explain the assertions of FOIA Exemptions 1, 3, and 5.

Mr. Cox's only remaining challenge is to the FBI's and CIA's withholding of FBI materials pursuant to FOIA Exemptions 1 and 5 and the withholding of information in Cox-30 pursuant to Exemption 3.

A court reviews an agency's decision to withhold information *de novo*. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). The agency bears the burden of justifying its withholding, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 174 (1991), and "[a]ll doubts are resolved in favor of disclosure," *Bloomberg, L.P. v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (brackets and quotations omitted). To meet its burden, an agency may produce "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption." *N.Y. Times v. CIA*, 965 F.3d 109, 114 (2d Cir. 2020) (quotations omitted). Such affidavits and declarations "are accorded a presumption of good faith," and if "reasonably detailed," "suffic[e] to sustain the agency's burden" at summary judgment. *Ibid.* (quotations omitted)

"[W]hen the information requested concerns national security," as it does here, "courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Ibid.* (quotations omitted; emphasis in original). "Ultimately, an

Case 1:17-cv-02989-BAH Document 20-1 Filed 03/27/22 Page 21 of 30    Case 1:17-cv-02989-BAH Document 61-1 Filed 05/27/22 Page 31 of 30 PageID #: 2440

USCA Case #22-5252      Document #1988603      Filed: 03/04/2023      Page 160 of 192

agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Ibid*. (quoting *Wilner v. NSA*, 592 F.3d 60, 75 (2009)).

**B.      Defendants adequately explain their assertions of of Exemption 5.**

Applying these principles, the FBI and CIA have met their burden in explaining their application of Exemption 5 to the FBI materials.   Section 552(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."   5 U.S.C. § 552(b)(5).   This exemption "withholds from a member of the public documents which a private party could not discover in litigation with the agency."   *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975)).   Included in this exemption is information that would be shielded by attorney-client privilege, *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76 (2d Cir. 2002), and the deliberative-process privilege, *Klamath Water Users Protective Ass'n*, 532 U.S. at 8.

Attorney-client privilege "promote[s] open communication between attorneys and their clients so that fully informed legal advice may be given."   *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 360 (2d Cir. 2005) (quotations omitted).   It protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance."   *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012) (quotations omitted).   However, while the privilege "protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance," it "may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy."   *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L.*, 697 F.3d at 207 (quotations omitted).

The deliberative-process privilege protects those documents that "reflect[] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water Users Protective Ass'n*, 532 U.S. at 8. Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," this privilege "enhance[s] the quality of agency decisions by protecting open and frank discussion among those who make them within the [g]overnment." *Id.* at 8-9 (internal quotations omitted). Documents qualify for this privilege if they are "both predecisional and deliberative." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (quotations omitted). "Generally, 'documents are predecisional if they were generated before the agency's final decision on a matter, and they are deliberative if they were prepared to help the agency formulate its position.'" *NRDC v. EPA*, 19 F.4th 177, 184 (2d Cir. 2021) (brackets omitted) (quoting *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021)). Predecisional documents are those created "to assist an agency decisionmaker in arriving at his decision." *ACLU v. NSA*, 925 F.3d 576, 592 (2d Cir. 2019) (quotations omitted). To determine whether a document is deliberative, the court examines "whether the document was prepared to help the agency formulate its position, by analyzing if it reflects the give-and-take of the consultative process." *NRDC v. EPA*, 19 F.4th at 184 (quotations omitted). The "key question" when evaluating assertions of the deliberative-process privilege is "whether disclosure would tend to diminish candor within an agency." *Id.* at 185 (quotations omitted).

The FBI and CIA have adequately explained the withholding of FBI records pursuant to Exemption 5. The FBI and CIA withheld information in twenty-four and twenty FBI documents respectively on the basis of this exemption. *See* Seidel Decl. ¶¶ 18, 19 & n.5; *id.* Ex. A ("FBI *Vaughn* Index"); Blaine Decl. Attachment A ("CIA *Vaughn* Index"). The FBI has categorized the

JA 157

produced records into four categories: emails, letterhead memoranda, handwritten notes, and a white paper. Seidel Decl. ¶ 20. Its *Vaughn* index describes each document produced or withheld and the nature of the exempt information in each document. *Ibid*.; *see generally* FBI *Vaughn* Index. The Seidel Declaration also include a detailed explanation of the FBI's redactions pursuant to Exemption 5. Seidel Decl. ¶¶ 37-62.

The subject matter of the materials withheld under deliberative-process privilege ranges from "suggested language changes, redactions and classification recommendations" for the SSCI report, *id.* ¶ 47, to "how best to address important revisions to a sensitive program run by another intelligence agency," *id.* ¶ 59. The FBI also withheld information pursuant to the attorney-client privilege on a variety of matters—for example, advice on the legality of "the application of an investigative technique." *Id.* ¶ 44. These topics are related to each document in the *Vaughn* index. Through the Seidel Declaration and the FBI *Vaughn* index, the FBI has sufficiently explained its assertions of Exemption 5.

The same is true of the CIA's assertions of Exemption 5. The Blaine Declaration explains in detail the information withheld under this exemption. Under attorney-client privilege, the CIA withheld communications offering legal advice that the FBI had solicited. Blaine Decl. ¶ 33. The CIA also exempted, for example, information in "inter-agency communications related to the process by which the CIA and other Executive Branch agencies agreed to declassify certain national security information" in the SSCI report's Executive Summary, *id.* ¶ 34, as well as "requests and proposals for the distribution of the final report," *id.* ¶ 36. As the CIA explains, none of the withheld information reflects "final decisions." *Ibid.* Furthermore, the CIA describes the withholdings for each document in detail in its *Vaughn* index. *See generally* CIA *Vaughn* Index. This index can be cross-referenced with the disclosed documents, which are available as

23

Case 1:17-cv-02419-BAH   Document 20-1   Filed 05/27/22   Page 24 of 30
Case 1:17-cv-02419-BAH   Document 61   Filed 03/27/22   Page 24 of 30   PageID #: 2443
USCA Case #22-5252      Document #1988603           Filed: 03/04/2023      Page 163 of 192

an attachment to the Seidel Declaration.  *See* Seidel Decl. Ex. B.  Based on the declarations and

the CIA's *Vaughn* index, the CIA has sufficiently explained its assertions of Exemption 5.

Mr. Cox only specifically challenges defendants' application of Exemption 5 to Cox-30,

and these fall short.  This document, an email chain with the subject line "RE: Hard Bound Copies

of the SSCI Reports," contains redactions by both the FBI and CIA.  *See* Cox-30, Seidel Decl. Ex.

B ("Cox-30").  The FBI explains that it asserted Exemption 5 in connection with Cox-30 because

that document contains "deliberations between FBI employees concerning the SSCI report, and

communications between FBI employees discussing requests and proposals for distribution of the

final report."  FBI *Vaughn* Index.  The FBI also explains that these deliberations "predate a final

decision regarding the handling of the report" and do not reflect any "final decision[]."  *Ibid*.

Failure to protect these deliberations, the FBI warns, would "make FBI employees much more

hesitant to provide their candid opinions when proposing actions or developing new FBI policies

or procedures."  *Ibid*.  The CIA, for its part, asserts Exemption 5 to "protect pre-decisional and

deliberative information regarding the handling of and access to the final SSCI report," squaring

cleanly with the FBI's statement.  CIA *Vaughn* Index.

These "reasonably detailed explanations" are "'logical [and] plausible.'"  *N.Y. Times v.

CIA*, 965 F.3d at 114 (quoting *Wilner*, 592 F.3d at 75)).  The release of predecisional deliberations

concerning the appropriate handling of a sensitive, highly classified report might well chill internal

agency deliberations.  Here, "whether disclosure would tend to diminish candor within an agency"

is the "key question," and disclosing deliberations concerning how to handle a sensitive, highly

classified report might well "diminish candor" in the future.  *NRDC v. EPA*, 19 F.4th at 185

(internal quotations omitted).

Case 1:17-cv-02419-BAH Document 60-1 Filed 05/27/22 Page 25 of 30
Case 1:17-cv-02419-BAH Document 20-1 Filed 05/27/22 Page 25 of 30 D #: 2444
USCA Case #22-5252      Document #1988603      Filed: 03/04/2023      Page 164 of 192

Mr. Cox argues that the FBI's and CIA's explanations of their Exemption 5 redactions to Cox-30 conflict, since the CIA describes Cox-30 as discussing "inter-agency deliberations" whereas the FBI states that Cox-30 consists of emails between "FBI employees." Pl.'s Mem. in Opp'n 44-45 (emphasis omitted). He also suggests that the "brevity of this email exchange and the pedestrian nature of the subject line also raise questions about whether this could really constitute deliberative material." *Id.* at 45. These arguments lack merit. First, the CIA's and FBI's descriptions are not contradictory. To begin, the CIA—like the FBI—describes Cox-30 as "[e]mail between FBI employees." CIA *Vaughn* Index. Furthermore, it is entirely "plausible" and "logical," *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations omitted), that FBI employees might discuss "inter-agency deliberations" internally, and that the "distribution of the final report" might implicate "inter-agency deliberations," FBI *Vaughn* Index. And Mr. Cox's argument that the brevity of the exchange and its subject line raise doubts that it "could really constitute deliberative material" is entirely speculative. Pl.'s Mem. in Opp'n 45. Applying the presumption of good faith to which the agencies' declarations are entitled, *N.Y. Times v. CIA*, 965 F.3d at 114, the declarations sufficiently explain the agencies' assertions of Exemption 5.

### C. The agencies also adequately explain their assertions of Exemption 1.

Further, the agencies have adequately explained their assertions of Exemption 1.

Exemption 1 permits agencies to withhold records "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order No. 13,526 permits the classification of information pertaining to "intelligence sources or methods" or "foreign relations or foreign activities of the United States" when an "original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." Exec.

Order No. 13,526 §§ 1.1(a)(3)-(4), 1.4(c)-(d), 75 Fed. Reg. 707, 707, 709 (Dec. 29, 2009). Since information classified pursuant to Exemption 1 "concerns national security," the Court "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations omitted; emphasis in original).

The FBI and CIA withheld information in nineteen documents pursuant to Exemption 1. *See* Seidel Decl. ¶¶ 26, 33; FBI *Vaughn* Index; CIA *Vaughn* Index. The agencies' declarants, FBI Section Chief Michael G. Seidel and CIA Officer Vanna Blaine, are original classification authorities under Executive Order 13,526. Seidel Decl. ¶ 2; Blaine Decl. ¶ 3. Both officers reviewed the exempted information and determined that it was appropriately classified pursuant to the executive order. Seidel Decl. ¶¶ 24-25; Blaine Decl. ¶ 13. The subject matter of the FBI redactions includes topics ranging from the FBI's "intelligence methods" to information that could identify the "target of foreign counterintelligence/espionage investigation." Seidel ¶¶ 26, 30. The FBI's *Vaughn* index identifies the information withheld in each document. FBI *Vaughn* Index. The FBI has met its burden with respect to its assertions of Exemption 1, because it has offered "reasonably detailed explanations" of why the withheld information "fall[s] within an exemption." *N.Y. Times v. CIA*, 965 F.3d at 114.

So has the CIA. As the Blaine Declaration explains, "[a]ll classified information for which the CIA has asserted Exemption (b)(1) constitutes intelligence sources and methods information." Blaine Decl. ¶ 14. FBI documents that the CIA redacted "contain the names of CIA personnel associated with the CIA's former detention and interrogation program," the location of field installations, codewords, and information about intelligence sources, methods, and activities. *Id.* ¶ 18; *see id.* ¶ 18-31. The CIA's *Vaughn* index, in turn, identifies the information withheld in each

26

JA 161

Case 1:17-cv-01335-BAH   Document 60-1   Filed 05/27/22   Page 27 of 30
Case 1:17-cv-01335-BAH   Document 60-1   Filed 05/27/22   Page 27 of 30   PageID #: 2446
USCA Case #22-5252      Document #1988603      Filed: 03/04/2023      Page 166 of 192

document with reasonable specificity.  CIA *Vaughn* Index.  In sum, the CIA's submissions offer "plausible" and "logical" explanations of its assertions of the exemption.  *N.Y. Times v. CIA*, 965 F.3d at 114.

Mr. Cox again focuses his opposition on Cox-30 alone.  Pl.'s Mem. in Opp'n 42-43.  The FBI makes no Exemption 1 redactions to this document.  The CIA redacts one paragraph, explaining that it did so:

> to protect classified intelligence activities, sources and methods, and classified foreign activities of the CIA—includ[ing] category (i) information regarding personnel associated with the review of the former detention and interrogation program; and category (iii) information pertaining to specific intelligence activities, methods, and operations, including counterterrorism techniques.

CIA *Vaughn* Index.  This explanation is both "plausible" and "logical," as emails concerning the report might include information about the CIA's foreign intelligence activities.  *N.Y. Times v. CIA*, 965 F.3d at 114.  Furthermore, these claims are entitled to a presumption of good faith, *Grand Cent. P'ship, Inc.*, 166 F.3d at 489, and given the subject matter, must be accorded "substantial weight," *N.Y. Times v. CIA*, 965 F.3d at 114 (quotations and emphasis omitted).  Accordingly, this description adequately justifies the CIA's redaction of the single paragraph in Cox-30.

Mr. Cox presents no persuasive arguments to the contrary.  Mr. Cox first argues that the "inculpatory nature" of the SSCI report "creates an incentive for [d]efendants to conceal its contents," and so the agencies' assertions that materials are classified should be "approach[ed] . . . with caution."  *Id.* at 42.  But an agency's declarations are entitled to a presumption of good faith, rebuttable only when contradicted by evidence on the record or by a showing of bad faith.  *See N.Y. Times v. CIA*, 965 F.3d at 114; *accord Wilner*, 592 F.3d at 69; *Grand Cent. P'ship, Inc.*, 166 F.3d at 489.  The subject matter of the disclosures is not grounds for abandoning the presumption,

and Mr. Cox has not identified evidence contradicting the agencies' assertions or showing bad faith in this litigation.

Mr. Cox also asserts that it is "implausible" that an "exceedingly brief email exchange" could contain "information pertaining to specific intelligence activities, methods, and operations, including counterterrorism techniques" of the CIA. Pl.'s Mem. in Opp'n 43. But based on its subject line, this email thread discusses copies of the SSCI report, which itself details the CIA's intelligence activities. Given the topic of this email thread, it seems entirely plausible that the FBI employees might have referred to the contents of the report, and that the report's contents included "information pertaining to specific intelligence activities . . . including counterterrorism techniques." CIA *Vaughn* Index.

Finally, based on the subject line and timing of the email, Mr. Cox suggests that the CIA invoked the exemption to conceal misstatements to the D.C. Circuit. "[I]f," Mr. Cox states, Cox-30 "were, for example, discussing FBI's use of CIA copies" of the SSCI report, it "could" mean that a declaration filed by the DOJ in litigation was "technically true, but grossly misleading." Pl.'s Mem. in Opp'n 44. These claims are entirely speculative, and the Court "cannot base [its] judgment on mere speculation." *Wilner*, 592 F.3d at 75. Absent evidence of bad faith, the CIA is entitled to a presumption of good faith in its representations. *Id.* at 69 (citation omitted).

Accordingly, I conclude that defendants have also met their burden as to Exemption 1.

### D.    The Court does not reach the CIA's assertion of Exemption 3 for Cox-30.

Because Exemption 1 and Exemption 5 adequately support all of the CIA's redactions to Cox-30, the Court need not address Mr. Cox's objections to the CIA's assertion of Exemption 3 as an additional ground for certain redactions. "[E]xemptions 1 and 3 are separate and independent grounds" to justify withholding information, *Wilner*, 592 F.3d at 72, and "courts may uphold agency action under one exemption without considering the applicability of the other," *ibid*.

28

Case 1:17-cv-03329-BAH Document 60-1 Filed 03/27/22 Page 39 of 80
Case 1:17-cv-03329-BAH Document 60-1 Filed 03/27/22 Page 39 of 80
USCA Case #22-5252    Document #1988603    Filed: 03/04/2023    Page 168 of 192

(quoting *Larson v. Dep't of State*, 565 F.3d 857, 862-63(D.C. Cir. 2009)).  Since the CIA has adequately justified its redactions to Cox-30 based on Exemption 1, the Court need not address the agency's assertion of Exemption 3.

###### E. Mr. Cox's request for *in camera* review is denied.

Mr. Cox's request for an *in camera* review of Cox-30 is denied.  The Second Circuit has adopted a "restrained approach" to such review, *Halpern v. FBI*, 181 F.3d 279, 292 (2d Cir. 1999), directing that "[a] court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs," *Wilner*, 592 F.3d at 75-76.  "When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate."  *Rutigliano v. U.S. Dep't of Just.*, 847 F. App'x 86, 87 (2d Cir. 2021) (quoting *Larson*, 565 F.3d at 870) (summary order).  Since the defendant agencies have adequately explained their redactions to Cox-30, *see* pages 20-29, *supra*, an *in camera* review of that document would not be "appropriate," *Rutigliano*, 847 F. App'x at 87.

## IV. Mr. Cox's Motion for Discovery Is Denied

Finally, Mr. Cox's motion for discovery is denied.  In the context of FOIA, discovery is rarely warranted.  *See, e.g.*, *Immerso v. U.S. Dep't of Lab.*, No. 19-CV-3777 (NGG) (VMS), 2020 WL 8996744, at *3 (E.D.N.Y. Mar. 2, 2020); *Est. of Ghais Abduljaami v. U.S. Dep't of State*, No. 14-CV-7902 (RLE), 2016 WL 94140, at *3 (S.D.N.Y. Jan. 7, 2016); *N.Y. Times Co. v. U.S. Dep't of the Treasury*, No. 15-CV-5740 (ER), 2016 WL 4147223, at *5 (S.D.N.Y. Aug. 2, 2016) (citing *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 187 (D.D.C. 2011)).  To obtain discovery where, as here, the defendant agencies' submissions "are adequate on their face," Mr. Cox "must make a showing of bad faith on the part of the agency sufficient to impugn the agenc[ies'] affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agenc[ies]

should not apply or summary judgment is otherwise inappropriate." *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994) (citations omitted).

Mr. Cox makes no such showing. He identifies neither "contrary evidence," nor representations or actions or statements "suggestive of bad faith." *Halpern*, 181 F.3d at 292. Instead, his argument turns entirely on the idea that "[d]efendants' heavily-lawyered declarations and cherry-picked documents" are insufficient to support summary judgment. Pl.'s Mem. in Opp'n 41. Rhetoric aside, Mr. Cox has the law backward. FOIA cases are "most appropriately resolved on motions for summary judgment" using precisely these sorts of documents, *not* through discovery. *Robbins Geller Rudman & Dowd LLP v. U.S. Sec. & Exch. Comm'n*, 419 F. Supp. 3d 523, 530 (E.D.N.Y. 2019) (quoting *Platsky v. Food & Drug Admin.*, No. 13-CV-6250 (SLT) (RLM), 2014 WL 7391611, at *3 (E.D.N.Y. Dec. 24, 2014), *aff'd* 642 Fed. Appx. 63 (2d Cir. 2016), *as amended* (Jun. 21, 2016)). Without more than "purely speculative claims," Mr. Cox is not entitled to discovery. *Grand Cent. P'ship, Inc.*, 166 F.3d at 489 (quotations omitted).

## CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiff's cross-motion for summary judgment is denied. Mr. Cox's request for *in camera* review and his motion for discovery under Rule 56(d) are also denied. The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: March 30, 2022
     Brooklyn, New York

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SHAWN MUSGRAVE, | |
| Plaintiff, | Civil Action No. 21-cv-2198 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| MARK WARNER, *et al.*, | |
| Defendants. | |

## ORDER

Upon consideration of defendants' Motion to Dismiss, ECF No. 5, the memoranda submitted in support and opposition, the exhibits thereto, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion issued contemporaneously with this Order, it is hereby

**ORDERED** that defendants' Motion to Dismiss, ECF No. 5, is GRANTED and this case is DISMISSED WITHOUT PREJUDICE; it is further

**ORDERED** that plaintiff's Cross Motion for Partial Summary Judgment, ECF No. 15, is DENIED; and it is further

**ORDERED** that the Clerk of Court shall close this case.

**SO ORDERED.**

Date: September 15, 2022

*This is a final and appealable Order.*

_____
BERYL A. HOWELL
Chief Judge

JA 166

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHAWN MUSGRAVE,

               Plaintiff,

               v.

MARK WARNER, *et al.,*

               Defendants.

Civil Action No. 21-cv-2198 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiff Shawn Musgrave asserts that the common-law right to public access requires defendants, the Senate Select Committee on Intelligence ("SSCI" or "Committee") and Mark Warner, in his capacity as the Chair of SSCI, to disclose, in full, the classified 2014 Senate Report 113-288, *Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program* ("the Report"). *See generally* Compl., ECF No. 1.[1]  According to plaintiff, defendants' failure to produce, upon requested, the classified Report violates the common-law right of public access "to inspect and copy public records and documents." *Id.* ¶ 7.  Defendants move to dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defs.' Mot. Dismiss ("Defs.' Mot."), ECF No. 5, arguing that the Speech or Debate Clause and sovereign immunity bars the exercise of jurisdiction here and that no valid claim is presented, Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 1–2, ECF No. 5-1.  Plaintiff moves for partial summary judgment

---

[1]     All references to the parties' briefs and associated exhibits reflect the enumeration generated automatically by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.

seeking "a declaratory judgment that the common law right of access applies to reports written by Committees of the U.S. Congress in appropriate circumstances."  Pl.'s Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n") at 1, ECF No. 14; *accord* Pl.'s Mot. Partial Summ. J., ECF No. 15.  For the reasons explained below, defendants' motion is granted for lack of jurisdiction, requiring dismissal of the Complaint without prejudice.

## I.    BACKGROUND

In December 2007, after a briefing from then-CIA Director Michael Hayden, the Committee ordered a review of the destruction of videotapes related to CIA interrogations of specific individuals.  Report, Executive Summary at 8 (background on the Report);[2] Defs.' Mem. at 4.  That review proved extensive and led SSCI to deepen its evaluation into the destruction of videotapes related to CIA interrogations, which revealed that a broader study of the CIA's detention and interrogation program at large was needed.  *Id.*  Consequently, on March 5, 2009, "against [the] backdrop [of September 11, 2001]—the largest attack against the American homeland in our history," Compl. ¶ 17—SSCI approved a study into the CIA's former program of detention and interrogation techniques with instructions that this examination be used "as broadly as appropriate to help make sure that this experience is never repeated," *id.* ¶ 26; *see* Report at 8.  SSCI's study resulted in a report more than 6,700 pages long with approximately 38,000 footnotes, that is "highly critical" of the CIA's response to 9/11 and the agency's actions taken "in the name of national security."  Compl. ¶¶ 16–18.  The classified report, Senate Report 113-288, was approved by SSCI on December 13, 2012.  *See* Report at i.  Senator Dianne

---

[2]    Citations to the Report throughout this Opinion reference the publicly released, redacted version of the classified Report, available at Press Release, U.S. Senate Select Comm. on Intel., Comm. Releases Study of the CIA's Det. and Interrogation Program (Dec. 9, 2014), http://www.intelligence.senate.gov/press/committee-releases-study-cias-detention-and-interrogation-program.

Feinstein, then-Chair of SSCI, described the Report as "the most significant and comprehensive oversight report in [SSCI's] history."  Compl. ¶ 23; *accord* Report, Foreword at 5.

On December 9, 2014, the full Report was ordered to be printed and the 700-page declassified Executive Summary, Findings and Conclusions, and Additional and Minority Views were released to the public.  *Id.* ¶ 16; *see also* Press Release, U.S. Senate Select Committee on Intelligence, Committee Releases Study of the CIA's Detention and Interrogation Program (Dec. 9, 2014), http://www.intelligence.senate.gov/press/committee-releases-study-cias-detention-and-interrogation-program.  According to plaintiff, Senator Feinstein did not seek immediate declassification of the full Report because doing so for the "more than six thousand page report would have significantly delayed the release of the Executive Summary."  Compl. ¶ 21; *accord* Report, Foreword at 3.  Plaintiff contends that "[a]lthough the Executive Summary provides sufficient detail to demonstrate the inaccuracies of each of the CIA's claims," the Report provided to the President and executive agencies "is far more extensive."  Compl. ¶ 20 (internal citations omitted).

On January 14, 2015, Senator Richard Burr, Senator Feinstein's successor as Chair of SSCI, requested that "all copies of the full and final report in the possession of the Executive Branch be returned immediately to the Committee."  *ACLU v. CIA*, 823 F.3d 655, 661 (D.C. Cir. 2016); *see also* Compl. ¶ 27.  Many executive-branch departments complied with Senator Burr's request, *see id.* ¶ 29, and the Trump administration later provided the White House's copies of the Report, *see id.* ¶ 30, but two copies were not returned to SSCI.  Copies of the Report are maintained by the National Archives and Records Administration, as part of President Obama's official presidential archive, and by a federal district court and the Department of Defense pursuant to Judge Lamberth's order of preservation in connection with pending Guantanamo Bay

litigation.  *Id.* ¶ 28; *see also Al-Nashiri v. Obama*, No. 08-cv-1207, Preservation Order, ECF No. 268 (D.D.C. Dec. 28, 2016).  According to plaintiff, the return of the Report by executive agencies "increase[d] the risk that future government officials, unable to read the report, will never learn its lessons."  Compl. ¶ 30.

On June 4, 2021, plaintiff requested from SSCI a copy of the full Report because of the significant "public interest in disclosure," *id.* ¶ 15, of a "critical piece of American history," *id.* ¶ 34.  SSCI denied his request.  *Id.* ¶ 37.  Plaintiff then filed this lawsuit on August 18, 2021, against SSCI and its current Chair, Senator Mark Warner, asserting a claim under the common-law right of access to public records, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651.  Compl. at 1.

Defendants' pending motion to dismiss and plaintiff's cross-motion for partial summary judgment are now ripe for review.

## II.     LEGAL STANDARD

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'"  *Bronner v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see Gunn v. Minton,* 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by [the] Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)))  Federal courts therefore have a corresponding "independent obligation to ensure that they do not exceed the scope of their jurisdiction" and "must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).  Absent

subject-matter jurisdiction over a case, the court must dismiss it.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  When considering a motion to dismiss under Rule 12(b)(1), the court must determine jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "'constru[ing] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citations omitted)).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions.  *Id.* at 288 (making clear that liberally construing complaint in plaintiff's favor "does not entail accept[ing] inferences unsupported by facts or legal conclusions cast in the form of factual allegations" (internal quotations and citations omitted)); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## III.   DISCUSSION

Defendants argue that the Court lacks jurisdiction over this case for two reasons: first, "the SSCI Report constitutes a Senate committee's communication to the Senate on a matter within the legislative sphere, and, therefore, the Committee and its Chairman are absolutely protected from compelled disclosure of the Report by the Speech or Debate Clause," Defs.' Mem. at 8; and, second, "[b]oth SSCI, as a congressional committee, and Senator Warner, as a

Senator and as the Chairman of SSCI sued in his official capacity, are covered by sovereign

immunity," *id.* at 13.  Plaintiff counters that neither form of immunity applies, *see* Pl.'s Opp'n at

2–7, 15–18, and instead that the common-law right of access permits disclosure of the full

Report in this instance, *id.* at 7–15, 18–20.  Each argument is addressed in turn.[3]

## A.      Speech or Debate Clause

Plaintiff's demand for disclosure of the Report is barred by the Speech or Debate Clause,

which provides that "Senators and Representatives . . . for any Speech or Debate in either

House . . . shall not be questioned in any other Place."  U.S. CONST., art. I, § 6, cl. 1.  This Clause

creates "absolute immunity from civil suit."  *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir.

2015) (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502–03 (1975)).  The purpose

of such immunity "is to protect the individual legislator, not simply for his own sake, but to

preserve the independence and thereby the integrity of the legislative process."  *United States v.

Brewster*, 408 U.S. 501, 524 (1972); *see also Eastland*, 421 U.S. at 502 ("The purpose of the

Clause is to insure that the legislative function the Constitution allocates to Congress may be

performed independently."); *Rangel*, 785 F.3d at 23 ("The Clause reflects the Founders' belief in

legislative independence.").  As it safeguards legislative independence, the Clause also "'serves

the additional function of reinforcing the separation of powers so deliberately established by the

---

[3]      Defendants also argue that plaintiff fails to state a claim, warranting dismissal under Federal Rule of Civil
Procedure 12(b)(6), "for two reasons: (1) the common law right does not apply to documents of a House of
Congress; and, even if it did, (2) the classified SSCI Report is not subject to compelled disclosure under the
standards of [the common-law right of access] doctrine."  Defs.' Mem. at 20.  Except to the extent these arguments
are intertwined with the jurisdictional analysis, *see infra* Part III.B.2(b)–(c), they need not be addressed since the
complaint is dismissed for lack of subject-matter jurisdiction.  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 7 (D.C. Cir.
2019) (finding that district court properly considered jurisdictional issue "before considering whether dismissal for
failure to state a claim was appropriate under Fed. R. Civ. P. 12(b)(6)"); *see also Steel Co. v. Citizens for a Better
Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)) ("'Jurisdiction is
power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing
the fact and dismissing the cause.'").

Founders.'" *Eastland*, 421 U.S. at 502 (quoting *United States v. Johnson*, 383 U.S. 169, 178 (1966)).

"Without exception," the Supreme Court "ha[s] read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501; *see also Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 991 (D.C. Cir. 2021). Therefore, "although [the Clause] speaks of 'Speech or Debate,' it extends to protect all 'legislative acts.'" *Id.* (quoting *Doe v. McMillan*, 412 U.S. 306, 312 (1973)). When "it is determined that Members are acting within the 'legitimate legislative sphere[,]' the Speech or Debate Clause is an absolute bar to interference." *Eastland*, 421 U.S. at 503 (quoting *McMillan*, 412 U.S. at 314)).

To be considered within the "legislative sphere" for purposes of the Clause, a given activity "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972). Under this standard, "authorizing an investigation pursuant to which the subject materials were gathered" qualifies for protection, *McMillan*, 412 U.S. at 313, and as the Supreme Court has explained, that function is an "integral part of the legislative process," *Eastland*, 421 U.S. at 505. The Clause also applies to a legislative act even when "a plaintiff alleges that [the act] violated the House Rules . . . or even the Constitution." *Rangel*, 785 F.3d at 24 (citing *Kilbourn v. Thompson*, 103 U.S. 168, 203 (1880), and *McMillan*, 412 U.S. at 312–13). "Such is the nature of absolute immunity, which is—in a word—absolute." *Id.* (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54–55 (1998).

As applied to the Report, the Speech or Debate Clause completely bars plaintiff's suit. "[T]he power to investigate is inherent in the power to make laws because 'a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Eastland*, 421 U.S. at 504 (citing *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)). The Report, a product of a comprehensive Senate investigation, "is related to and in furtherance of a legitimate task of Congress"—to propose legislation based on accurate, well-researched, and complete information in an area of public interest. *Id.* at 505; *see, e.g.*, *McMillan*, 412 U.S. at 313 ("The acts of authorizing an investigation pursuant to which the subject materials were gathered, . . . preparing a report where [investigative materials] were reproduced, and authorizing the publication and distribution of that report were all integral parts of the deliberative and communicative processes" that define a legislative act). The Report not only summarizes the results of the investigation, but it also includes the recommendations and minority opinions of various Committee members, Report at 500–683, thereby representing the "collective expressions of opinion within the legislative process" that is "protected by the Speech or Debate Clause." *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979). Although "there need be no predictable end result" of a congressional investigation or committee report for Speech or Debate immunity to apply, *see Eastland*, 421 U.S. at 509, defendants confirm that "the Senate enacted legislation containing limitations on interrogation techniques used upon detainees" within a year of the full Report's release to the Senate. Defs.' Reply Mem at 9 n.4, ECF No. 17 (citing National Defense Authorization Act for FY 2016, Pub. L. No. 114-92, § 1045, 129 Stat. 726, 977 (2015)). The Report is thus an act of Congress "done in a session . . . in relation to the business before it," and nothing about the Report removes the absolute bar to suit that the Speech or Debate Clause confers. *Gravel*, 408

U.S. at 624.  *See also McMillan*, 412 U.S. at 312–13 (suit concerning House report on

investigation into D.C. school system barred by Speech or Debate Clause).

Plaintiff's opposition to application of Speech or Debate immunity stems from the

concurring opinion in *Judicial Watch*, 998 F.3d 989 (D.C. Cir. 2021).  Relying on that

concurrence, plaintiff argues that Speech or Debate Clause immunity does not apply in all

circumstances and that the Court must perform a "fact-dependent inquiry" into whether the

Clause applies here.  Pl.'s Opp'n at 15–17; Pl.'s Reply Mem. at 2–3, ECF No. 20.[4]  Plaintiff

urges that the factual context of the Report places this suit outside of the Clause's immunity

because, "[w]hile information about *how* the Committee wrote the report would arguably still be

protected by the Speech or Debate Clause, the report *itself* would not" because it is a public

record.  Pl.'s Opp'n at 17 (emphasis in original).  To the extent that the disaggregation plaintiff

envisions is possible, plaintiff's argument is nonetheless unconvincing.  The Court is bound by

the law of the D.C. Circuit's majority opinion in *Judicial Watch*, which held that the Speech or

Debate Clause provided absolute immunity against a suit seeking disclosure of subpoenas and

responsive materials to those subpoenas brought pursuant to the common-law right of access.  *Id.*

at 992.  That same reasoning and result applies here.[5]

---

[4]        Plaintiff further uses *Gravel v. United States* to support his argument that application of the Speech or
Debate Clause turns on specific facts that must first go through the "*Gravel* filter."  *See* Pl.'s Opp'n at 17.  That
comparison is misguided.  The Supreme Court in *Gravel* held that the Clause did not protect U.S. Senator Gravel
from liability because the act in question was not deliberative and thus "not part and parcel of the legislative
process."  *Gravel*, 408 U.S. at 626.  That conclusion aligns with the absolute immunity the Speech or Debate Clause
confers over acts conducted in the "legislative sphere."  *Eastland*, 421 U.S. at 503; *see also Gravel*, 408 U.S. at 625.
Thus, the "*Gravel* filter" to which plaintiff cites, is a fiction.

[5]        Plaintiff draws attention to an *amicus* filing in *ACLU v. CIA*—a FOIA case seeking disclosure of the Report
from the CIA—that he argues shows SSCI's lack of "inten[t] to maintain control over" the Report as support for
removing any Speech or Debate immunity here.  Pl.'s Opp'n at 19.  That argument is unfounded.  The D.C. Circuit
expressly rejected *amicus*'s argument in *ACLU v. CIA* and specifically held that SSCI "intended to control any and
all of its work product, including the Full Report, emanating from its oversight investigation of the CIA."  823 F.3d
at 665.  The Circuit cited to then-SSCI Chair Feinstein's statements regarding the Report's release, explaining that,
at the time of the Report's drafting, the Committee was yet to determine "if and when to publicly disseminate the
Full Report."  *Id.* at 667.  Moreover, the Supreme Court in *Eastland* rejected a similar argument as "view[ing] the
scope of the privilege too narrowly."  421 U.S. at 508.  Specifically, the Court reasoned that "in determining the

Consequently, the Speech or Debate Clause bars this lawsuit because the Report at issue

was an "integral part" of examining the CIA's detention and interrogation program, a "matter[]

which the Constitution places within the jurisdiction of either House." *Gravel,* 408 U.S at 625.[6]

This case must therefore be dismissed. *See, e.g.*, *Judicial Watch*, 998 F.3d at 993 (majority

resolving case on Speech or Debate Clause grounds without addressing sovereign immunity or

the *Larson-Dugan* exception).[7]

## B.      Sovereign Immunity

Defendants next argue that sovereign immunity bars plaintiff from bringing the instant

suit against them.  Defs.' Mem. at 13–19.  The Supreme Court has stated that "[t]he general rule

is that a suit is against the sovereign if the judgment sought would expend itself on the public

treasury or domain, or interfere with the public administration, or if the effect of the judgment

would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372

U.S. 609, 620 (1963) (internal quotations and citations omitted).  For such suits, "[t]he basic rule

of federal sovereign immunity is that the United States cannot be sued at all without the consent

of Congress." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287

(1983); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign

immunity shields the Federal Government and its agencies from suit.") (citations omitted);

*United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may

not be sued without its consent and that the existence of consent is a prerequisite for

---

legitimacy of a congressional act we do not look to the motives alleged to have prompted it." *Id.*  At bottom, what matters for analyzing Speech or Debate immunity is whether the Report is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." *Gravel*, 408 U.S. at 625.  Intent to release those deliberative and communicative acts of the legislature to outside agencies or the public has no bearing on whether the Speech or Debate Clause bars suit.

[6]      Plaintiff separately requests disclosure of the full Report with redactions of classified information, Pl.'s Opp'n at 20, but because jurisdiction over this suit is lacking, plaintiff's separate argument is moot.

[7]      The parties strongly dispute whether the Speech or Debate Clause is dispositive, yet as Section III.B shows, consideration of plaintiff's alternative ground for relief under the *Larson-Dugan* theory does not salvage his claim.

jurisdiction."); *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008) (quoting *Gray v. Bell*, 712 F.2d 490, 506 (D.C. Cir. 1983)) ("The United States is protected from unconsented suit under the ancient common law doctrine of sovereign immunity.").  Any "waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied."  *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted).

Sovereign immunity extends to Congress when "sued as a branch of the government," *McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009), *abrogated on other grounds by Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020), and makes members of Congress "immune from liability for their actions within the legislative sphere," *id*.  As such, the doctrine of sovereign immunity generally bars suits brought against the Congress and its houses because of their "purely legislative activities."  *Shade v. Congress*, No. 13-5185, 2013 WL 5975978, at *1 (D.C. Cir. Oct. 15, 2013) (quoting *Brewster*, 408 U.S. at 512).  *See also Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) (holding that sovereign immunity "forecloses . . . claims against the House of Representatives and Senate as institutions," and against members of both congressional houses "acting in their official capacities," since "an 'official capacity' suit is treated as a suit against a government entity" (quoting *Rockefeller v. Bingaman*, No. CIV-06-0198, 2006 WL 4061183, at *3 (D.N.M. Sept. 20, 2006) (citing *Keener v. Cong. of the U.S.*, 467 F.2d 952, 953 (5th Cir. 1972))); *Cofield v. United States*, 64 F. Supp. 3d 206, 213–14 (D.D.C. 2014) ("[S]overeign immunity bars any claim for money damages against the United States (including the U.S. Senate) and its agencies.").

In the face of defendants' claim of sovereign immunity, plaintiff acknowledges that this suit against a Senate Committee and a Senator is for a report ordered by Senator Dianne Feinstein, then-Chair of SSCI.  Compl. ¶ 16.  Notwithstanding the official capacity in which the

requested Report was ordered, plaintiff contends that the so-called *Larson-Dugan* exception to

sovereign immunity applies to permit this suit to go forward.  Pl.'s Opp'n at 2–7 (first citing

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949), then *Dugan*, and then *Wash.*

*Legal Found. v. U.S. Sent'g Comm'n* ("*WLF II*"), 89 F.3d 897 (D.C. Cir. 1996)).  As the analysis

that follows shows, even upon application of the *Larson-Dugan* exception to sovereign

immunity, the disclosure of the requested records is not legally required.

### 1. *Application of the* Larson-Dugan *Exception*

In *Larson v. Domestic & Foreign Commerce Corp.*, the plaintiff sued the head of the War

Assets Administration, not for money damages, but for specific performance of the delivery of

surplus coal in accordance with plaintiff's contract with the government, 337 U.S. at 684–85.

Finding that the Administrator's action in refusing the coal shipment to the plaintiff was not

unconstitutional or *ultra vires* conduct outside the scope of the Administrator's authority, nor

contrary to statute or order, *id.* at 703, the Supreme Court concluded that the Administrator's

action "was, therefore, inescapably the action of the United States and the effort to enjoin it must

fail as an effort to enjoin the United States," *id.*; *see also id.* at 688 (noting suit would be barred

"not because it is a suit against an officer of the Government, but because it is, in substance, a

suit against the Government over which the court, in the absence of consent, has no

jurisdiction").  The Court thereby clarified, and made explicit in *Dugan*, an exception to

sovereign immunity in actions seeking specific relief for "(1) action by [government] officers

beyond their statutory powers [or] (2) even though within the scope of their authority, the powers

themselves or the manner in which they are exercised are constitutionally void." 372 U.S. at

621–22.  "In either of such cases the officer's action 'can be made the basis of a suit for specific

relief against the officer as an individual.'"  *Id.* at 622 (quoting *Malone v. Bowdoin*, 369 U.S.

643, 647 (1962)); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994)) (quoting *Larson*, 337

U.S. at 691 n.11) (summarizing *Larson* as holding "that sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers'" (emphasis in original)); *Pollack v. Hogan*, 703 F.3d 117, 119–21 (D.C. Cir. 2012); *id.* at 120 (quoting *Larson,* 337 U.S. at 689, 693) ("Under [the *Larson-Dugan*] exception, 'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity.").

Defendants first consider each statute or legal doctrine on which plaintiff grounds his complaint—the general federal question provision, 28 U.S.C. § 1331, the mandamus statute, 28 U.S.C. § 1361, the Declaratory Judgment Act, 28 U.S.C. § 2201, the All Writs Act, 28 U.S.C. § 1651, and the common-law right of access—and proffer that none of these provisions waive sovereign immunity.  Defs.' Mem. at 14–16.  This argument is insufficient.  As *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305 (D.D.C. 2020), states regarding mandamus relief, defendants' argument "merely begs the question," *id.* at 312, because, if the *Larson-Dugan* exception does apply, "[n]o separate waiver of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a duty required in his official capacity," *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005); *see also WLF II*, 89 F.3d at 901 (citing *Chamber of Cong. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996)) ("If a plaintiff seeks a writ of mandamus to force a public official to perform a duty imposed upon him in his official capacity, however, no separate waiver of sovereign immunity is needed.").  Plus, the existence of the common-law right of access inherently waives sovereign immunity where it applies.  *See Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (holding that "sovereign immunity does not act as a bar to our exercising jurisdiction" since *Larson-Dugan* exception applies "and hence no waiver of sovereign immunity is required here").

Aside from the waiver argument, defendants contend that the *Larson-Dugan* exception is inapplicable because plaintiff presents no claim that the challenged action of either of the Senate defendants was unconstitutional, *ultra vires*, or beyond statutory authority.  Defs.' Mem. at 16–19.  As was the case in *Judicial Watch*, no allegation is made—and no evidence suggests—that SSCI or its chairman acted *ultra vires* or in a manner contrary to the Constitution or a statute in commissioning the Report, investigating the CIA's program, or disseminating the Report to select entities.  To the contrary, as defendants note, the Senate established SSCI "to oversee and make continuing studies of the intelligence activities and programs of the United States Government, and to submit to the Senate appropriate proposals for legislation and report to the Senate concerning such intelligence activities and programs."  *Id.* at 3 (citing S. Res. 400 at 125, 94th Cong., 2d Sess. (1976)).  Additionally, Senate Resolution 400 expressly authorizes the Committee's classification of the Report and "specifies the mechanism for SSCI to disclose information publicly, including intricate procedures for SSCI to seek to disclose classified information."  *Id*. at 4 (citing S. Res. 400 § 8).

Defendants' added argument that the *Larson-Dugan* exception is inapplicable because "plaintiff does not allege that the defendants have acted 'beyond statutory authority,'" Defs.' Mem. at 17, topples in the face of binding D.C. Circuit precedent.  In *WLF II*, plaintiffs sought, pursuant to the common-law right of public access to government records, disclosure of documents "compiled or created by an advisory committee established by the United States Sentencing Commission," 89 F.3d at 898–99.  In the Circuit's analysis, the relevant "duty" owed by the defendants in the case stemmed from the common-law right itself, not a separate statute or regulation.  *Id.* at 901.  Whether the *Larson-Dugan* exception to sovereign immunity applies

"depends upon whether the Government has a duty to the plaintiff, *viz.* to allow it access to certain government records." *Id.* [8]

As a result, applicability of the exception turns first on the existence of the duty, and the application of sovereign immunity merges with the claimed duty to disclose asserted in the Complaint. The D.C. Circuit explained: "the question of jurisdiction merges with the question on the merits," triggering an assessment of the validity of plaintiff's claim under the common-law right of access. *Id.* at 902. *See also Swan*, 100 F.3d at 981 (determining whether "the *Larson-Dugan* exception would be triggered and hence no waiver of sovereign immunity is required" rested on "discussion of the central merits question in the case, namely whether" challenged government action violated statute); *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031–32 (9th Cir. 2013); *id.* at 1032 (quoting *WLF II*, 89 F.3d at 901–02) (following D.C. Circuit's practice when finding that "the question of '[w]hether the *Larson-Dugan* exception' applied 'merge[d] with the question on the merits,'" and therefore turning "to address the substantive merits of the mandamus claim before it'" (alterations in original)); *accord Int'l Fed'n. of Prof'l & Tech. Eng'rs v. United States*, 934 F. Supp. 2d 816, 821–22 (D. Md. 2013) (applying *Larson-Dugan* exception to avoid sovereign immunity bar and reach merits of suit by union and employees of legislative branch entities against Secretary of the United States Senate and

---

[8]    The D.C. Circuit's expansion of the *Larson-Dugan* doctrine to allow claims akin to those brought against federal agencies, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of records from other federal government components, pursuant to the common-law right of public access, significantly broadens this exception to sovereign immunity beyond the parameters articulated by the Supreme Court and, at first blush, is not easily reconciled with Supreme Court jurisprudence that waivers of sovereign immunity must be expressly set out by statute. *See, e.g.*, *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2253–54 (2021) (referring to "this Court's precedents holding that Congress cannot abrogate state sovereign immunity in the absence of an 'unmistakably clear' statement" (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 786 (1991)); *United States v. Bormes*, 568 U.S. 6, 9 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" (quoting *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34 (1992) (citing *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95 (1990))) (internal quotation marks omitted)). Nonetheless, the Court is bound by D.C. Circuit authority, which demands this analysis.

Sergeant at Arms of the Senate in their official capacities, claiming parts of the Stop Trading on

Congressional Knowledge Act were unconstitutional); *Ctr. for Arms Control & Non-*

*Proliferation v. Lago*, No. 05-682 (RMC), 2006 WL 3328257, at *4–*6 (D.D.C. Nov. 15, 2006)

(in suit for disclosure of materials used by defunct presidential commission in developing a

report to the President, finding that sovereign immunity defense was "auxiliary to the ultimate

question on the merits" as to whether the commission owed duty of disclosure under sunshine

provisions of Federal Advisory Committee Act and therefore addressing the merits).

Accordingly, the merits of plaintiff's request for disclosure of the classified Report under

the common-law right of access must be considered to assess whether sovereign immunity bars

this lawsuit against defendants.[9]

### 2.      *No Common-Law Right of Access to Requested Records*

The Supreme Court has made "clear that the courts of this country recognize a general

right to inspect and copy public records and documents, including judicial records and

documents." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) (footnote omitted).  This

right of access is "not absolute," *id*. at 598, but "left to the sound discretion of the trial court, a

discretion to be exercised in light of the relevant facts and circumstances of the particular case,"

*id*. at 599; *see SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013) ("Of course, even if a

document is a record of the type subject to the common law right of access, the right is not

absolute: it is defeated when the government's interest in secrecy outweighs the public's interest

---

[9]        Defendants invoke *Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64 (D.D.C. 2021), as further
support that the *Larson-Dugan* exception to sovereign immunity does not apply for lack of a statutory duty.  *See*
Defs.' Mem. at 18.  *Maynard* is of no help to defendants.  As plaintiff notes, *see* Pl.'s Opp'n at 5, the *Maynard*
court concluded that the *Larson-Dugan* exception was inapplicable because the "duty" that plaintiff there identified arose
from assurances made in the defendant's human resources manual, which did not comply with the exception's
requirement that the duty to act arises from a statute.  *See Maynard*, 544 F. Supp. 3d at 81; *see also Larson*, 337 U.S.
at 689; *Dugan*, 372 U.S. at 621–22.  In comparison, the duty here arises from the common-law right of public
access, which was not at issue in *Maynard*, and so that case does not alter this holding.

in disclosure.").  Binding precedent in this Circuit ensures that "the common law right of access extends beyond judicial records to the 'public records' of all three branches of government." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 936 (D.C. Cir. 2003) (citing *WLF II*, 89 F.3d at 903–04); *see also Schwartz v. U.S. Dep't of Justice*, 435 F. Supp. 1203, 1204 (D.D.C. 1977) (holding "that Congress is subject to the common law rule which guarantees the public a right to inspect and copy public records" and explaining that even though "Congress has exempted itself from the requirements of the Freedom of Information Act, 5 U.S.C. § 552, by 5 U.S.C. § 551(1)(A)[,] [t]hat Act, however, is not coextensive with the common law rule").

### (a) Two-Part Test for Application of Common-Law Right of Public Access

The D.C. Circuit has outlined a two-step process for determining whether the common-law right of access applies.  *See Wash. Legal Found. v. U.S. Sent'g Comm'n* ("*WLF I*"), 17 F.3d 1446, 1451–52 (D.C. Cir. 1994).  First, a court must decide "whether the document sought is a 'public record,'" *id*. at 1451, and, if it is, then, second, "the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure," *id*. at 1451–52; *see also WLF II*, 89 F.3d at 899 (summarizing prior holding).  As to the first prong, under "federal common law," a "public record" subject to the public right of access "is a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived."  *WLF II*, 89 F.3d at 905; *see also Am. Int'l Grp.*, 712 F.3d at 3 (same).  In applying the second prong of this test, courts "should focus on the specific nature of the governmental and public interests as they relate to the document itself," rather than engaging in "an abstract inquiry."  *WLF I*, 17 F.3d at 1452.[10]

---

[10]     In *WLF I*, the D.C. Circuit found that the "district court erred" by concluding categorically that the common-law right did not apply "without knowing" precisely which documents were at issue, and thus instructed

The Report does not satisfy this two-part public access test.

### (b)   The SSCI Report Is Not a Public Record

The requested Report issued by SSCI is indisputably an official action of the Committee,

but not every ministerial or preliminary step to gather information by a government entity

amounts to creation of a "public record."  In fashioning the definition of "public records" subject

to the common law right of public access, the D.C. Circuit articulated two guideposts:

"adequately protect[ing] the public's interest in keeping a watchful eye on the workings of public

agencies—an interest we regard as fundamental to a democratic state," *WLF II*, 89 F.3d at 905

(internal quotations and citations omitted), and "yet narrow enough to avoid the necessity for

judicial application of the second-step balancing test to documents that are preliminary, advisory,

or, for one reason or another, do not eventuate in any official action or decision being taken," *id*.

As examples of the latter "not encompass[ed]" by the definition, the Circuit cited "the

preliminary materials upon which an official relied in making a decision or other writings

incidental to the decision itself—for example, the report of a blood test provided in support of an

application for a marriage license, the job application of a would-be government employee, a

government auditor's preliminary notes used in the preparation of an official report, or a cover

memorandum circulated with a copy of an official report or study." *Id.* at 905–06.

The Report was such a preliminary and advisory step to gather information pertinent to

the Committee's task of "oversee[ing] and mak[ing] continuing studies of the intelligence

activities and programs of the United States Government" in an effort to submit "appropriate

proposals for legislation" to the Senate.  Defs.' Mem. at 3.  It thus does not qualify as a public

---

that "the court should have analyzed each category of document requested."  *WLF I*, 17 F.3d at 1452.  Here, by
contrast, the requested classified SSCI Report is identified plainly.  Compl. ¶ 16; Pl.'s Opp'n at 1.

record subject to the common-law right of public access.[11]  In comparison, in the analogous case

of *Pentagen Technologies International, Ltd. v. Committee on Appropriations of the United*

*States House of Representatives* ("*Pentagen Technologies*"), 20 F. Supp. 2d 41 (D.D.C. 1998),

*aff'd*, 194 F.3d 174 (D.C. Cir. 1999), a private company and individual sued, under the common-

law right of public access, for disclosure of investigative reports prepared by staff of the

defendant Committee on Appropriations of the U.S. House of Representatives, *id.* at 43.  The

*Pentagen Technologies* court declined to compel disclosure, finding that the investigative reports

at issue were "'preliminary materials' that do not fall within the definition of 'public records'

employed by this Circuit," because "the reports are 'investigative' in nature" and do not

"memorialize or record any official action taken by the Committee."  *Id*. at 45.  This finding led

to the conclusion that "[t]here thus exists no common law right of access to the reports, and the

Court need not apply the second-step balancing test of *WLF I* to the reports."  *Id*.

SSCI commissioned the Report as part of its investigative effort to examine and advise

the CIA's detention and interrogation program in the aftermath of the terrorist attacks on

September 11th.  Though undeniably a form of Committee action, the Report was preliminary to

any final recommendation or proposed legislation such that this action lacks the legal

significance to constitute a "public record" to which the right of public access attaches.  *See WLF*

*II*, 89 F.3d at 906 (concluding that requested documents of the Advisory Group to U.S.

Sentencing Commission were "made up entirely of materials that are, if not preliminary, then

merely incidental to the only official action the Advisory Group was authorized to take, *viz*.,

---

[11]     Contrary to plaintiff's view, *McMillan*, *Gravel*, and *Hutchinson* are all on point.  As discussed, the Report
is integral to the deliberative and communicative role of the Committee and its Members in legislating, and so, like
the committee reports at issue in the aforementioned cases, the Report is within the legislative sphere and plaintiff
cannot compel its disclosure because of the Speech or Debate Clause.  Nowhere in *McMillan*, *Gravel*, or *Hutchinson*
was a Speech or Debate distinction made for committee reports documenting objectionable statements, as plaintiff
suggests.  *See* Pl.'s Opp'n at 16.

recommending sentencing guidelines to the Commission," and did not qualify as "public

records").

### (c)   *The Government's Interest in Secrecy Outweighs the Public's Interest in Disclosure*

For good measure, the requested disclosure of the Report also fails the second part of the

test for public access, which requires "balanc[ing] the government's interest in keeping the

document secret against the public's interest in disclosure." *WLF II*, 89 F.3d at 903.  The D.C.

Circuit has made clear that "the government has a compelling interest in protecting the secrecy

of information important to our national security" and that the "need to guard against risks to

national security interests overcomes a common-law claim for access." *Dhiab v. Trump*, 852

F.3d 1087, 1098 (D.C. Cir. 2017) (internal quotations and citations omitted); *see also Am. Int'l

Grp.*, 712 F.3d at 3 ("Of course, even if a document is a record of the type subject to the common

law right of access, the right is not absolute: it is defeated when the government's interest in

secrecy outweighs the public's interest in disclosure.").

As plaintiff acknowledges, *see* Pl.'s Mem. at 20, the Report contains highly classified

information about the CIA's detention and interrogation policies and procedures that would

compromise national security if released, far outweighing the public's interest in disclosure.

Plaintiff also unpersuasively argues that the already-disclosed 500 pages of the Report are

insufficient to bolster the public's interest in reviewing more.

Consequently, disclosure of this Report under the common-law right of access is not

required.[12]

---

[12]      The Court's lack of subject-matter jurisdiction over this suit also bars plaintiff's request for limited
discovery in lieu of dismissal.  *See* Pl.'s Opp'n at 21–22.

**IV.      CONCLUSION**

For the reasons set forth above, plaintiff has no right to demand disclosure of the Report

ordered by the SSCI for lack of subject-matter jurisdiction.  This case is therefore dismissed.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  September 15, 2022

_____
BERYL A. HOWELL
Chief Judge

JA 187

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**

Plaintiff:     **Shawn Musgrave**
_____

vs.                           Civil Action No. **21-2198 (BAH)**
                                              _____

Defendant:     **Mark Warner**
_____

## CIVIL NOTICE OF APPEAL

Notice is hereby given this  20  day of  September   20 22 , that

Shawn Musgrave
_____

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the

judgement of this court entered on the  15  day of  September , 20 22 , in

favor of Defendants
_____

against said Plaintiff
_____

                                        Kelly B. McClanahan
                                    _____
                                        Attorney or Pro Se Litigant


(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil
action must be filed within 30 days after the date of entry of judgment or 60 days if the United
States or officer or agency is a party)

USCA Form 13
August 2009 (REVISED)

JA 188